1          UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2

3    WANDA GERTRUDE ALLEN,        )
     et al.,                      )
4                                 )   Civil No. 00-591
            Plaintiffs,           )
5                                 )
       v.                         )
6                                 )   Washington, D.C.
     DISTRICT OF COLUMBIA,        )   September 7, 2016
7                                 )   10:40 a.m.
            Defendant.            )
8    _____  )

9          TRANSCRIPT OF EVIDENTIARY HEARING
          BEFORE THE HONORABLE G. MICHAEL HARVEY
10             UNITED STATES MAGISTRATE JUDGE

11   APPEARANCES:

12    For the Plaintiffs:     RONALD LEE DRAKE, ESQ.
                              MICHAEL MURALI, ESQ.
13                            Ron Drake Law Office
                              5 P Street, SW
14                            Washington, D.C.  20024

15    For the Defendant:      CHAD WAYNE COPELAND, ESQ.
                              Offiice of Attorney General - D.C.
16                            441 Fourth Street, NW
                              Washington, D.C.  20001
17

18
     Court Reporter:    PATRICIA A. KANESHIRO-MILLER, RMR, CRR
19                      U.S. Courthouse, Room 4704-B
                        333 Constitution Avenue, NW
20                      Washington, DC 20001
                        (202) 354-3243
21

22   Proceedings reported by stenotype shorthand.
     Transcript produced by computer-aided transcription.

23

24

25

1      PROCEEDINGS

2          (In open court)

3              THE DEPUTY CLERK:  This is Civil Case 2000-591, Wanda

4      Gertrude Allen, et al., versus District of Columbia.  This is a

5      continued evidentiary hearing.

6              Would the parties please introduce yourselves to the

7      Court, beginning with the plaintiffs.

8              MR. DRAKE:  Ron Drake on behalf of the plaintiffs.  I

9      have with me Mike Murali, who has helped put the charts and

10     the flow charts together.  I request he be permitted to sit

11     with me.

12             THE COURT:  That's fine.

13             MR. COPELAND:  Good morning, Your Honor, Chad

14     Copeland here on behalf of defendant.  With me at counsel

15     table is Patia Roundtree.

16             THE COURT:  Good morning.

17             We are here for a continued hearing in this case.

18     Since we were last together, I did receive plaintiffs' notice

19     to correct the record regarding the December 2nd hearing,

20     correct the record not only for that hearing but the prior

21     one in July.

22             Mr. Drake, come forward please.  Let me understand

23     what you're saying here.

24             I have not heretofore understood you to be objecting

25     to the Court's treatment with regard to any overage in the

1    payments that have been made according to the Court's

2    calculations.  I have not understood you to be objecting to

3    the Court's treatment of that overage with respect to the

4    judgments themselves.

5         In the preliminary order, I think we spelled out, at

6    footnote 88, I believe it was, how the Court was treating

7    that overage.  One second.

8         (Pause)

9         THE COURT:  It is footnote 105, to which there was no

10   objection.

11        MR. DRAKE:  Which document?

12        THE COURT:  This is the Court's preliminary ruling,

13   document 90-4.  There was a section at the end that dealt

14   with the actual calculations of the judgments and the

15   interests thereon.  In footnote 105, it includes the fact

16   that in the Adams case, the two consent judgments

17   acknowledged prior payments of $364,000.  Based on the

18   Court's calculation of payments made to date, the Court

19   calculated $569,000, so about $205,000 more in payments than

20   had been included in the consent judgment.

21        Because we had no information concerning when all

22   these payments were made, what I put in there was that that

23   overage, that $205,000 and change, would be considered

24   post-judgment payments and be credited towards the amount

25   that's due on the judgments.  It was on that basis that the

1    Court made its calculations regarding the amount due on the

2    judgments in the Adams case and interest thereon.

3          So do I understand you to be objecting to that now?

4          MR. DRAKE:  Yes, Your Honor.

5          THE COURT:  Why is that?

6          MR. DRAKE:  Your Honor, if the Court will give me a

7    moment.

8          That is a collateral attack on the judgments.  If I

9    may go back, I brought this matter before Judge Lamberth on a

10   motion to compel payment of the outstanding judgments.  I was

11   in Indiana.  I got a call from the Court's law clerk to come

12   back immediately, within 2 or 3 days, to have a hearing on

13   that matter.  And the judge at that time asked that I inform

14   the Court of the HODs which had not been paid up to the

15   $4,000.  I did that.  I came back over a weekend, went

16   through the file, and pulled out what I saw as the HODs that

17   had not been paid up to $4,000 and submitted them to the

18   Court.  The Court referred the matter over to the magistrate

19   judge to deal with those.  Judge Lamberth's order was, on any

20   HOD which the District had not paid up to 4,000, they were to

21   pay it.

22         THE COURT:  Judge Lamberth also wants the Court, this

23   Court, to calculate the amount that is due on the judgments

24   with interest.  There are two assignments here:  There is

25   one, let's figure how much you should be paid today based on

1    Judge Lamberth's ruling that the $4,000 cap applies

2    retroactively; and the second part is calculate how much

3    remains to be paid and interest thereon through

4    September 30th of last year.

5           MR. DRAKE:  Yes, Your Honor.  That doesn't change

6    what I am attempting to say to the Court.

7           THE COURT:  Okay.

8           MR. DRAKE:  These judgments were all either

9    negotiated between me and the District, or they were

10   decisions made by the Court in each instance.  Take Abraham,

11   for example.  Abraham was negotiated at an amount of

12   62 percent of the amount of invoices that had been submitted

13   to DCPS.  At the same time, DCPS knew what it had paid,

14   whether it had paid 4,000, more or less, up to that point.

15   So the negotiations that went on at that time was I asked for

16   a certain amount, I had invoiced a certain amount.  DCPS knew

17   exactly what they paid, that is what we finally negotiated,

18   and came to a figure.  Everything is subsumed in that

19   negotiation, including to the extent DCPS made an overpayment

20   beyond the cap, which I don't concede that for a moment, that

21   that happened.  As I told the Court before, there was a

22   period of time during which the Office of General Counsel

23   determined that they had funds available from other years in

24   which they paid over the cap.  And I suggested to the Court

25   that that is a reasonable explanation of why there were

1    payments that exceeded the cap.

2          The District has done nothing -- and I informed the

3    Court and the District of the names of the general counsel

4    and the assistant -- and there has been nothing come forward.

5    So, yes, I'm saying to the Court that those judgments, again,

6    are sacrosanct; they cannot be collaterally attacked.  All

7    that went on prior to the entry of the judgment is subsumed

8    in that.  If they overpaid, they had that knowledge all at

9    the time we sat down and we negotiated.  If I was willing to

10   give up one-third of the amount that was owed, that's on me.

11   I can't come back and say, wait a minute, I didn't like that.

12   That's what's happening here, in essence.  They're now

13   saying, wait a minute, we overpaid back there before we sat

14   down and negotiated and now we want that reduced.

15         THE COURT:  There were multiple numbers that were at

16   issue in that consent judgment, okay?  The consent judgment

17   actually mentions the amount that you invoiced, which was

18   about $2.1 million -- I'm in the Adams case -- $2.1 million

19   you invoiced.  Apparently, the parties negotiated, and that

20   amount as a result of that negotiation was reduced to we will

21   say 1.5; 1.473 million.  That was one part of the

22   negotiation.  You invoiced the 2.1.  You negotiated with the

23   District, and that went down to 1.5.  That is that percentage

24   discount you gave to the District.  All right.

25         MR. DRAKE:  Yes, Your Honor.

1          THE COURT:  The consent judgment, however, also

2     mentions the amount of payments that have been made to date,

3     and really it was an agreed-upon amount.  I don't know if it

4     was a precise amount.  It seems to suggest that the parties

5     had agreed that in the Adams case the District had paid

6     $364,000 and change.  So that amount was also part of the

7     negotiation, apparently.  Is that correct?

8          MR. DRAKE:  Yes, Your Honor, that is true.

9          THE COURT:  When you say the judgment is sacrosanct,

10    I mean the judgment at least as of the date it was entered,

11    which was May 25th of 2005, you were going to receive at some

12    point in the future if the law were to change and all of a

13    sudden all the caps were listed and you were to pay the full

14    amount you were due --

15          MR. DRAKE:  Which I suggest to the Court was

16    anticipated on both sides at that time.

17          THE COURT:  Understood.  That you would not

18    receive -- I think it is plain, you're not going to receive

19    the 1.5 million.  You would receive the 1.5 million minus the

20    $364,000.

21          MR. DRAKE:  Yes, Your Honor.

22          THE COURT:  We will just call that 1.2.  That's the

23    number.  That 1.2 is what's owed you and you say cannot be

24    changed.  What is happening here is, you believe, a

25    collateral attack trying to further reduce that number.

1     Right?

2              MR. DRAKE:  Yes, Your Honor.

3              THE COURT:  That was the way I calculated it.  Any

4     overage that I found above and beyond the three sixty-four,

5     I'm going to credit that to the District.  You're saying I

6     should not do that because that is a collateral attack on the

7     judgment.  Right?  I'm just trying to understand the

8     argument.

9              MR. DRAKE:  If I may, Your Honor?

10             THE COURT:  But that is correct, right?

11             MR. DRAKE:  That is correct.  The only HODs that the

12    Court should be looking at --

13             THE COURT:  I don't want to go back to the HODs yet.

14    I have questions for you about the HODs.  I want to stick on

15    the big numbers because I want to understand how you think

16    this should work, and I think I do understand it, which is

17    you do not want any overage that the Court has identified,

18    overage above and beyond the three sixty-four, to be counted

19    towards the District's obligation to pay that 1.2 million;

20    right?

21             MR. DRAKE:  With respect, Your Honor, may I respond?

22             THE COURT:  Okay, I think you agree with that.

23             MR. DRAKE:  With respect, Your Honor, that was never

24    for the Court to review.

25             THE COURT:  Just say that you agree.  I understand.

1    Just say that you agree with that.  What I just said, that's

2    what you want?

3            MR. DRAKE:  Let me understand again, so I don't

4    misspeak this time.

5            THE COURT:  Okay.  Any overage that the Court has

6    identified above and beyond, in the Adams case, the $364,000,

7    so any additional payments that I have identified that the

8    District has made over time, you say that that overage should

9    not be a credit towards the amount of money that the District

10   owes you on that judgment?

11           MR. DRAKE:  We're not in agreement on that at all,

12   Your Honor.

13           What I am saying is this:  Once the negotiation was

14   done and we had a discrete figure, after crediting what they

15   had previously paid prior to the time we sat down at the

16   negotiating table, that discrete figure cannot be touched.

17           THE COURT:  Right.  That is what I just said.

18           MR. DRAKE:  If that is what the Court said, I accept

19   that.

20           THE COURT:  I'm not saying I agree with you.

21           MR. DRAKE:  I would ask the Court to allow me to make

22   one additional statement, with respect.

23           THE COURT:  Okay.

24           MR. DRAKE:  It is, in my view, beyond the Court's

25   purview to review any HOD in which either 4,000 or more than

1    4,000 was paid.  The only thing to be reviewed are the HODs

2    and settlement agreements on which DCPS did not pay 4,000.

3    If they paid over $4,000, that was all in the negotiation.

4    The Court may remember, we were here the last time, and a

5    number of issues came up -- I can't remember how it

6    went -- but to the extent that I was attempting to go behind

7    the judgment.  Unfortunately, what has happened here is that

8    they are going behind the judgment, and that is

9    impermissible.

10              THE COURT:  Okay.  All right.  I think I understand

11   your argument.  Then, let's deal with the point you made

12   right there at the end.  Every time you're introducing -- if

13   I'm understanding the District's position -- every time you

14   found new HODs, new HODs that were not included, based on the

15   District's evidence, as HODs at the time of the judgment, the

16   District is saying that you're going behind the judgment.  If

17   I understand correctly, they're only asserting that argument

18   when you're talking about a plaintiff who has never before

19   had any record of an HOD in a case.  I'm going to ask

20   Mr. Copeland in a moment.  I don't believe he is making that

21   argument with respect to plaintiffs who had some number of

22   HODs and you found some additional HODs that should be

23   considered by the Court.  But focusing just on those

24   plaintiffs -- and there's been a handful -- I think it has

25   been the named plaintiffs, actually -- you've identified,

1    we'll just say -- I don't know a good example of one -- but

2    one of the named plaintiffs in the case which was not on any

3    of the documents that the City has created in this case, that

4    the Court has relied upon in the past, where there were no

5    indication that that individual had any HODs, you've come

6    forward with a few.  The City says exactly what you're

7    telling me now.

8              MR. DRAKE:  That's not correct.

9              THE COURT:  Very similar.  It says you're trying to

10   go behind the judgment.

11             MR. DRAKE:  I'm not, Your Honor.

12             THE COURT:  Let me finish.  Because the judgment

13   includes an agreed-upon amount that the City has paid up to

14   that date and, moreover, includes language that you would not

15   -- this would extinguish all of your claims with regard to

16   any other liabilities, presumably, including attorney's fees,

17   for court proceedings related to this case.  So how is that

18   not you going behind the judgment?

19             MR. DRAKE:  Not at all, Your Honor.  As I told the

20   Court, when I filed the complaints for attorney's fees, HODs

21   were not identified.  Plaintiffs were identified.  And then

22   coming forward from there, as Judge Lamberth said, where

23   there is an HOD unpaid, pay it.  So it is not an issue -- we

24   are not coming forward with any new plaintiffs whatsoever.

25   We are not coming forward in terms of we had a certain number

1    of HODs that were negotiated.  That was never part of the

2    negotiation.  The negotiation was an overall figure of what

3    was billed, what was requested, and what the District was

4    willing to pay.

5         THE COURT:  It is negotiated because you say the

6    parties further agree that the payment of the judgment amount

7    is subject to applicable law and that the DCPS's prior

8    payments to plaintiffs' counsel of $364,087 is the limit of

9    what the defendant may lawfully pay at this time under such

10   applicable law.  Part of the negotiation was -- we talked

11   about it 10 minutes ago -- the amount of money that had been

12   paid.  Now you're coming forward and saying, well, there were

13   not only additional HODs but additional plaintiffs.

14        MR. DRAKE:  No, I'm not saying additional plaintiffs

15   at all.  I'm saying we are bound by the plaintiffs that were

16   there, but in terms of the number of HODs, that was never a

17   discussion, that was never part of the negotiation.

18        THE COURT:  But how could you have a situation, a

19   plaintiff who was part of the case, who had received

20   zero -- again, I wish someone would come up with an

21   example -- a plaintiff who had received zero at that time,

22   how could that ever have been -- when you say that for all of

23   those individuals they had been paid up to the amount which

24   was applicable and lawful at that time.  It should have been

25   something; right?  They should have received some money.

1          MR. DRAKE:  I am simply saying to the Court -- first

2     of all, in terms of the document the Court has had before it

3     that DCPS put together for Abraham, there were five names --

4     as we went through it again and again -- five names left off

5     that were plaintiffs but had not been listed by them.  I do

6     have those HODs at the appropriate time to show the Court.

7     There were five, I think, three of which were withdrawn,

8     because after Buckhanan came down, the catalyst theory, the

9     three that were only catalysts without HODs, they immediately

10    came out.  I'm simply saying to the Court that there was

11    never ever -- even though I don't agree that this should be

12    an issue before the Court -- there was never ever a

13    discussion or count of HODs during the negotiation.  And I

14    challenge the District to come forward and present someone to

15    state to the contrary because they can't do it truthfully.  I

16    was there; they weren't.  They know where they can find their

17    people; I don't.  Those are the facts.

18         But again, I stand clearly on the limitation, the

19    doctrine -- it is collateral -- you cannot make a collateral

20    attack on a judgment, and the limitation for this Court by

21    Judge Lamberth as to what is to be examined, and that is any

22    HOD or settlement agreement which was not paid in full, not

23    paid up to $4,000, they are to pay the difference.

24         THE COURT:  Have there been any payments made by the

25    District post-judgment?

—14—

1          MR. DRAKE:  I'm glad the Court asked that question.

2     No, there have not.  There was a $313 check that came in long

3     after that.  I finally figured, went back, it was court costs

4     that they had already agreed was supposed to be paid, $313.

5     Not a dime has been paid, as they see my life trickling away,

6     holding money which is mine.

7          THE COURT:  I hear you.  Let's stay focused on the

8     facts.  So no money was paid post-judgment in Adams; right?

9          MR. DRAKE:  I want to understand what the Court is

10    saying.  The payments that were on Abraham, for example,

11    there was -- it was negotiated that they either have paid or

12    will pay X number of dollars, $495,000.  That was paid.

13    That's not a post-judgment payment.  That is a payment

14    contemporaneous with the settlement.  And Adams, the same

15    way.  I don't have Adams in front of me.  Whatever it was --

16          THE COURT:  Three sixty-four.

17          MR. DRAKE:  There has not been a dollar paid since

18    the day we sat down and negotiated other than if it relates

19    to the contemporaneous payment which was to be made --

20          THE COURT:  Required under the judgment.  Understood.

21          So no payments other than those that were directly

22    indicated would be made underneath the judgment; right?

23          MR. DRAKE:  Except for the $313 I informed the Court

24    about.  Other than that, that is exactly right.

25          THE COURT:  Okay.  Let me hear from Mr. Copeland.

1    Let's start with that last point first.  Mr. Copeland, do you

2    have any reason to disagree with that factual statement made

3    by Mr. Drake regarding any post-judgment payments?  And by

4    that, I mean payments in excess of the payments that were

5    indicated in the judgment itself.

6         MR. COPELAND:  I do.  I do disagree.  I think that

7    the review of the Court and of the information that is the

8    subject of this proceedings reflects that there were amounts

9    paid, payments made.

10        THE COURT:  The question is when?

11        You will see in footnote 105, which no party has

12   objected to until now, the basis for my decision to give the

13   City credit -- in Adams -- for the $205,000 above the amount

14   indicated in the Adams judgment itself of three sixty-four

15   was because I assumed that those were post-judgment payments.

16   But there is no evidence that I know of when those payments

17   were made.  They very well could have been payments that were

18   made prior to the judgment, and then either because no one

19   did an accounting back then, things were just as confused at

20   the time the judgments were entered, or you negotiated the

21   amount for whatever reason.  There were multiple negotiations

22   going on at the time of that consent judgment.  And you came

23   up with a figure of three sixty-four.  I don't think that

24   that means if I came up with a different number that that

25   number must have been paid post-judgment, when I just heard

1    from Mr. Drake -- and I would think he would know about the

2    checks he has received since these judgments, he has been

3    fighting for it all this time -- when those judgments

4    occurred.  I don't have any evidence of when those judgments

5    occurred.  What evidence do you have, other than the

6    assumption that I made and the fact that there appears to

7    have been payments in excess of three sixty-four, what

8    evidence do you have as to when the payments were made?

9        MR. COPELAND:  We don't have independent evidence,

10   but what I heard Mr. Drake say is that there were payments

11   made before and after the date of the consent judgment but

12   that were contemplated by the consent judgment.  That's what

13   I heard him say.  If that's the case, because there is

14   no -- he hasn't established that they all occurred prior

15   to -- excuse me -- whatever the date of the consent judgment

16   is.

17       THE COURT:  I don't think that is what he said.  I

18   would be happy to have him clarify it.  What I heard him

19   saying is that he has not been paid, for example, in the

20   Adams case in excess of the $364,000 and change since the

21   date of that payment, since the date of that judgment.  I

22   will ask him again.  But beyond what he has just said, I want

23   to know what evidence you have.  You have just said you don't

24   have any independent evidence.

25       MR. COPELAND:  I don't have any independent evidence.

1          THE COURT:  We don't know.  We have lost the payment

2     information?

3          MR. COPELAND:  Correct.

4          THE COURT:  So why if there is no evidence -- and

5     Mr. Drake has made the representation that he has made -- and

6     given that you bear the burden of proof on payment, which I

7     think would include date of payment, why should I not agree

8     with Mr. Drake and say that what appears to be happening here

9     is -- if I were to do anything else, I would be undercutting

10    or collaterally attacking the judgments themselves given the

11    lack of evidence produced by the City as to when these

12    payments were made.  And I will instead just focus on the

13    primary task assigned to the Court by Judge Lamberth, which

14    is trying to identify what additional money is due Mr. Drake

15    today given Judge Lamberth's decision, how much has been paid

16    underneath the cap and how much has not been paid, and then

17    do a calculation, as the judge has requested, regarding the

18    judgments and interest due thereon.  The calculation would be

19    quite a bit more simple if I were not to credit all of the

20    overpayments, or we will just say payments, the difference in

21    payments between the amounts in the judgments and the amounts

22    that I have been able to calculate.  Why shouldn't that be

23    the result?

24          MR. COPELAND:  For two reasons:  The first reason is

25    that the Court has independent evidence in the record that

1    payments were made by the District consistent with the

2    documents that the Court has relied upon in other instances.

3    There are not question marks over a subset of payments under

4    the HODs.  Insofar as we talk about the number of HODs,

5    Mr. Drake says that there is just a negotiated amount and

6    nobody was counting HODs.  That doesn't make sense to me.

7    How do you agree and how do you look to what the cap, the

8    maximum payable under the cap, if you're not counting the

9    HODs?  I don't know if there was a wrong count made at the

10   time this judgment was made.  I think when the Court looks to

11   the evidence in the Adams case, looks back at the materials

12   that it relied upon in arriving at its preliminary

13   calculations, there is evidence that payment was made.

14        THE COURT:  That is different.  I'm not backing away

15   from that, the prima facie evidence of payments being made,

16   and I think we still have to deal with numbers of HODs, and I

17   will hear your arguments on that.  I'm focusing on a

18   different point, a bigger point mathematically, as to the

19   dates of the payment and what evidence do I have as to the

20   dates of the payment.  I mean I made an assumption -- and now

21   Mr. Drake has clearly finally objected to it -- as to how any

22   such overpayments should be credited if at all.  He is

23   suggesting they should not, they just disappear.

24        MR. COPELAND:  The second -- sticking to what I was

25   trying to say as to the first reason, is that Mr. Drake

1    hasn't identified -- we went through payments in preparation

2    of this document, went through them last week, and there was

3    an acknowledgment that many of these payments were, in fact,

4    made.  So it is a question of -- leading me to the second

5    reason -- that payments were made in connection with a case

6    and that somehow it is more fair and more equitable in light

7    of the circumstances at large that those payments should

8    somehow disappear, that they should never have been credited.

9    If that's the case, Mr. Drake has to reimburse the District

10   for the $200,000 independently.  I don't think he is in a

11   position to do that.  I don't think that that is the best

12   solution in light of why we are here and why he has moved to

13   enforce.  I think that Judge Lamberth asked the Court to

14   perform the task that it did, and I don't think that it is

15   right or fair or equitable for public funds that were paid to

16   him that he acknowledged he was owed and acknowledged in

17   large part at least that he received should somehow not be

18   credited.

19         THE COURT:  I know.  You don't have to agree with

20   this.  He represented that he's not received post-judgment

21   payments.  What's the chance he received $200,000 and has

22   forgotten about it and is choosing not to be straight with

23   the Court about that?  I think that is low.  I think, more

24   likely, at the time of the negotiation, nobody knew, nobody

25   has done the math, nobody has figured this out, nobody has

1    drilled down, so that the three sixty-four figure is probably

2    just wrong.  But nevertheless, you negotiated it, and a Court

3    put it in a consent judgment.  If that's true, then how would

4    that be fair and equitable all of a sudden to undo that deal,

5    the deal and an order on top of it, by giving the District a

6    further credit, a $200,000 credit towards a judgment when you

7    can't show me when the payments were made and the burden of

8    proof is on you to prove payment?

9         MR. COPELAND:  There is no dispute that that payment

10   was made.

11        THE COURT:  But it is a big difference as to when it

12   was made.  It doesn't matter.  The payment is a different

13   issue.  It is when was it made, and that's all the difference

14   in the world to Mr. Drake.

15        MR. COPELAND:  Mr. Drake isn't saying that the three

16   sixty-four, whatever it was, wasn't paid.  That's conceded

17   that that was paid.

18        THE COURT:  It's the other $200,000.  Where did it

19   go?  When was it made?  He is saying it wasn't made after the

20   judgment was entered.  And you know what?  I kind of believe

21   that.  Because is the City just saying, hey, we're going to

22   pay him another $200,000 when the judgment doesn't require it

23   and the law doesn't require it and it's been fighting for

24   years to try to keep him from being paid?

25        MR. COPELAND:  If I can push back gently on the Court

1    here, what I would say is the District's records, we have

2    evidence in the record of a process of payment where

3    Mr. Drake has conceded in large part or the Court has

4    concluded that that process resulted in payment.  The

5    District's records reflect that payments were made consistent

6    with HODs in a specific case, in Allen --

7         THE COURT:  But what is the evidence of the date?

8         MR. COPELAND:  I think that Your Honor has

9    to -- Mr. Drake has produced a set of -- you can't pull this

10   apart in this way, Your Honor.  Mr. Drake has produced a set

11   of HODs that he thinks are reflected by our count in this

12   case.

13        THE COURT:  All of which predate the judgment.

14        MR. COPELAND:  That's true, but the documents I

15   think, in large part -- I understand there was like some --

16        THE COURT:  There might have been a few.

17        MR. COPELAND:  -- some before and after.  That's

18   another question.  If we were willing to accept -- I objected

19   I think to this last Friday.  I objected to ones that came

20   after the fact.  Your clerk pointed out that we appeared to

21   pay on them anyway because they were part of the case.  So,

22   in that respect, I think Mr. Drake is perhaps just mistaken,

23   and I don't think that he is trying to pull one over on the

24   Court.  I don't think he is being dishonest at all.  He

25   certainly hasn't been with us at all.  The fact of the matter

1    is that what his records reflect are of less evidentiary

2    value to the Court than what the District had put in the

3    record at the time.  So if the Court is going to have to

4    weigh that evidence, even accepting -- we have prima facie

5    evidence of payment -- if the Court then has to weigh what

6    countervails that, I don't think it is enough to dislodge the

7    fact that there was a payment made -- there were multiple

8    payments, apparently $200,000 worth of payments made in Adams

9    that we don't know when they were issued but they were

10   related to HODs that Mr. Drake acknowledges were part of the

11   Adams case and which our documents reflect resulted -- at

12   least went through the process that should have resulted in a

13   payment.  I think when you put those two things together,

14   that the notion that this money -- that we would pay above

15   and beyond the consent judgment, that that amount should be

16   discounted is -- I believe it is fundamentally unfair.

17         THE COURT:  Unless you did it prior to the consent

18   judgment, unless the payments were made prior to the consent

19   judgment.  You don't know how much you paid.  This whole

20   action is about how much did you pay.

21         MR. COPELAND:  Even if it was paid before the consent

22   judgment and the consent judgment reflects a lower amount,

23   that doesn't mean that those amounts weren't put towards it.

24   The consent judgment preserves his right not only to seek

25   additional amounts but it preserves any defenses we have, as

1    well.  And I submit to the Court there is a defense that we

2    have paid an amount beyond the consent judgment, the

3    negotiated amount, at whatever time; that that remains a

4    defense to paying --

5         THE COURT:  And you bear the burden on it.  It does

6    come down to what evidence that you have, I think, about when

7    the payments were made.

8         You have heard me with regard to what payments were

9    made and the relative burdens and the documentation that the

10   Court has relied upon to date and I anticipate relying upon

11   going forward, the District's documentation, and it does

12   appear to show a method, procedure for making these payments,

13   and these documents were part of that procedure, and I think

14   a fair inference can be drawn from those that the payments

15   were made, but that is different and critically important,

16   the issue about when the payments were made.  I just have not

17   seen any clear evidence about when the payments were made.

18        Okay.  Let's move forward.

19        Before we do, Mr. Drake, I do want to have you

20   respond because I want to make it clear, there is a

21   potential, just in the Adams case alone, a $200,000

22   difference between the amount --

23        MR. DRAKE:  There is not, Your Honor.  This is the

24   first time -- the first time -- that a question came up about

25   whether there is some payment that had been made that has not

1    been credited.  It is personally offensive.  It is not true.

2    Not true at all.  And if they would just go get Bob Utiger

3    and bring him in here to tell the truth about it.  The only

4    question was -- when I filed this clarification of the record

5    on Friday -- was simply to say that the Court is going beyond

6    the parameters of what Judge Lamberth assigned in looking to

7    whether or not there was something paid beyond $4,000 on the

8    judgments.  I will represent to the Court there was never, in

9    the negotiations on either one, Adams or Abraham, any

10   discussion about the number of HODs, whatever it might be.  I

11   accepted the District's representation that they had paid all

12   that they could pay.  That's my mistake.  I should have known

13   better.  I dealt with them 30 years.  I accepted the

14   representation.

15           THE COURT:  You accepted the representation about the

16   amount of money that had been paid in the Adams case, the

17   364,000?

18           MR. DRAKE:  I accepted the representation that they

19   had paid all that they could pay.  That's on me.  I made a

20   mistake in relying on them.  There is no disappearance of

21   $200,000 or $2,000.  Every dollar that the District has paid

22   has been accounted for by me, and I am saying to the Court

23   again, this is the first time -- I have communicated with

24   Mr. Utiger and others over the years, saying:  Here is what

25   is owed on the judgments.  Will you pay them?  Never, oh, we

1    have already paid you, no.  The fee cap, which we drafted,

2    bars us from paying any more.  No one ever contemplated that

3    we would be here at this point counting HODs.  Never in my

4    wildest dreams would I have thought we would be counting

5    HODs.  It was a settled issue.  Now the question arises --

6    and I hope the Court would ask the District -- if the cap

7    were lifted today, do you agree that you owe Mr. Drake on

8    Abraham two million -- two million one hundred -- whatever

9    that figure might be -- let me see if I can find it here.  If

10   the District said that if the cap were lifted today that

11   there is a dispute about what is owed in Abraham and Adams,

12   if it is, it would be -- I don't know how to describe

13   it -- it would be dishonest, and that is the polite way to

14   describe it.

15          THE COURT:  Before I ask Mr. Copeland, I want you to

16   answer a question, because I want you to focus on what I

17   think the issue truly is, which is the dates of the payment.

18   In the Adams case, it actually mentions the parties agreed

19   that DCPS made a prior payment to plaintiffs' counsel of

20   $364,087 and that that is the limit of what the defendant may

21   lawfully pay at this time under such applicable law.

22          So my question in Adams is:  Did you receive any

23   further payments from the government related to the Adams

24   plaintiffs following the Adams consent judgment, which was

25   the 25th day of May of 2005?

1         There was another consent judgment in Adams, which I

2    am going to read to you.  There was a second consent judgment

3    on August 30th of 2005, which reflected a further payment of

4    $25,380.

5         MR. DRAKE:  No, Your Honor.

6         THE COURT:  No, that is what it does reflect.  You're

7    answering my question?

8         MR. DRAKE:  It doesn't reflect a payment.  It

9    reflects fees on fees.  This is an additional amount of

10   attorney's fees that were awarded.  After we had entered into

11   the consent judgment, then there was additional work that had

12   gone on, and this was for that additional work.  Never a dime

13   paid.  I will represent to the Court as an officer of the

14   Court, at the bar more than 50 years, never a question of my

15   integrity or honesty, that the only check ever received from

16   the District once these judgments were entered was $313, that

17   didn't relate to the judgments but related back on something

18   they thought they paid but hadn't paid.  Nothing whatsoever.

19   For them to come into Court at this point questioning my

20   honesty -- bring a witness, that's what I suggest, and swear

21   the witness to tell the truth.  There were no payments made

22   post-judgments.  In each of these instances, the money that

23   is reflected to be paid or to be paid contemporaneous with

24   the consent judgment is precisely what happened.  I know

25   Mr. Copeland wasn't here at that time, hasn't been here very

1    long.  I have been struggling with this thing for nearly

2    20 years, trying to get paid.

3              THE COURT:  I am finished reading Judge Bates'

4    August 30, 2005 consent judgment.  It gives you an additional

5    award of $25,380, which would be in addition to the $364,087

6    in the May 25th.

7              MR. DRAKE:  No, Your Honor.  That is incorrect.  The

8    364,000 had already been paid in the first judgment.  That

9    money either had been paid or was paid contemporaneous with

10   the judgment.  The remaining amount in that one was the

11   amount awarded minus the payment made.  This subsequent

12   25,000 was, I said, for litigation in court over this matter.

13   Nothing paid.  It was not additional payment that had been

14   made.  It is simply this was owed, as well, for additional

15   work that had to be done to enforce --

16             THE COURT:  I didn't say payment had been made.  I

17   say they awarded you this amount.

18             MR. DRAKE:  I misheard the Court.

19             THE COURT:  You have not been paid that $25,380?

20             MR. DRAKE:  Absolutely not.

21             THE COURT:  So that is in the Adams case, where you

22   just indicated you received no post-judgment payments on the

23   amounts due in both of those consent judgments; is that

24   correct?

25             MR. DRAKE:  That is correct, Your Honor.  Not only

1    correct, it is true.

2              THE COURT:  Let's talk about the Abraham case.  In

3    the Abraham case, there was an agreement that you would be

4    paid two and a half million dollars for your attorney's fees

5    and costs related to the Abraham case.  It indicates that

6    DCPS had made a prior payment of $20,984.50.  It had approved

7    payments to plaintiffs' counsel --

8              MR. DRAKE:  Your Honor, they have some confusion

9    there.  It all comes down to the total, which I have accepted

10   and agreed is true, the four hundred ninety-seven, they don't

11   add up together.  This is a check they wrote.  I agree.  This

12   is it.  This is what was written once we had the consent

13   agreement.

14             THE COURT:  Four ninety-seven, you received a payment

15   for that amount of money; right?

16             MR. DRAKE:  Yes.

17             May I have a moment?

18             THE COURT:  Okay.

19             (Pause)

20             MR. DRAKE:  Your Honor, I received a check from the

21   District on August 1st, 2005.  The amount was $451,611.50.

22   There have been prior payments made, which brings up to the

23   total shown in the judgment, brings it up to $497,922.75.

24   There is some confusion the way they wrote it, but it all

25   comes down to a total prejudgment payment of the

1    497,000-plus.

2            THE COURT:  You did not receive any post-judgment

3    payments in the Abraham case; that is, payments after

4    December 2nd of 2005, when the consent judgment was entered?

5            MR. DRAKE:  As an officer of the Court, I tell you,

6    the Court, that is absolutely true.

7            THE COURT:  Let's go back to what we were trying to

8    do today, which is going through the HODs.

9            MR. DRAKE:  Your Honor, I had a preliminary matter

10   before the Court gets to that.

11           THE COURT:  Okay.

12           MR. DRAKE:  Your Honor, when Court adjourned, I asked

13   the law clerk for a copy of Defendant's Exhibit 2, and

14   inadvertently I received the one that has a sticker on it.

15   May I give it back to the clerk?

16           THE COURT:  Please.

17           MR. DRAKE:  I have given opposing counsel a copy, and

18   I kept a copy myself.

19           Second, the Court assigned the responsibility of

20   going through Sidney Shaw to make clear what the story was

21   there.  I withdraw the HOD at this point.  I was wrong on

22   that.  So that is withdrawn.  The HOD November 20th, 2001, it

23   is withdrawn.

24           THE COURT:  Okay.

25           MR. DRAKE:  I think those are the only preliminary

1    matters that I have for the Court, Your Honor.

2              THE COURT:  I think we are then moving on to

3    J. Smith --

4              MR. COPELAND:  Your Honor, may I be heard on one

5    thing before we go back to this because I think it is

6    important?

7              THE COURT:  Okay.

8              MR. COPELAND:  The Adams consent judgment reflects

9    payments of $364,087.  That, of course, is the number that

10   matches the Adams documentation.  We call it different names.

11   This is what we introduced at the initial hearing.  And I

12   apologize, I don't remember what exhibit number it was.  The

13   total --

14             THE COURT:  You have to pass that up.

15             MR. DRAKE:  I don't have a copy.

16             MR. COPELAND:  I can show it to you.

17             THE COURT:  This is from Ms. Harris-Lindsey's

18   testimony, Defense Exhibit 1.

19             MR. COPELAND:  Right.

20             If you add all of these numbers up reflected in this

21   exhibit, it equals the amount reflected in the consent

22   judgment.  If you go to Your Honor's chart -- and I'm at page

23   13 of the one with the notes on it, it is footnote number 34,

24   for a student whose last name is Boney.  Boney is not listed

25   on Ms. Harris-Lindsey's exhibit.  That $364,000 payment did

1    not reflect payment grouped under that $364,000 sum.

2    Nevertheless, in footnote 34, plaintiffs acknowledge that

3    they were able to separate the amounts paid for fees on this

4    child.  So for plaintiff to say that he didn't receive

5    anything other than this $364,000 is not correct.  He has

6    established in going through his own files that additional

7    payments were made.  So I think that calls into question his

8    statement -- I don't think it is intentionally false -- that

9    additional amounts were paid beyond that $364,000.

10        I apologize for jumping up like this, but I think it

11   is important before the Court simply discounts that

12   additional amount of money that we contend, of course, was in

13   fact paid.

14        THE COURT:  Footnote 34, does he say there when it

15   was paid?

16        MR. COPELAND:  He doesn't say when it was paid, but

17   he acknowledges payment.

18        THE COURT:  Okay.

19        MR. COPELAND:  And he acknowledges --

20        THE COURT:  It may be that whoever negotiated the

21   $364,000 figure, for whatever reason, maybe because that was

22   part of the negotiation, maybe because the records were poor,

23   maybe because they didn't do a good job, they came up with

24   three sixty-four and it was too low.

25        I will hear from Mr. Drake.

1          Mr. Drake, Mr. Copeland has indicated, in footnote

2     34, you identify an additional payment or payments made to

3     Mr. A. Boney.  Mr. A. Boney does not appear, according to

4     Defendant's Exhibit 1, to be one of the plaintiffs in the

5     Adams case which made up the $364,000 figure which appears in

6     the Adams consent judgment.  So Mr. Copeland is suggesting

7     that that indicates right there that you are acknowledging

8     that additional payments were made outside the amount of

9     364,000 reflected in the Adams judgment.

10         MR. DRAKE:  That is not true.  For Mr. Copeland to

11    say that I am not telling the Court the truth is offensive.

12         In addition to that, Mr. Copeland is going behind his

13    own predecessor's negotiated figure.  The consent judgment

14    holds.  I don't know how we were able to construct all of

15    these charts, frankly, to begin with.  I am simply saying to

16    the Court one more time that HODs, settlement agreements were

17    never discussed at the negotiations.  It was simply how much

18    do we owe, how much are we willing to pay, and how much can

19    we lawfully pay.  And again, as I say, I accepted their

20    figures.  Mr. Copeland is going behind the negotiated figure.

21    I do not agree that there is any discrepancy at all.  Again,

22    we never anticipated we would be going through HODs one by

23    one 15 years ago.  I don't have an answer other than to say

24    the judgment stands and the judgment is true, and my

25    statement that there was never any payment beyond what was

1    represented there is true.  I regret, after all these years,

2    that having dealt with DCPS, that Mr. Copeland comes along

3    now too and questions my honesty and my integrity.  I regret

4    that.

5         THE COURT:  The payments you identified, footnote 34,

6    do you have the date of when that payment was received?

7         MR. DRAKE:  Your Honor, Mr. Murali put these

8    together.  May he speak to that?

9         THE COURT:  Sure.

10        MR. MURALI:  Your Honor, with regard to plaintiff

11   Boney, A., the plaintiffs don't have the specific date of the

12   payment, but we would like to point out that the source for

13   this plaintiff is DSS, at 2, and that is a District-prepared

14   document.  It was not prepared by the plaintiffs.  This is

15   from the District's own records.

16        THE COURT:  Why don't you take a look at that,

17   Mr. Copeland.

18        MR. COPELAND:  I have, Your Honor.

19        THE COURT:  DSS, what I call the dispute summary

20   sheets, whatever that thing is which is located in the docket

21   of the Adams case at 16-1, on page 2, does reflect, with

22   regard to Mr. A. Boney, under the Adams caption, payments

23   being made to him.

24        MR. COPELAND:  We agree, Your Honor, and if you will

25   notice plaintiffs' footnote, they have been very consistent

1    in acknowledging cases where they have received no payment.

2    They don't say that for A. Boney.  Their objection is they

3    were able, based upon their own evidence they have not put

4    before the Court, that they were able to say that $2,605 of

5    that amount was paid in fees and $64 of that was paid in

6    costs.  They don't say, unlike, for example, the footnote 36,

7    where the plaintiffs reflected no payment, footnote

8    number -- I think it is 41 where they say they have received

9    no payment.

10          THE COURT:  I just want to go back to -- I have a

11   document in front of me that is in the Adams case created by

12   the District that indicates payments being made to A. Boney

13   different from Defendant's Exhibit 1.  Right?

14          MR. COPELAND:  Yes.

15          THE COURT:  No A. Boney there.

16          MR. COPELAND:  Correct.

17          THE COURT:  Whoever came up with Defendant's

18   Exhibit 1, I can't explain it, but one explanation is they

19   didn't look back at 16-1 when they came up with Defendant's

20   Exhibit 1.  I don't know why they did that.  It could be that

21   they didn't look at their own documents.

22          MR. COPELAND:  I apologize.  I don't have 16-1 in

23   front of me.  I'm generally familiar with what they look

24   like.  Does it have a date?

25          THE COURT:  It was filed on the Court's docket

1    November 18th of 2004, it was revised November 12th of 2004.

2           MR. COPELAND:  That would be consistent if you look

3    back at Ms. Harris-Lindsey's exhibit.

4           THE COURT:  That was in September of 2014.

5           MR. COPELAND:  Or a check that was supposed to be

6    picked up on October 14, 2014.  So we're in the next month.

7    There are additional amounts owed.  These things were going

8    out about 30 days after.  If you have a document that shows

9    it was processed for payment in November under the Adams

10   case, I think there is every reason to expect that payment

11   would have been made the following month, consistent with the

12   earlier one.

13          THE COURT:  Well, nevertheless -- you think the

14   payment would have been made the following month?

15          MR. COPELAND:  That appears to be based upon the

16   other evidence in Adams.

17          THE COURT:  Okay.  I know.  But then, on May 5th, six

18   months later, the Court signs a consent judgment

19   nunc pro tunc back to February 1st, indicating the amount of

20   prior payments as $364,000.

21          MR. COPELAND:  Clearly, there were numbers that were

22   off, but again, in terms of the Court looking to -- comparing

23   the systems from which the numbers derived and the systems

24   from which the question of whether there was payment or

25   whether there wasn't payment, the District at least has a

1     clear system that shows payments were made, a process was

2     followed.  Mr. Drake's recordkeeping system is not organized

3     by HOD.  He has not produced -- other than that one check in

4     Nesbitt, he hasn't produced anything at all.  And realize, on

5     his statements to the Court, that we don't need to be sworn,

6     we think the Court can accept them, but I think in balancing

7     those two things, I think one system provides credible basis

8     for conclusions, whereas one has a whole lot of questions to

9     it.  We would urge the Court to stick by its original

10    conclusions, at least with regard to these payments in Adams.

11              THE COURT:  All right.  Let's keep moving.

12              MR. DRAKE:  Your Honor, I had one more preliminary

13    matter, if I may.

14              THE COURT:  Yes.

15              MR. DRAKE:  In searching files over the weekend on

16    the Sidney matter, I found one additional --

17              THE COURT:  Which matter?  Sidney?

18              MR. DRAKE:  Sidney Shaw, Your Honor.  I found one

19    additional HOD that the District had omitted from their

20    document, and the child is part of the Abraham case as a

21    plaintiff, and if I may offer that in evidence, as I think

22    Plaintiffs' Exhibit --

23              THE COURT:  A moment ago you said your issue with

24    regard to Shaw was withdrawn.

25              MR. DRAKE:  That's right.  This is a separate matter.

1     As I was researching Shaw, I found then that there was one

2     additional plaintiff HOD that they had left off of what is

3     called their dispute summary sheet, and I wanted to offer

4     that so that gets into evidence.

5          THE COURT:  What plaintiff is that?

6          MR. DRAKE:  The plaintiff is Boykins, Dimitri

7     Boykins.  It is a settlement agreement dated January 11,

8     2001, and I would offer that as Plaintiffs' Exhibit 3.

9          THE COURT:  Okay.  Have you provided a copy of that

10    to Mr. Copeland?

11         MR. DRAKE:  Yes, I am.

12         And Mr. Murali has just reminded me that the Court

13    had raised an issue about Abraham HODs, why they weren't

14    there.  I located those, and I would ask to be permitted to

15    offer those in evidence, as well, a settlement agreement for

16    D. Abraham dated May 16, 2000 and a HOD for Abraham dated

17    January 11th of 2000.  I also have copies for opposing

18    counsel.

19         I ask if those could be labeled plaintiffs' -- I

20    don't know what number we're at.

21         THE DEPUTY CLERK:  3.

22         MR. DRAKE:  3 and 4 or 4 and 5.

23         THE COURT:  Hold on.  Mr. Drake, I already have the

24    Abraham ones.  They're the first two entries --

25         MR. DRAKE:  The Court indicated that it didn't

1    understand why we didn't have those -- if the Court has it, I

2    will withdraw the exhibit.

3           THE COURT:  The issue is not that we didn't have

4    them.  It was why he didn't appear on any of the material to

5    date, including his own material.  This guy just showed up

6    out of nowhere.

7           MR. DRAKE:  It's a young lady.  She did not show up

8    out of nowhere.  She was a plaintiff, of course, in the case

9    itself.  As we put it together -- again, we relied on the

10   purported District's dispute summary sheet -- and she was not

11   there.  Why she is not there, that is up for them to answer.

12   If the Court already has those, I will withdraw both of those

13   in Abraham but continue with the Boykins.  I should say

14   withdraw, simply withdraw these submittals because they're

15   simply there but not withdrawing the HODs themselves for

16   Abraham.

17          THE COURT:  Okay.  I will hear Mr. Copeland with

18   regards to Mr. Boykins.

19          MR. COPELAND:  Your Honor, first of all, we object to

20   this.  This is the first we have seen this, literally when it

21   was handed to us.  I have been deprived the opportunity to

22   consult with the agency.

23          But I will note that these payments were made in

24   2001, September of 2001.

25          THE COURT:  Right.

1      MR. COPELAND:  The consent judgment in Abraham is

2  from December 2005, 4 years later.  It reinforces the notion

3  that they weren't, in fact, part of Abraham because they had

4  been paid four years prior.

5      Further, there is no context as to the amounts

6  invoiced, number of hours spent on these cases.  I know they

7  were settled, being that there was not really a dispute

8  between the parties to the degree that it required a hearing

9  officer decision.  I just don't believe that -- I'm going to

10  have to withdraw that.  I see the date of the check is

11  9/2/2005.

12      THE COURT:  It is for something made earlier.  I

13  think you're right about the 9/6/2001.

14      MR. COPELAND:  It makes sense to me if they were paid

15  separately why they are not part of the Abraham case.

16      THE COURT:  You're withdrawing what?  You're

17  objecting to this being included or not?

18      MR. COPELAND:  Yes, we object to this being included,

19  and I think that even should the Court consider it that it is

20  not part of -- this reinforces it is not part of that Abraham

21  case because these amounts were paid separate -- appear to

22  have been paid separate and apart from the consent judgment.

23      THE COURT:  But what is that based on?

24      MR. COPELAND:  Well, the consent judgment in Abraham

25  speaks to the $2.5 million being to encompass vouchers

1    already submitted as opposed to already submitted and paid.

2    Any remaining adjustments to vouchers and any claims for

3    attorney's fees, it sort of speaks to things that still have

4    to be done in the case.  The prior payment was only

5    $20,984.50 in that case.  All that remained were approval of

6    payments totaling $447,000, which again there was nothing

7    approved about this payment.  It had already been issued at

8    this time.  I just don't think it was part of the case.

9         THE COURT:  Let me ask Mr. Drake this question:

10   Mr. Drake, you have presented a letter which you say

11   qualifies as essentially an HOD from Mr. Boykins.

12   Mr. Boykins doesn't appear in any of the paperwork that I see

13   to date as being involved in the Abraham case.

14        What is the Abraham case?

15        MR. DRAKE:  Boykins is a plaintiff in the Abraham

16   case.

17        THE COURT:  How do I know that?

18        MR. DRAKE:  I have the complaint.

19        THE COURT:  He is in the complaint?

20        MR. DRAKE:  Yes, he is.

21        May I hand this to the clerk?

22        THE COURT:  Sure.

23        MR. DRAKE:  I would like to be heard briefly on the

24   remark Mr. Copeland made about the Abraham case.

25        THE COURT:  Did you do any work for Mr. Boykins

1    outside the Abraham case?

2         MR. DRAKE:  I think we have one HOD.  It would be

3    included.  That's the remark I asked the Court to allow me to

4    make in that regard.  The Court will see in Abraham I think

5    it is something over a hundred plaintiffs.  The Court may ask

6    the question:  Why were those bills not submitted seriatim?

7    My response to that is this:  I was so busy with indigent

8    mothers coming to me to represent the child.  I wasn't

9    sending in invoices to DCPS.  It finally became so great I

10   had to submit them.  I didn't have a database.  I had hand

11   entries of time sheets.  So for a period of time, Mr. Utiger

12   and I negotiated about was I going to have to reduce those to

13   hundreds of pages of entries of time sheets.  We never got

14   past that.  So I finally got all those submitted.  In any

15   event, the passage of time between the time the work was done

16   and the filing of the complaint, I would hope, would validate

17   what I have said, that I was in it for saving kids that they

18   wouldn't save.

19        THE COURT:  So Mr. Copeland, you don't object that

20   Mr. Boykins is in fact a plaintiff in the Abraham case;

21   right?

22        MR. COPELAND:  Is it in --

23        THE COURT:  He is in the complaint.

24        MR. COPELAND:  If he is listed there, he is listed

25   there.  I think in light of the fact that Mr. Drake has

—42—

1    produced proof of payment that predates any of the payments

2    in Abraham, coupled with the fact that the consent order is

3    pretty explicit about a time frame as to what had been paid

4    and what was left to be paid.

5            THE COURT:  This is not in excess of the amount that

6    had been paid.  This could have been part of that amount;

7    could it not?  $14,549 is less than the 20-some-thousand

8    dollar prior payment indicated in the consent judgment.

9            MR. COPELAND:  Yes, it could have been.

10            THE COURT:  Right.

11            And the payment was made right at or around the time

12    of the consent judgment itself, and that is when these

13    matters were being litigated and addressed by the Court.

14            MR. COPELAND:  Three months before.

15            THE COURT:  Right.  Is this not at least back in that

16    time period?  Would not this letter, which has been provided

17    to the Court and which the Court should mark as plaintiffs'

18    Exhibit 3, would you agree that this appears to indicate that

19    Mr. Boykins was a prevailing party and that this is the

20    equivalent of an HOD back in 2001?

21            MR. COPELAND:  I agree that it would have been

22    treated like an HOD back in 2001 and would have paid it --

23            THE COURT:  And would have entitled Mr. Drake to

24    payment for fees; correct?

25            MR. COPELAND:  Correct.

1           THE COURT:  The only question you have is whether or

2     not Mr. Boykins is part -- this HOD is part of the Abraham

3     complaint?

4           MR. COPELAND:  That's correct, Your Honor.

5           THE COURT:  Okay.

6           MR. COPELAND:  I would like to grab that Abraham

7     consent judgment really quick.

8           THE COURT:  Okay.

9           MR. COPELAND:  That's our position, Your Honor.

10          THE COURT:  If I were to agree with the plaintiff and

11    include this as another HOD, Mr. Drake, how much are

12    you -- you concede that you were paid $2,592 in September of

13    2001; right?

14          MR. DRAKE:  I don't have it in front of me, Your

15    Honor.

16          THE COURT:  That is what this shows.

17          MR. DRAKE:  How much, please?

18          THE COURT:  Can you hand that down.

19          MR. DRAKE:  Yes, we accept that figure as the figure

20    paid, included in the check, and that would be -- what would

21    be owed would be the difference between that and the $4,000,

22    taking into account obviously the $92.  I would represent

23    that that was costs.  Costs were in the range of $30 to $100.

24    So that would be what I would claim.

25          THE COURT:  Do you want to be heard on the amounts,

1    Mr. Copeland?  He is basically saying that it is $25,000 in

2    fees and $92 in costs.  You don't object to that?

3             MR. COPELAND:  I don't.  It looks like it is probably

4    correct.

5             THE COURT:  The calculation, if I were to accept this

6    as an HOD would be to have the District essentially pay the

7    difference between $2,500 and $4,000.

8             MR. COPELAND:  Correct.  All right.

9             THE COURT:  All right.  Let's keep going.

10            MR. MURALI:  Your Honor, if I may, may I request

11   clarification regarding one prior objection.  It was on

12   number 57.  I just want to make sure that the plaintiffs are

13   acknowledging only payment of 8,051 and not the 16,010 that

14   appears to be in the footnote.  This is for plaintiff

15   Jenkins, K.

16            THE COURT:  Okay.  Mr. Copeland, number 57, I think I

17   acknowledged last time this was just an error.  The Court

18   acknowledged an error.  Mr. Copeland is going to stand by, I

19   assume, the $8,000 payment.  Right?

20            MR. COPELAND:  We do.

21            THE COURT:  And $51 in costs.

22            MR. COPELAND:  Correct.

23            THE COURT:  Okay.  So we're going to make that

24   correction.

25            Now let's move to --

1      MR. MURALI:  Thank you, Your Honor.

2           As one additional preliminary matter, with regard to

3      the plaintiffs, where there was record of no payment,

4      plaintiffs have the invoices for those plaintiffs.  They were

5      Jackson, N.; Ward, R.; Watkins, M.; Boney, A.; Curtis-Walker,

6      R.; Perkins, L.; and Hopkins, A.  Plaintiffs have the

7      invoices that Mr. Drake submitted, and if he could introduce

8      them.  I don't think it is appropriate for me to.  I recall

9      defense said there were no invoices provided to the District

10     with regard to plaintiffs where there was no payment.  We

11     have those invoices here, Your Honor.

12          THE COURT:  So you have the invoices but you're

13     claiming there was no payment made on them?

14          MR. MURALI:  Yes, Your Honor.  And the District, if

15     I'm correct, claimed there were no invoices submitted;

16     therefore, there would be no payment.  However, we do have

17     the invoices.

18          THE COURT:  Mr. Drake, you want to introduce those,

19     then?

20          MR. DRAKE:  Yes, Your Honor.

21          THE COURT:  What are we going to mark this as?

22     Plaintiffs' Exhibit?

23          THE DEPUTY CLERK:  4.

24          THE COURT:  Have you provided copies to Mr. Copeland?

25          MR. DRAKE:  I will now, Your Honor.

1          I'm not sure if Mr. Murali referenced the invoice in

2     Sidney Shaw on the other two HODs that she had, and we have

3     that, as well, if the Court would accept that as Exhibit 5.

4          THE COURT:  Okay.  Do you have any objections to

5     admission of these exhibits, Mr. Copeland?

6          MR. COPELAND:  I do, Your Honor.  We have literally

7     just been provided them.

8          THE COURT:  Okay.

9          MR. COPELAND:  Looking at the first one, that's the

10    first of the invoices or the letters that says that an

11    invoice was being provided.  That is for R. Curtis-Walker,

12    not for S. Curtis-Walker.  The Court has already concluded

13    that R. Curtis-Walker had one HOD and was entitled to

14    payment.  The problem was with S. Curtis-Walker, which

15    doesn't appear to be in here.

16         THE COURT:  Okay.  I'm going to give you a chance to

17    look at these over lunch.  We are going to take a break.  I

18    will hear you afterwards.

19         Do you have any other exhibits?

20         MR. DRAKE:  I think not.  I think we have finally

21    taken care of all the preliminary matters.

22         THE COURT:  All right.  I will hear from you after

23    the lunch break.

24         (Luncheon recess taken)

25

1                    AFTERNOON SESSION

2          THE COURT:  This is a continuation of the hearing

3    from this morning.

4          I had a few questions about the exhibits that were

5    submitted right before the lunch break.  I'm trying to understand

6    what they are.

7          Who would like to address that?

8          MR. DRAKE:  Which exhibit, Your Honor?

9          THE COURT:  Plaintiffs' Exhibit 4, the stack of

10   invoices.

11         MR. DRAKE:  Your Honor, my understanding was, during

12   the course of the last hearing, the District had objected to

13   a number of the cases saying that they hadn't been paid

14   because they had never been billed.  I went back on those

15   cases where that issue had been raised and went through each

16   file and xeroxed the cover sheet, being an invoice, and did

17   not copy the time sheets but the invoice itself.  That is

18   simply to respond to their objection that they never had been

19   invoiced.  It simply shows they had.

20         THE COURT:  I'm trying to understand what subset of

21   cases these invoices are relevant to.

22         MR. DRAKE:  Could I defer to Mr. Murali on that?

23         THE COURT:  Okay.

24         MR. DRAKE:  Thank you, sir.

25         THE COURT:  I assume these relate to cases,

1   Mr. Murali, where the plaintiffs' position is that the City

2   has paid nothing?

3               MR. MURALI:  That's correct, Your Honor.  The

4   plaintiffs' position --

5               THE COURT:  The plaintiffs' position was that the

6   District had paid nothing.  Mr. Copeland said, well, the

7   plaintiff hadn't even submitted an invoice, which might be

8   some indication of an obligation to pay.

9               MR. MURALI:  That's correct, Your Honor.

10              THE COURT:  That's what you have collected here?

11              MR. MURALI:  Yes, Your Honor.  Plaintiffs' original

12  position was plaintiffs could not prove a negative.  Where

13  there was no payment, plaintiffs could not provide proof of

14  no payment.  The District came back and defended, saying that

15  plaintiffs could provide invoices that they had submitted as

16  potential proof that there was at least a claim made for

17  payment for these plaintiffs, and so plaintiffs have now

18  provided those invoices.

19              THE COURT:  Let's go through each one.  I see A.

20  Boney, R. Curtis-Walker.  Both of those, it is plaintiffs'

21  position that your records reflect no payment?

22              MR. MURALI:  Yes, Your Honor.

23              THE COURT:  We come to A. Hopkins, which is the same.

24              MR. MURALI:  Yes, Your Honor.

25              THE COURT:  Then there is a check after the

1    A. Hopkins invoices.  What does that signify?  What is its

2    relevance, a check for $35,484.50.

3             MR. DRAKE:  Which child are we talking about, Your

4    Honor?

5             THE COURT:  I have no idea.  It looks like a series

6    of children.

7             MR. DRAKE:  Yes, this would be for Nicole Jackson,

8    and the Court may see faintly where the District had printed

9    Jackson.  The handwriting is mine.  I ascribe it to Nicole

10   Jackson.  The check is in front of the invoice itself.  It is

11   submitted only in relation to Nicole Jackson.  This is simply

12   for Nicole Jackson.

13            THE COURT:  Where does Ms. Jackson fall?  Is she a

14   party to the Adams case?

15            MR. DRAKE:  I'm not sure which one.

16            THE COURT:  I don't see her anywhere.

17            MR. MURALI:  Your Honor, Ms. Jackson is a party to

18   A.C. Clark, can be found under footnote 15 on Page 8.

19            THE COURT:  Okay.  So then don't your records reflect

20   payment?

21            MR. MURALI:  With regard to?

22            THE COURT:  Nicole Jackson.

23            MR. MURALI:  Let me confer with Mr. Drake.

24            THE COURT:  I see a check here for $4,018.

25            MR. MURALI:  Yes, Your Honor.  And to that extent,

1    plaintiffs would withdraw a claim of no payment for

2    Ms. Jackson.

3            THE COURT:  Okay.  That one is withdrawn, and she was

4    a plaintiff under A.C. Clark.

5            MR. MURALI:  That's right.

6            THE COURT:  Then we come to Paul Jackson;

7    Ms. Perkins, L. Perkins --

8            MR. MURALI:  Yes, Your Honor.

9            THE COURT:  -- who is a plaintiff in the Adams case

10    that you're claiming no payment; correct?

11            MR. MURALI:  Yes, Your Honor.

12            THE COURT:  So that is your invoice.

13            The last plaintiff is R. Ward.  Where is R. Ward?

14            MR. MURALI:  R. Ward is on page 10, Your Honor, under

15    A.C. Clark.  So this check would validate payment up to

16    $4,000.

17            THE COURT:  Because the documents with regard to

18    Ms. Ward under Plaintiffs' Exhibit 4 reflect both the invoice

19    but also a payment of $4,111; right?

20            MR. MURALI:  Yes, Your Honor.

21            THE COURT:  For Ms. R. Ward, you will withdraw --

22            MR. MURALI:  We will withdraw the objection there, as

23    well.

24            THE COURT:  You have been paid.

25            MR. MURALI:  Yes, and I believe that is reflected in

1     Your Honor's charts.

2           THE COURT:  Mr. Copeland, I will hear you on

3     Plaintiffs' Exhibit 4 if you have anything further to add

4     other than what I discovered over the lunch break.

5           MR. COPELAND:  I do.  The invoices we do not believe

6     add anything to the discussion.  In each of the cases where

7     we said there was no invoice -- and I'm speaking -- the one

8     that jumps to my mind is -- I think it is Carswell, D.

9     Carswell.

10          THE COURT:  What case is that in?

11          MR. COPELAND:  Carswell.  It is in the Adams case,

12    footnote number 37 on page 13.  That's a case --

13          THE COURT:  That's a case where there's no HODs.

14          MR. COPELAND:  Right.

15          THE COURT:  I understand that these invoices were

16    addressing a different issue, cases where they said there was

17    no payment.  And you said, well, at least they could show you

18    the invoices, and that's what they have done.  And in two

19    cases, they have withdrawn, because looking back through

20    their records, they found evidence of payment in two cases.

21          MR. COPELAND:  Correct.  What I was saying with

22    regards to this one is that our issue when there was no

23    invoice or anything submitted, that's where -- the dispute

24    summary sheets, things like that, were prepared upon

25    submission of the invoice.  For example, in Carswell, where

1    there is zero there, we didn't receive one.  Plaintiffs could

2    counter that with evidence of submission of an invoice.

3            THE COURT:  Your point is wherever the dispute

4    summary sheets show zero HODs and they are asserting there

5    are some HODs, then they should be providing the Court with

6    invoices?

7            MR. COPELAND:  Correct.

8            We acknowledge, I think, because we prepared dispute

9    summary sheets or something similar for all of the letters

10   that are included in this exhibit.

11           One other issue, going back to the check, if you will

12   look again at Watkins, is the other defendant, on page 10,

13   footnote 24, plaintiffs again said that their records

14   reflected no payments made.  This record shows $12,138 was

15   paid on that case, as well.

16           THE COURT:  Which case is Watkins in?

17           MR. COPELAND:  It is in Clark, as well.

18           THE COURT:  Okay.  Mr. Drake.

19           MR. DRAKE:  One moment, Your Honor.

20           THE COURT:  Did you have any other comments on this

21   exhibit, Mr. Copeland, other than Watkins?

22           MR. COPELAND:  Only, Your Honor, that I think this

23   speaks to a bit of disadvantage that we're at here.  We are

24   not privy to his files or record system or anything like

25   that.  Each time he has presented the Court with information,

1    something in there has reaffirmed a position that I think was

2    borne out by Your Honor's preliminary calculations.  We're

3    wondering what else is out there if we had an opportunity to

4    review these records or if they had been provided to us in a

5    more timely fashion.

6            THE COURT:  Okay.  Mr. Drake.

7            MR. DRAKE:  The docket indicates that payment was

8    made in Watkins, that's correct.

9            With regard to a review of documents, if they had

10   provided documents for us, it would have been much more

11   helpful.

12           THE COURT:  Okay.  I'm going to have the record

13   reflect, in the A.C. Clark case, that the plaintiffs concede,

14   with regard to plaintiff Watkins, the receipt of it looks

15   like $12,000 and $138 in costs.

16           I will admit then Plaintiffs' Exhibit 4.

17       (Plaintiffs' Exhibit 4 received in evidence)

18           THE COURT:  Let's talk about Plaintiffs' Exhibit 5.

19           MR. DRAKE:  At this time, Your Honor, I'm not sure

20   what our issue was there.

21           THE COURT:  I don't know, either.  Why are you

22   submitting Plaintiffs' Exhibit 5, which appears to be an

23   invoice related to S. Shaw?

24           MR. DRAKE:  Yes, she had three cases, one of which we

25   withdrew earlier today.  Beyond that, I don't recall that

```
1        issue, so we withdraw that issue.
2              THE COURT:  I will not admit, then, Plaintiffs'
3        Exhibit 5.
4              Okay.  Mr. Murali, let's continue.
5              Just so it's clear, we left off the other day on
6        Number 73 with S. Shaw.  I think you said multiple times that
7        you were withdrawing your objection as to that one.  Correct?
8              MR. MURALI:  Yes, Your Honor.
9              Apologies, Your Honor.  Can we also withdraw our
10       objection, as to footnote 51 on page 15, with regards to Ms.
11       Grimes.  There were two HODs, one filed under Johnson, one
12       filed under Grimes.  However, the one under Johnson, there
13       was an issue with it, so plaintiffs are withdrawing their
14       claim regarding that HOD.  So it will just be only one HOD.
15             THE COURT:  You are withdrawing your objection to
16       51 --
17             MR. MURALI:  Yes, Your Honor.
18             THE COURT:  -- regarding S. Grimes?
19             MR. MURALI:  Yes, Your Honor.
20             THE COURT:  And you agree that there is one payable
21       HOD in that case?
22             MR. MURALI:  Yes.  There were two HODs filed.  There
23       was only one that plaintiffs can make a claim on, and that is
24       under the name Grimes.
25             THE COURT:  Okay.  What about the payment?
```

1          MR. MURALI:  I believe Mr. Drake can speak to that.

2          (Pause)

3          MR. MURALI:  Yes, Your Honor, plaintiffs concede

4     payment of $2,589.75.

5          THE COURT:  You withdraw the objection to footnote

6     number 52?

7          MR. MURALI:  Yes, Your Honor.

8          THE COURT:  Let's move forward then to footnote 75.

9          MR. MURALI:  Yes, Your Honor, I believe we are in

10    agreement on footnote 75.

11         THE COURT:  Okay.  Footnote 76.  There are two HODs.

12    This deals with T. Stevens.  You have indicated or you have

13    suggested you provided three HODs.

14         MR. MURALI:  Yes, Your Honor.

15         THE COURT:  But the booklet that I received only has

16    two HODs, and they match the HODs in the paperwork provided

17    by the City, which is reflected in the Court's preliminary

18    order.

19         MR. MURALI:  Yes, Your Honor.  May I just have a

20    moment to consult with Mr. Drake?

21         THE COURT:  Okay.

22       (Pause)

23         MR. MURALI:  Your Honor, we withdraw the objection to

24    76.

25         THE COURT:  Withdraw the objection to footnote 76.

1           MR. MURALI:  Yes, Your Honor.  So two HODs for

2     Stevens, T.

3           THE COURT:  Okay.  Footnote 77, we're in agreement.

4           MR. MURALI:  Yes, Your Honor.

5           THE COURT:  Footnote 78, we're in agreement as to the

6     number of HODs.

7           MR. MURALI:  Yes, Your Honor.

8           THE COURT:  But as to the payment, what's the

9     plaintiffs' position on that?

10           MR. MURALI:  Let me consult with Mr. Drake for a

11     moment.

12           THE COURT:  Okay.

13        (Pause)

14           MR. MURALI:  Your Honor, plaintiffs waive, as it is a

15     $2 difference.

16           THE COURT:  You waive that dispute, withdraw that

17     objection.

18           Wheeler, W., footnote 80.

19           Did I skip one?

20           MR. MURALI:  79, Your Honor.

21           THE COURT:  I skipped one.

22           MR. MURALI:  This is Wade, L.

23           THE COURT:  Okay.  So this is the HOD that I think I

24     alerted everyone to over our teleconference.  Preliminary

25     order reflected four HODs.  You provided five for L. Wade,

1    but one of those appears to reflect a teleconference, just an

2    interim teleconference.  So are you still pressing for

3    payment for that piece of paper?

4            MR. MURALI:  Let me consult with Mr. Drake.

5            THE COURT:  Do you know which one I'm referring to?

6    Let's just make the record clear.

7            MR. MURALI:  Sure.

8            THE COURT:  It is the document which reflects a

9    September 13, 2001 telephone conference call, and it is dated

10   the same date by David R. Smith, Hearing Officer.  It says

11   that this is an interim administrative decision.  But what it

12   reflects is just a status telephone conference call.

13           So yes, what is the plaintiffs' position on that?

14           MR. MURALI:  Your Honor, Mr. Drake will speak to

15   that.

16           MR. DRAKE:  Your Honor, is that the HOD, date of

17   telephone conference call September 13th, September 26th, and

18   October 11th?

19           THE COURT:  This one is just dated September 13th.

20   Hold on.

21           It is dated September 17th, but it reflects a

22   telephone conference call being held on September 13th.

23   Review the status of the placement activity for the child.

24           MR. DRAKE:  The one, date of telephone conference

25   call dated September 13, 2001, I believe that should be

1    withdrawn.

2              THE COURT:  I think it should, too.  I don't see any

3    basis for that being counted for an HOD.

4              That brings us back to four HODs, plaintiffs having

5    withdrawn their request.

6              Let's go to footnote 80, W. Wheeler.  In this case,

7    for this plaintiff, the preliminary order said four HODs.

8    You provided the Court with five, which you purport to be

9    HODs.

10             MR. MURALI:  Yes, Your Honor.

11             THE COURT:  So what is the situation here?

12             MR. MURALI:  Your Honor, plaintiffs maintain five

13   HODs.

14             THE COURT:  The new one is the one dated October 15th

15   of 2004.

16             In my book, I must say, I just have the first page of

17   what says Hearing Officer's Decision Cover Page.

18             MR. MURALI:  Yes, Your Honor.

19             THE COURT:  I don't have any other pages.  So I have

20   no idea what was decided, what it is --

21             MR. MURALI:  Yes, Your Honor.

22             THE COURT:  -- if you prevailed.

23             MR. MURALI:  May I just have a moment?

24        (Pause)

25             THE COURT:  The other four HODs I believe were

1    accounted for in the government's paperwork.

2         (Pause)

3              THE COURT:  The government's paperwork indicates that

4    there were five HODs, but one of them was denied because it

5    was nothing more than a continuance, according to that

6    paperwork.  And that HOD, the one that was denied, was dated

7    April 24th of 2003, but that HOD is not among the five that's

8    been given to the Court by the plaintiffs.  The five that the

9    plaintiffs gave the Court, four of them match up with the

10   four in the government's paperwork, which they had approved

11   for payment.  There is a fifth one dated October 15th of

12   2004, which is not in the government's paperwork that I think

13   the Court needs to make a decision about.  My issue is that

14   all I have is a cover page.  I have nothing to indicate

15   whether or not --

16             MR. DRAKE:  May I inquire, Your Honor, which HOD is

17   it?

18             THE COURT:  October 15th of 2004 for W. Wheeler.  It

19   is the first HOD for Wheeler.

20             No, it is not the first.  It is the last HOD for W.

21   Wheeler.

22             MR. DRAKE:  Okay.  I only have the cover sheet, and

23   that's all.  It is simply a reproduction problem there.  I

24   don't know what may have happened to it.  But that, we

25   wouldn't voluntarily withdraw that without getting the

1    original and checking to be sure what the rest of the pages

2    show.

3              THE COURT:  Okay.  Mr. Copeland.

4              MR. COPELAND:  We don't think it should be counted,

5    Your Honor.  There is no evidence that they prevailed on it,

6    that it was actionable, that they were entitled to recover

7    fees from it.  Unless they can establish that it was missed

8    by a showing that they actually prevailed on it, we don't

9    think it should be counted.

10             THE COURT:  I don't think there is a basis for

11   showing that you prevailed at this point.  We have to speak

12   about at the end of the hearing if I'm going to permit

13   additional evidence in the case.  This is the third hearing

14   date in this case.  I think it is time for the record to be

15   closed.  I will hear from the parties at the end once

16   everyone is knowledgeable about what may be missing and

17   what's not.

18             Let's move on then with regard to K. Wingfield,

19   number 81.

20             MR. MURALI:  Yes, Your Honor.

21             THE COURT:  This is one we have dealt with

22   previously; is it not?

23             MR. MURALI:  I don't believe we have dealt with

24   Wingfield specifically, but it is in the class of single

25   minor plaintiffs.  So there is one HOD for Wingfield listed

1    amongst the single plaintiffs.

2            THE COURT:  That's where you think it should go?

3            MR. MURALI:  Yes, Your Honor.

4            THE COURT:  Essentially, we should remove him from

5    the Adams case --

6            MR. MURALI:  Yes, Your Honor, and apply it to

7    Wingfield.

8            THE COURT:  His one HOD should go in his individual

9    case, right?

10           MR. MURALI:  Yes, Your Honor.  And I believe that's

11   how the Court has listed it on page 26.

12           THE COURT:  The city doesn't have any objection to

13   that; right?

14           MR. COPELAND:  Correct.

15           THE COURT:  Let's go to Woodberry, J., number 82.

16           MR. MURALI:  Yes, Your Honor.

17           THE COURT:  In this case, in the chart, the Court's

18   preliminary ruling, is two HODs; you have provided three.

19           MR. MURALI:  Yes, Your Honor.

20           THE COURT:  Two of which match up to the ones

21   identified by the District.  One, dated March 24th, of 2005,

22   does not.

23           MR. MURALI:  Yes, Your Honor.

24           May I have one moment to clarify something with

25   Mr. Drake?

1          THE COURT:  Yes.

2      (Pause)

3          MR. MURALI:  Your Honor, I believe the other one is

4   in A.C., on page 10, so that would account for all three.

5          THE COURT:  J. Woodberry.

6          MR. MURALI:  J. Woodberry?

7          THE COURT:  Yes, J. Woodberry.  He is listed as a

8   plaintiff in A.C. Clark?

9          MR. MURALI:  Yes, Your Honor, on page 10, third from

10   the bottom.  So I believe that would account for the third.

11          THE COURT:  Okay.  You didn't have any objections to

12   that?

13          All right.  No objection to that, Mr. Copeland?

14          MR. COPELAND:  No, Your Honor.

15          THE COURT:  We go to the J. Woodberry, the payments

16   under footnote 83.

17          MR. MURALI:  Yes, Your Honor.  Plaintiffs are

18   maintaining that $4,015 was paid in fees and $68 was paid in

19   costs, per Mr. Drake's records.

20          THE COURT:  Okay.  Go back to J. Woodberry, under

21   A.C. Clark.

22          MR. MURALI:  Yes, Your Honor.

23          THE COURT:  Look how much the payment is there, which

24   you didn't object to.  It's the same amount, $4,015.

25          MR. MURALI:  Yes, Your Honor.  That's the extent of

1    payment Mr. Drake has for plaintiff named J. Woodberry,

2    across both cases, Your Honor.

3            THE COURT:  Okay.  So for number 83, you think that

4    number should be zero?

5            MR. MURALI:  Yes, Your Honor, if the 4,015 is

6    reflected in --

7            THE COURT:  All right.  Mr. Copeland.

8            MR. MURALI:  With $68 having been paid in costs.

9            MR. COPELAND:  Your Honor, this is one of the cases

10   we touched on last week where we processed it for payment.

11   There is record, there is information in the record

12   reflecting it was processed.  By and large, the plaintiff

13   confirms that payments processed under that fashion were

14   received.  In fact, even with this evidence today, I think

15   most of the payments that we talked about earlier for this

16   sort of situation, I understand that Mr. Drake keeps his

17   files by child name, it's reflected, the checks often come

18   with multiple names on them.  It seems to me that could

19   present an opportunity to make a mistake in terms of filing.

20   I think there is sufficient evidence to conclude that there

21   was payment made in this case.

22           THE COURT:  Okay.  All right.  Let's go on to 484, S.

23   Woodberry.  Essentially, you are admitting to three.

24           MR. MURALI:  Yes, Your Honor.

25           THE COURT:  We said four, right?

—64—

1           MR. MURALI:  Yes, Your Honor.

2           THE COURT:  You consent to three?

3           MR. MURALI:  Yes, Your Honor.  We were only able to

4      find three HODs for S. Woodberry.

5           THE COURT:  So your prior submission was just

6      incorrect?

7           MR. MURALI:  Yes, Your Honor.

8           THE COURT:  Okay.  Mr. Copeland.

9           MR. COPELAND:  Your Honor, we trust our records.  We

10     said there were four.  We would ask the Court to say that

11     there were four.

12          THE COURT:  I thought your dispute summary sheet does

13     not state the number of HODs with respect to this plaintiff.

14     I thought this one was made entirely on the concession of

15     plaintiffs, which they say was wrong.

16          MR. COPELAND:  I'm sorry.  I was looking at the wrong

17     one.

18          THE COURT:  84.

19          MR. COPELAND:  Yes, I apologize.  We can go with

20     three if that is what plaintiffs' records establish.

21          Your Honor, actually, I need to revise my opinion on

22     this one.

23          THE COURT:  Go ahead, Mr. Copeland.

24          MR. COPELAND:  We do have one of the three that have

25     been provided, in the Clark case.  That's on page 10.

1    Really, there are only two reflected here, which candidly,

2    appears to align with the amount that was paid, of $8,000.

3              Again, I apologize.  I was on the wrong Woodberry.

4              MR. MURALI:  Your Honor, if I may, plaintiffs are

5    willing to accept two in Adams and one in A.C. Clark.

6    However, the total payment on all of those, according to

7    plaintiffs' records, would be $4,030.

8              THE COURT:  That's the next objection.  Let's just

9    get the HODs down.

10             Okay.  On the HODs, it sounds like the parties are

11   now in agreement that there was a total of three.  There is

12   one for J. Woodberry in the A.C. Clark case and two for that

13   individual in the S. Woodberry case.  Is that correct?

14             MR. MURALI:  Yes.

15             THE COURT:  The parties are in agreement about that.

16             As for total amount of money that was paid?

17             MR. MURALI:  Yes, Your Honor.  As I said, Mr. Drake's

18   records reflect a total of $4,030 paid for this plaintiff

19   across all cases.

20             THE COURT:  Which is the amount of money that was

21   owed and that the City said was paid with regard to S.

22   Woodberry in the A.C. Clark case.

23             MR. MURALI:  Yes, Your Honor.

24             THE COURT:  You don't believe there were any payments

25   made with regard to this child in the Adams case?

1          MR. MURALI:  Yes, Your Honor.

2          THE COURT:  I'm going to skip over that.  I think I

3     know the parties' arguments on that.

4          Let's move on to the next one, which is 86,

5     K. Wright.

6          MR. MURALI:  Yes, Your Honor.  Plaintiffs count three

7     HODs for Mr. Wright.  However, there appears to be one HOD in

8     A.C. Clark.

9          THE COURT:  Okay.  Again, you're withdrawing your

10    objection --

11         MR. MURALI:  Yes, Your Honor.

12         THE COURT:  -- providing the chart reflects, as it

13    does now, one HOD for K. Wright in the A.C. Clark case and

14    two in the Adams case.  Is that correct?

15         MR. MURALI:  Yes, Your Honor, three total.

16         THE COURT:  Mr. Copeland, you don't have an objection

17    to that?

18         MR. COPELAND:  No, we do not.

19         THE COURT:  K. Wright, as for the payments, what is

20    your position?

21         MR. MURALI:  We agree.

22         THE COURT:  You're in agreement?

23         MR. MURALI:  Yes, Your Honor.

24         THE COURT:  Now we're to individual notes,

25    footnote 88 with regard to the Allen case, K. Allen.  This is

1     the dispute over the number of HODs, but I think we have

2     previously resolved this.

3              MR. MURALI:  Yes, Your Honor, there should be two

4     HODs now.

5              THE COURT:  Well, I thought we were shifting all

6     three to here.

7              MR. MURALI:  I'm sorry.  Yes.  All three go to the

8     individual case, yes.

9              THE COURT:  And similarly, we will shift --

10             MR. COPELAND:  That's not correct, Your Honor.

11             THE COURT:  Okay.

12             MR. COPELAND:  On Allen, if Your Honor will recall,

13    there were only two.  There was one in Adams originally, and

14    there was one in this individual case.  Plaintiff submitted

15    four in their stack of HODs.  One of them was a duplicate,

16    and one of them was from 1997, when there was no fee cap in

17    place.  The plaintiffs agreed to withdraw that one.

18             THE COURT:  Okay.

19             MR. MURALI:  Apologies, Your Honor.  Mr. Copeland is

20    correct.  Two HODs total.

21             THE COURT:  Two HODs here.

22             MR. MURALI:  Yes.

23             THE COURT:  None in the other case?

24             MR. MURALI:  Yes, Your Honor.

25             THE COURT:  As for payment, footnote 89.

1        MR. MURALI:  Yes, Your Honor.

2        THE COURT:  You agree that there has been a payment

3    of $11,973?

4        MR. MURALI:  And $0.50, yes, Your Honor.

5        THE COURT:  And $0.50.

6        Okay.  Certainly, if there is only going to be two

7    HODs, that is in excess of the amount that is due.  Right?

8        MR. MURALI:  Yes, Your Honor.  Let me consult with

9    Mr. Drake regarding this.

10        (Pause)

11        MR. MURALI:  Yes, Your Honor.  That would go over the

12    8,000 that would be owed up to the fee cap.

13        Plaintiffs would again renew their position that any

14    amounts over would count as simply having satisfied the

15    $4,000 requirement.

16        THE COURT:  Okay.  Let's go to number 90.

17        MR. MURALI:  Yes, Your Honor.

18        THE COURT:  We had originally said one HOD, based on

19    Magistrate Judge Kay's decision.  You provided five HODs.

20        MR. MURALI:  Yes, Your Honor.

21        THE COURT:  Or so you say.

22        MR. MURALI:  I'm just verifying that they are all

23    here, Your Honor.

24        (Pause)

25        MR. MURALI:  Your Honor, I can attest that there were

1    five counted.  I'm not certain why they weren't copied in the

2    packet that was provided, but there is only one currently.

3              THE COURT:  In this case, Judge Kay made a finding as

4    to the number of HODs.  There were no objections.  So what is

5    your basis for trying to increase the HODs in this case?

6              MR. MURALI:  Your Honor, I would have to let

7    Mr. Drake speak to that.

8              THE COURT:  Okay.

9              MR. DRAKE:  I don't recall that issue at all, Your

10   Honor.  I can simply fall back on what Judge Lamberth said,

11   is pay the HODs up to the $4,000.  I have no other response.

12             THE COURT:  Mr. Copeland, do you want to be heard on

13   that?

14             MR. COPELAND:  No, Your Honor.

15             THE COURT:  Number 91.

16             MR. MURALI:  Yes, Your Honor.

17             THE COURT:  What is the issue here?

18             MR. MURALI:  Again, it would be, provided the five

19   HODs, the amount owed would be $20,000 as opposed to the

20   4,000 that the Court has listed.  And thus far, according to

21   Mr. Drake's records, there is no record of payment in the

22   Bradley case.

23             THE COURT:  We don't say there has been any payment

24   made.

25             MR. MURALI:  That's correct.

1          THE COURT:  Aren't we in agreement on that?

2          MR. MURALI:  Yes, Your Honor.  The only dispute would

3    be with regard to the amount of fees owed.

4          THE COURT:  Either 4,000 or --

5          MR. MURALI:  20,000, Your Honor.

6          THE COURT:  -- 20,000.

7          Okay.  Mr. Copeland?

8          MR. COPELAND:  Your Honor, based on the age of this

9    case, we don't have anything additional to submit to the

10   Court.  Our database doesn't allow us to go back that far.

11         THE COURT:  I think we are all agreed that nothing

12   has been paid, and it is just an issue of the number of HODs.

13   I assume the City agrees with the preliminary ruling.  Judge

14   Kay found one HOD, and that's what it should be.

15         MR. COPELAND:  Correct.  For purposes of clarity, I

16   wouldn't say I would agree that it hasn't been paid.  I just

17   would agree I don't have any evidence.

18         THE COURT:  That's where we are.  That's what the

19   records show.  I hear you.

20         Let's go on to number 92.

21         MR. MURALI:  Yes, Your Honor.

22         THE COURT:  We said one HOD in the preliminary order.

23   You have provided three HODs.

24         MR. MURALI:  Yes, Your Honor.  And I believe this was

25   taken care of --

1        THE COURT:  Earlier, right?

2        MR. MURALI:  -- earlier.

3        THE COURT:  We are going to shift a total of three

4    HODs into Isaac, E., right, the individual case?

5        MR. MURALI:  Yes, Your Honor.

6        THE COURT:  We previously have taken care of 92.  The

7    City doesn't object to that?

8        MR. COPELAND:  No.

9        THE COURT:  We go to 93 with regard to the payment.

10       MR. MURALI:  Yes, Your Honor.  Plaintiffs have a

11   record of payment of $13,596.50.

12       THE COURT:  Okay.  We will make sure that it reflects

13   that concession.

14       MR. MURALI:  Yes, Your Honor.

15       THE COURT:  In any event, you are owed nothing on

16   this one.

17       MR. MURALI:  Yes, Your Honor.

18       THE COURT:  Okay.  94, D. Jones.  Haven't we

19   previously dealt with this issue?  Isn't it similar?

20       MR. MURALI:  I believe so, yes.

21       THE COURT:  In this case, we are going to move, it

22   looks like, a total of four HODs into the individual case?

23       MR. MURALI:  Yes, Your Honor.

24       THE COURT:  The prior D. Jones has got one.  The

25   D. Jones in the Adams case, there is one HOD there.  We had

1    another HOD in the individual case.  That's two HODs.  You

2    have provided four.

3              MR. COPELAND:  If I may jump in, Your Honor, and

4    clear this up?

5              THE COURT:  Sure.

6              MR. COPELAND:  One of the four is a duplicate of the

7    other.  The fourth one was from 1997, when there was no fee

8    cap.

9              THE COURT:  We did deal with this one the other day.

10             MR. MURALI:  Yes, Your Honor, this was resolved.

11             THE COURT:  We're going to have two HODs.

12             MR. MURALI:  Yes, two in Jones.

13             THE COURT:  As to the payment, number 95?

14             MR. MURALI:  Yes, Your Honor.

15             THE COURT:  What is your position as to the payment?

16             MR. MURALI:  That would probably now be $1,716 owed

17    minus the $8,000 for the two HODs that were removed.  So

18    plaintiffs' position is that $1,716 is still owed on Jones,

19    D.

20             THE COURT:  Okay.  Where is that number coming from?

21             MR. MURALI:  Your Honor, that would be a combination

22    of Mr. Drake's records and the figure here, $9,716, was based

23    on $16,000 owed.  As two HODs have since then come out, it

24    would be $8,000 less, so $1,716.

25             THE COURT:  Okay.  I can do the calculation.

1          MR. MURALI:  Yes, Your Honor.

2          THE COURT:  I'm trying to confirm how much you

3     concede has been paid.

4          MR. MURALI:  Just one moment, Your Honor.

5        (Pause)

6          THE COURT:  D. Jones, in the Adams case, you conceded

7     that $10,230 has been paid in fees and $54 in costs.

8          MR. MURALI:  Yes, Your Honor.

9          THE COURT:  That would suggest you're not going to be

10    owed anything.

11         MR. MURALI:  In light of that, let me confer with

12    Mr. Drake briefly.

13            (Pause)

14         MR. MURALI:  Yes, Your Honor, that is correct.  My

15    apologies.  Plaintiffs then find that provided -- the 10,000

16    figure, payment has been made up to the cap, and again state

17    the position that this would then satisfy payment with no

18    further crediting.

19         THE COURT:  Okay.  96, D. McDowell.

20         MR. MURALI:  Yes, Your Honor.  I believe this was

21    also dealt with previously under Adams.

22            (Pause)

23         MR. MURALI:  We agree to move all the HODs over to

24    this case.

25         THE COURT:  How many is that?  You provided three.

1    MR. MURALI:  Yes, Your Honor.

2    THE COURT:  You want them all moved into this case?

3    MR. MURALI:  Yes, three total.

4    THE COURT:  You agree with that, Mr. Copeland?

5    MR. COPELAND:  Yes, Your Honor.

6    THE COURT:  As for the payment in this case?

7    MR. MURALI:  Your Honor, just one moment, Your Honor.

8        (Pause)

9    MR. MURALI:  Yes, Your Honor.  We only have a payment

10   up to, I believe, $2,540 that would reflect the fees and

11   costs, as shown on the Court's chart at 18, page 18.

12   THE COURT:  You concede there is $2,500 in fees and

13   $40 in costs?

14   MR. MURALI:  Yes, Your Honor, and the rest is

15   outstanding.

16   THE COURT:  You believe you are owed the difference

17   between that and 12,000?

18   MR. MURALI:  Yes, Your Honor.

19   THE COURT:  Okay.  Mr. Copeland.

20   MR. COPELAND:  We don't have anything to add on that,

21   Your Honor.

22   THE COURT:  That is what your records reflect, as

23   well, in terms of payment?

24   MR. COPELAND:  Correct.

25   THE COURT:  I think we are in agreement on that one

 1   as to how much is owed.

 2           A. Thomas, number 98.

 3           MR. MURALI:  Yes, Your Honor.  The physical count

 4   reflected seven HODs, one less than the original count that

 5   plaintiffs provided.  I believe these have all been provided

 6   to the Court.

 7           THE COURT:  The chart said two HODs.  Is Thomas

 8   involved in one of the other cases, too?

 9           MR. MURALI:  I'm checking right now, Your Honor.

10           MR. COPELAND:  Thomas is in Abraham, as well, Your

11   Honor.

12           THE COURT:  There is one HOD there.

13           MR. COPELAND:  Correct.  If you look at the seven

14   HODs that were provided, four of them match up to the HODs in

15   Abraham; one matches up to the one here in the individual

16   suit; one the plaintiff was not the prevailing party --

17           THE COURT:  Hold on.  When you say four match up in

18   Abraham, there is only one in Abraham.  Right now the chart

19   shows one HOD for T. Thomas.

20           A. Thomas in Abraham is the same as A. Thomas in the

21   individual case; is that correct?

22           MR. MURALI:  Yes, Your Honor.  And the Court has

23   provided six in the Abraham case and one in the individual,

24   and so plaintiffs, as with the other single minor plaintiffs,

25   would request that all the HODs be moved to the single minor

1    plaintiffs.

2              THE COURT:  A. Thomas has got six in the Abraham

3    case.  There are two in the individual case.  That makes

4    eight.  You say you provided us with seven?

5              MR. MURALI:  Yes, Your Honor.  Seven was all

6    plaintiffs were able to locate.

7              THE COURT:  Okay.  What do you have to say,

8    Mr. Copeland?

9              MR. COPELAND:  In this case, based on what plaintiffs

10   have provided, it appears on one case they were not a

11   prevailing party.  On another, it is a rescheduling, is the

12   conclusion of the HOD.  So in this case, because of those two

13   things, we would ask the Court to actually reduce it

14   from -- we would ask the Court to go no higher than seven.

15             THE COURT:  Okay.  Right now, there's eight.  They

16   concede there is only seven.  So you're both agreeing to

17   seven?

18             MR. COPELAND:  Yes.

19             MR. MURALI:  Yes, Your Honor.

20             THE COURT:  We're going to move seven into the Thomas

21   individual case.  And there will be none for Thomas, A. in

22   the Abraham case.

23             MR. MURALI:  Yes, Your Honor.

24             THE COURT:  As far as payment, I think the parties

25   are in agreement that there was $10,300 in fees and $95 in

1    costs made in the Abraham case; right?

2           MR. MURALI:  Yes, I believe that is correct.  That's

3    the amount that was paid in Abraham, $10,300 and $95 in

4    costs.  Plaintiffs do not have an objection to that figure.

5           THE COURT:  Okay.  And then 8,000 has been paid in

6    the individual case; right?

7           MR. MURALI:  Yes, Your Honor, $8,313.

8           THE COURT:  So we have to do the new math based on

9    seven HODs rather than eight?

10          MR. MURALI:  Yes, Your Honor.

11          THE COURT:  Okay.  Wingfield, number 99.

12          MR. MURALI:  Yes, Your Honor.  We have agreed there

13    is only one HOD.  Wingfield was also a plaintiff in Adams,

14    and plaintiffs requested that Wingfield be moved to the

15    individual case.

16          We further agree with the Court that there has been

17    no payment on Wingfield.

18          THE COURT:  Okay.  We end up with one HOD for

19    Wingfield and no payment; correct?

20          MR. MURALI:  Yes, Your Honor.

21          THE COURT:  Is that correct, Mr. Copeland?

22          MR. COPELAND:  Yes, Your Honor.

23          THE COURT:  All right.  We have already discussed the

24    judgments and the parties' arguments with regard to how

25    credits are going to be assessed.

1          MR. MURALI:  Yes, Your Honor.  I would just like to

2    draw the Court's attention to, on page 28, there is a

3    standing objection to all the figures in chart E, the

4    judgments chart.

5          THE COURT:  Okay.  What are those objections based

6    on?  I assume one of them is that because these charts seem

7    to provide credit --

8          MR. MURALI:  Yes, Your Honor.

9          THE COURT:  -- for any what we have been calling an

10   overage, overpayment, payment in excess of the amounts in the

11   consent judgments in Abraham and Abrams.

12         MR. MURALI:  Yes, Your Honor.  The objections were in

13   terms of the crediting of these so-called overpayments, as

14   well as the total HOD counts being changed based off of

15   plaintiffs' records, which obviously have been changed again

16   during the course of these proceedings.  As such --

17         THE COURT:  That shouldn't affect the judgments.

18         MR. MURALI:  That's correct, Your Honor.  The

19   judgments themselves are untouched.

20         THE COURT:  I am just trying to understand the basis

21   for your objection to our calculation of the judgment.  It

22   seems to be based only on the fact that we were reducing the

23   judgment by any overage that has been paid; isn't that right?

24         MR. MURALI:  Yes, Your Honor.

25         THE COURT:  If I went the other way on that, you

1       would no longer object; is that correct?

2              MR. MURALI:  That's correct, Your Honor, if the

3       judgments remain as they were originally handed down, yes.

4              THE COURT:  You also make a request that I calculate

5       the interest through August 15th.

6              MR. MURALI:  Yes, Your Honor.

7              THE COURT:  I'm not going to do that.  Judge Lamberth

8       didn't ask me to.  Someone in the future, if payments are

9       going to be made, the calculations can be done going forward.

10             MR. MURALI:  Yes, Your Honor.

11             THE COURT:  Mr. Copeland, anything further about the

12      calculations, the judgments themselves beyond what we have

13      already talked about?

14             MR. COPELAND:  No, Your Honor.  If Your Honor

15      reverses his position with regards to the overpayments, of

16      course then we would object.

17             THE COURT:  I understand that.

18             Anything further that any party wishes to raise

19      today?

20             MR. DRAKE:  Yes, Your Honor.

21             I'm not sure if this is the appropriate forum to

22      bring this issue up, but I want to preserve it; that is, in

23      the A.C. case, Judge Kennedy's order was somewhat imprecise

24      in terms of just exactly what he was ordering.  He

25      accepted -- I should say did not accept all of the

1    recommendations of the magistrate.  I have been only able to

2    calculate, to account for -- I don't see where we have it

3    right now.  My records reflect that the payment that was

4    anticipated, the contemporaneous payment that was expected at

5    the time that Judge Kennedy entered his order was not made in

6    full.  I believe that I have found $103,000, I believe;

7    whereas, the indication was it was to be $129,000 paid.  The

8    inference was -- well, no inference.  I can't find the

9    difference.  I don't know.  It seems to me the District

10   surely should have a record in that regard in that particular

11   judgment.  Did they pay what was contemporaneously expected

12   to be paid?  I can't find it.

13           THE COURT:  Okay.  Mr. Copeland, do you want to be

14   heard on that?

15           MR. COPELAND:  Only that Judge Kay made a finding

16   that it had been paid.  We believe that the Judge would not

17   have made that kind of conclusion without sufficient proof.

18           THE COURT:  Okay.  All right.  Anything further,

19   Mr. Drake?

20           MR. DRAKE:  Nothing further, Your Honor.

21           THE COURT:  Anything further from you, Mr. Copeland?

22           MR. COPELAND:  I would only say, Your Honor, that as

23   part of the Court's process, inevitably you are going to have

24   to draw conclusions in gray areas where the evidence is not

25   as conclusive as the parties or the Court would like it.

1    Although defendants did not comply with this Court's order

2    from August of 2015 to produce the information from its

3    database to Mr. Drake timely, certainly when I became aware

4    of that problem we made sure that we kind of overdid it, to

5    make sure that he had everything possible from our database

6    to rectify our non-compliance.

7            From Mr. Drake's point of view, we have never been

8    produced anything to rely upon.  He speaks to his records and

9    what his records reflect, and we haven't seen anything.  When

10   Mr. Drake does find something, he hangs on to it until we

11   show up in Court, and springs it on us whenever he is about

12   to introduce it.  It deprives us of the opportunity to review

13   the information with our client.  It deprives us of the

14   opportunity to know what exactly is in his files.  And while

15   I don't think having reviewed his files would provide a

16   complete picture of the process, inevitably whenever he has

17   introduced something, there is something unanticipated in

18   that document or that packet of documents that helps the

19   defendants.  I can't help but think that if we had had the

20   opportunity to be provided with that information -- he is

21   constantly finding things when he reviews his files -- that

22   would have been something to help us.  In the course of the

23   Court's consideration of the evidence, we would hope that we

24   would be entitled to the benefit of the doubt on many of

25   those instances.

1          THE COURT:  Understood.

2          No further evidence from the City?

3          MR. COPELAND:  No, Your Honor.

4          THE COURT:  Or from Mr. Drake?

5          MR. DRAKE:  None, Your Honor.

6          THE COURT:  We've had multiple hearings in this case;

7    I'm not going to have any others.  The record is closed.

8    Today was your opportunity.  I sent out multiple warnings

9    that the record was going to be closed after today, and it

10   is.  So I will make my decision based on the record that is

11   before me now, and I, hopefully, will have that decision

12   issued before the end of the month.  That's what I'm shooting

13   to do.  Then you can continue to litigate if you so wish on

14   up to Judge Lamberth and beyond.

15         Thank you very much.

16         The parties are excused.

17         (Proceedings concluded at 2:10 p.m.)

18

19

20

21

22

23

24

25

1

2                        I N D E X

3

4

5                     E X H I B I T S

6

7        Plaintiffs' Exhibit                    Page

8              4                                  53

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           CERTIFICATE OF OFFICIAL COURT REPORTER

2

3           I, Patricia A. Kaneshiro-Miller, certify that the

4   foregoing is a correct transcript from the record of proceedings

5   in the above-entitled matter.

6

7

8   ----------------------------------      -----------------------

9   PATRICIA A. KANESHIRO-MILLER                    DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25