```
1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2
      - - - - - - - - - - - - - - - x
3     WANDA GERTRUDE ALLEN, et al.,
                    Plaintiffs,        CA No: 00-cv-00591-RCL-GMH
4
                                       Washington, D.C.
5                                      Friday, September 2, 2016
      vs.                              10:33 a.m.
6
      DISTRICT OF COLUMBIA,
7                    Defendant.
      - - - - - - - - - - - - - - - x
8

9     _____

10                 TRANSCRIPT OF EVIDENTIARY HEARING
            HELD BEFORE THE HONORABLE G. MICHAEL HARVEY
11                  UNITED STATES DISTRICT JUDGE
      _____
12
      APPEARANCES:
13
      For the Plaintiff:     RONALD LEE DRAKE, ESQ.
14                           MICHAEL MURALI, ESQ.
                             RON DRAKE LAW OFFICE
15                           5 P Street, SW
                             Washington, DC 20024
16                           (202) 682-0223
                             rondrakeatty@msn.com
17
      For the Defendant:     CHAD WAYNE COPELAND, ESQ.
18                           OFFICE OF THE ATTORNEY GENERAL FOR D.C.
                             441 4th Street, NW
19                           Suite 630 South
                             Washington, DC 20001
20                           (202) 724-6623
                             chad.copeland@dc.gov
21
      Court Reporter:              Lisa A. Moreira, RDR, CRR
22                                 Official Court Reporter
                                   U.S. Courthouse, Room 6718
23                                 333 Constitution Avenue, NW
                                   Washington, DC  20001
24                                 202-354-3187

25    Proceedings recorded by mechanical stenography; transcript
      produced by computer-aided transcription
```

1              P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  This is civil case Year

3    2000-591, *Wanda Gertrude Allen, et al. vs. District of*

4    *Columbia*.  This is a continued evidentiary hearing.  Would

5    the parties please introduce yourselves for the record,

6    beginning with the plaintiff.

7              MR. DRAKE:  Good morning, Your Honor; Ron Drake on

8    behalf of plaintiff, and I'm asking permission for him to

9    remain here is Michael Murali, who is a New York attorney

10   not admitted here.  He's not appearing in court on behalf of

11   plaintiffs but simply for me in handling the charge.

12             THE COURT:  That's fine.  Can you spell his last

13   name for the record.

14             MR. DRAKE:  I'm sorry?

15             THE COURT:  Can you spell his last name for the

16   record, please.

17             MR. MURALI:  M-u-r-a-l-i.

18             THE COURT:  Thank you.

19             MR. COPELAND:  Chad Copeland, here on behalf of

20   defendant.

21             THE COURT:  Mr. Copeland.

22             All right.  We're here for a continued hearing

23   with regard to the report and recommendation that Judge

24   Lamberth has asked me to produce in this case, which will

25   reflect the amounts still owed on the various judgments in

1    the case, including interest.

2              I plan on hearing counsel with regard to whatever

3    argument they want to make, and in the process of this

4    hearing today, I also want to go through each of the

5    objections that were included in the filings -- the recent

6    filings from the parties to the Court's chart which reflects

7    its preliminary rulings in this case.  So I literally want

8    to go through each of those footnotes and hear from both

9    counsel as to whatever the dispute is.

10             So I want to go through some of the general

11   objections, then I want to go through the specific

12   objections.  I think there's going to be a lot of getting up

13   and sitting back down because I'm going to hear from each

14   side with regard to each objection.

15             I know, however, that the parties may want to

16   either make a preliminary statement or provide their own

17   evidence in this case so I'm happy to do that first, but I

18   want to hear from the parties as to how they want to

19   proceed.

20             Mr. Copeland?

21             MR. COPELAND:  Your Honor, in terms of the

22   evidence the District is presenting today, we filed a

23   declaration of Ms. Harris-Lindsey last night, which we think

24   closes the loop.

25             THE COURT:  I was reading that a moment ago.

1          MR. COPELAND:  We believe that closes the loop on

2     our two issues.  Beyond that, we're prepared to address the

3     position of plaintiffs on everything.  But setting aside the

4     Court's conclusions on all of our legal objections which

5     have been heard multiple times in sort of multiple different

6     hearings, subject to our overruled positions, we accept the

7     Court's calculations.

8          THE COURT:  Okay.  Understood.  But you -- I

9     assume you plan to dispute some of these additional HODs; is

10    that correct?  Or not.  We can just go through each and

11    every one of them, and I plan to do that.

12         MR. COPELAND:  We could.  We could.  In fact, when

13    we go through them, we'll see that, in fact, none of them

14    are new.

15         THE COURT:  Okay.

16         MR. COPELAND:  None of them are new, or plaintiff

17    was not a prevailing party in them.

18         THE COURT:  So that's the sort of argument I'm

19    going to hear.  Understood.

20         Mr. Drake, I just want you to focus for a moment

21    on what additional evidence you're going to provide to the

22    Court this morning, if anything, other than the HODs that I

23    have reviewed.

24         MR. DRAKE:  All right.  Your Honor, I don't know

25    of any additional evidence we have other than I believe that

1    there were two HODs that I noted for the Court, and I

2    believe there was Nesbit that was not provided in that large

3    stack.  I brought copies for the Court, but I had at least

4    identified it so the Court, I believe, is aware of that.

5    And we had been -- we were prepared, subject to the Court's

6    indication of how it wished to proceed, to respond to the

7    different issues the Court raised with us in the

8    teleconference and proceed step by step.

9         Also, I'd like to make a remark in regard to

10   Mr. Copeland indicating that, as the Court knows, they filed

11   an affidavit late yesterday evening.  That was with our

12   consent.  We agreed to it.

13        Mr. Copeland and I have had a very collegial

14   effort to make things work.  I had indicated to him that Ms.

15   Harris-Lindsey and I had been opposing counsel on many, many

16   cases in the HOD stage, and I put full confidence in her.

17   We believe, however, that the affidavit itself really

18   doesn't do anything for the defendant, but that -- we'll

19   come to that at the appropriate time, but I did want the

20   Court to know that we had agreed, but -- that we had agreed

21   for them to do the affidavit and for her not to be here, but

22   we reserve the right to object to anything or to counter

23   anything that she may have said there.  So I did want the

24   Court to know that at least at this stage we have worked

25   very cooperatively together.

1          THE COURT:  Okay.  Thank you for that.

2          So what I have in front of me is the plaintiffs'

3    HODs and settlement agreement.  This is the large stack that

4    was provided to the Court I don't even remember when.  Was

5    it at the July hearing, or was it after the July hearing?

6          MR. DRAKE:  That's correct, Your Honor.  During

7    the course -- in open court the last time we were here.

8          THE COURT:  Okay.  All right.  Well, that's what I

9    have in front of me.

10          So Mr. Copeland, I understand that you're going to

11    have arguments, we'll say, on the merits; that is, whether

12    or not a given HOD in here is properly part of a given case

13    indicating whether or not the individuals, in fact,

14    prevailed, et cetera, et cetera.  But do you object to just

15    the admission of all of these HODs?  I mean, do you have any

16    issue with their authenticity in these proceedings?

17          MR. COPELAND:  No, Your Honor.

18          THE COURT:  Okay.  I'm going to go ahead and

19    admit, then, this -- plaintiffs' HODs and settlement

20    agreements as an exhibit.  We will mark it as -- we have a

21    redacted version, and it's the redacted version that

22    ultimately we will -- if it goes on the record, will go on

23    the record.

24          I do have an unredacted version as well that's in

25    front of me.  So we will call this Plaintiffs' Exhibit 1.

1          MR. DRAKE:  Yes, Your Honor.  Thank you.  We move

2      its admission.

3          THE COURT:  Okay.  It will be admitted.

4          Before we get started, I also want to spend a

5      moment because I want to make sure I understand what

6      happened since the last hearing.

7          I think the best -- my understanding of what

8      happened, you know, pursuant to the Court's direction after

9      the last hearing was that efforts were made to once again go

10     back into the District's databases to determine whether or

11     not the District had any additional records regarding

12     payment to Mr. Drake in all of these cases.

13         Mr. Copeland, I just want to hear you on that.  I

14     know that you've got it in the declaration, but I want to

15     know from you what exactly took place.

16         MR. COPELAND:  Since the last hearing, DCPS went

17     back and confirmed that the pool, the nature of the pool --

18     what the pool was.  The pool was actually conducted before

19     Your Honor's August 28th -- I think it was August 28, 2015,

20     order, and DCPS wanted to make sure that it got everything

21     related to Mr. Drake, so it brought back in one of the

22     creators of the database itself to make sure that the pool

23     was complete and comprehensive.  They pulled everything

24     associated with Mr. Drake's name, and so that was pooled and

25     set aside and has remained that way ever since.

1          And it should have been produced back in the fall

2     of 2015, late summer or early fall of 2015.  And for reasons

3     that I can't find out because the attorney who is no longer

4     on this case is not available for me to speak with -- we

5     just produced everything.  We'll give it to the Court as

6     well so the Court would see it.

7          THE COURT:  You produced it.  It was not produced

8     last fall.  It was produced in August of this year.

9          MR. COPELAND:  Correct.  I don't remember the

10    exact date.  It was the date in the Court's order.

11         THE COURT:  August 5th, yes.

12         MR. COPELAND:  Yes, we produced it on that date.

13    We produced it to Mr. Drake, and we produced it to the

14    Court.

15         We attempted to go through and connect up the

16    information that was in the database.  It's mostly invoices

17    and sort of records with the specific HODs in this case, and

18    for a variety of reasons, that really wasn't possible.  A

19    case like Abraham predates the existence of the database

20    entirely so that information wasn't in it at all.

21         The earliest entry for Mr. Drake was 2004, if I

22    remember correctly, and that -- it cuts out a large chunk of

23    what's before the Court today.

24         And then once you go in and you try and look at

25    the individual children, the invoices, they are not

1    particularized to HODs.  And it was just -- we couldn't

2    match it up with any kind of accuracy or reliability.

3           I understand from Mr. Drake -- and he can

4    certainly speak for himself -- that as prepayment evidence,

5    he didn't believe that this was relevant to the Court

6    anyway, but nevertheless we thought -- we explained it to

7    him, and he understood what it was.  We gave him an

8    opportunity to ask any questions about what we had produced

9    to him, and he had none.

10          There are no check stubs or anything -- print

11   records, anything like that, in the CFO's office.

12          THE COURT:  So there are no check stubs.  There's

13   no, like, document with a "Paid" written on it or a paid

14   stamp?

15          MR. COPELAND:  That's correct.  The records -- all

16   of these payments are between seven to ten years ago, and

17   CFOs -- all District checks are issued by the CFO's office

18   through the Treasury regardless of the agency, and the

19   records retention is nothing -- is not going to allow us to

20   reach back that far by -- not even close.  So all of that

21   information was not available for us to use to compare sort

22   of post-payment documentation.

23          THE COURT:  All right.  So now I'm trying to

24   understand the difference between the documents that you

25   produced on August 5th and, we'll say, the dispute summary

1    sheets.  And for me there's two categories of that.  There's

2    the dispute summary sheets for I think it's the Abraham and

3    Adams cases, which I think is what we all have been

4    referring to as dispute summary sheets in this case for many

5    years.  There are also those documents that appear to have

6    been created not by DCPS, but by the Office of Attorney

7    General, which tried to provide the same sort of information

8    you would see in a dispute summary sheet, but -- I'm calling

9    all of that dispute summary sheets, but I realize there's an

10   asterisk next to the documents in the Clark case.

11        I'm trying to compare those documents to the

12   documents that were produced on August the 5th.  They seem

13   to be different, the same, I don't know.  I don't know what

14   to do with them.

15        MR. COPELAND:  They're different.  We don't think

16   that the documents produced on August 5th are what the Court

17   should use at all.  They're really -- the database is

18   intended to hold invoices generally.  It's not intended to

19   necessarily provide an analysis of the invoice itself.

20   Sometimes that information finds its way into the database,

21   but the dispute summary sheets, both in Abraham and Adams

22   and the ones in Clark that were prepared by the Office of

23   the Attorney General, we believe that that is the

24   information that we believe is reliable because it's a more

25   detailed consideration and analysis.  It was -- if the Court

1    wants an explanation as to how they were prepared, it was --

2    there was a backlog of cases, and there was a declaration

3    from Erika Pierson, and I have a copy of -- a list of the

4    cases I'll provide to the Court, if it would like it, the

5    docket number and the case number that confirms that.

6         Ms. Harris-Lindsey believes that was the case,

7    which is why her declaration is a little bit uncertain as to

8    affirmatively saying that this was part of a backlog, but

9    she believes that's what it was.  And it's confirmed by --

10   in other cases, specifically a declaration by Erika Pierson.

11        THE COURT:  Which says what?

12        MR. COPELAND:  It says that -- we had missed a

13   deadline.  This will come up in Nesbit because that's where

14   this comes up.

15        There was a Court-ordered deadline to provide the

16   District's response to the invoices, our position on what

17   should be paid.  And in it she talks about clearing out the

18   backlog of cases -- and there was a large backlog of

19   cases -- and the invoices that needed to be paid, and the

20   format of the invoices and the information in them had made

21   it especially difficult for her to figure out and allocate

22   funds among all of the invoices.  So that's really the

23   focus, to explain why the filing was made late to the Court,

24   but it certainly confirms that there was a backlog that OAG

25   and DCPS were trying to -- from all of these fees was trying

1    to get out from under.  I think that's also corroborated by

2    the fact of these multiparty cases, that these large numbers

3    are a way to move all these invoices out.

4         But the Office of the Attorney General assisted in

5    that.  There's a -- her name was Eden Miller.  I can confirm

6    for the Court that she worked in the section that handled

7    these kinds of cases because we overlapped in our time at

8    the Office of the Attorney General, and Ms. Harris-

9    Lindsey's memory of looking through it and sort of tracking

10   down what these things were is that Ms. Miller was largely

11   responsible for preparation of these, and it was for

12   purposes of paying attorneys' fees --

13        THE COURT:  Preparation of these.  "These" being

14   the documents produced from...?

15        MR. COPELAND:  No, preparation of the dispute

16   summary sheets in Clark.

17        THE COURT:  The dispute summary sheets, okay.

18        MR. COPELAND:  They were prepared by Ms. Miller.

19        THE COURT:  Okay.  I understand.

20        MR. COPELAND:  Or under her direction.

21        And so for the same reason that we think the Court

22   was proper to rely on the dispute summary sheets in Abraham

23   and Adams, we believe it was proper and reliable for the

24   Court to rely upon them in Clark.

25        THE COURT:  But all of those documents, including

1   the dispute summary sheets in Abraham and Adams, are they

2   all prepayment documents?

3           MR. COPELAND:  They are.

4           THE COURT:  So they were produced showing how much

5   the government had to pay and was going to pay.

6           MR. COPELAND:  And was going to pay.

7           THE COURT:  But they're not post-payment

8   documents?

9           MR. COPELAND:  Correct.  Regrettably, the District

10  has no post-payment evidence to present to the Court.

11          THE COURT:  Okay.

12          MR. COPELAND:  Okay.

13          THE COURT:  All right.  Mr. Drake.

14          I don't know if you just want to speak to that one

15  issue, which is the Court's use -- what use should the Court

16  make, if any, of the documents that were produced on August

17  the 5th?

18          MR. DRAKE:  Your Honor, if the Court please, may I

19  have just a moment of showing the Court a bit of background

20  and context of where we are today and how we wound up in

21  this situation?  This isn't the plaintiffs' doing.  This is

22  defendant.

23          Defendant knew that they had judgments outstanding

24  to which they had consented, and the record before Judge

25  Lamberth shows that they didn't dispute the fact that they

1    drafted the fee cap.  They drafted the exact language and

2    took it to the Hill.

3           Having done that and then to have destroyed,

4    discarded, or whatever else they may have done with their

5    records regarding payment -- not referring to Mr. Copeland.

6    He's late to the game.  But there's a whole history here of

7    this type of thing.  Your Honor, we wouldn't be here if the

8    District had done its job 25 years ago of educating disabled

9    children.  We wouldn't be here if I hadn't stepped up with a

10   godchild so many years ago who had been kept in the second

11   grade for three years and nobody knew it and nobody cared,

12   except Ron.  That's how we got here.

13          So while I don't question Ms. Harris-Lindsey's

14   affidavit -- I consider Ms. Lindsey a friend of mine, and an

15   honest friend of mine -- it doesn't do anything for their

16   case.  We've shown the Court different instances where we

17   first said we believed that payment hadn't been made or we

18   couldn't show payment and went back through records again

19   and found, on our own, unilaterally, and said, "By the way,

20   we're wrong.  Payment had been made."  We voluntarily came

21   before the Court and told the truth against our own

22   interest.  Always.  That's how I got into this 25, 30 years

23   ago because they didn't do their job.

24          Now they come, "We can't find the records."  Where

25   we found that what they claim to be a dispute -- let me

1   withdraw that.

2          Where we found payment had been made and they

3   couldn't show that it had, we acknowledged it.  There's no

4   question on our side of the table that we're trying to put

5   them in the proof of anything.  When we know it's true, we

6   tell the Court it's true, and we accept it.

7          But now we're before the Court, and we've found --

8   we've done the best we can do.  We've found these payments,

9   these payments and these payments, but we can't find this

10  payment.  And if we can't find it, it's our position it's

11  not there.

12         I don't know what else to say to the Court beyond

13  that.  It seems to me the inference would go against the

14  ones who had the responsibility of maintaining those records

15  because they knew or they had good reason to know when they

16  drafted that fee cap in 2009 that specifically cut out my

17  plaintiffs and others with whom they had negotiated good

18  faith, supposedly good faith, negotiated these judgments.

19  Abraham particularly -- is particularly offensive in my

20  regard.  The very person who negotiated that on behalf of

21  DCPS then sat down and drafted the fee cap that specifically

22  attempted to eviscerate the very judgment that they had

23  signed off on, and then boasted that they had written it in

24  a way that couldn't be broken.

25         That's our background.  That's our context.  Is

1      there anger?  Yes.  Is there unhappiness?  Yes.  I'd just

2      suggest to the Court that the burden is on the District to

3      produce the records.

4              Now, in that regard, Your Honor, if the Court will

5      indulge me, Mr. Murali -- as the Court knows I've been

6      rather involved in some other things for a period of time.

7      Mr. Murali has done the work of putting together, in

8      conjunction with me, the charts, so in terms of the Court

9      having any specific questions in regards to the charts, I

10     would ask --

11             THE COURT:  Here's my specific question:  I want

12     to know -- I guess your position is that we don't do

13     anything, that the Court does not rely upon any of the

14     documents produced by the government to you on August the

15     5th, all those prepayment materials.  You don't want the

16     Court to rely on that, right?

17             MR. DRAKE:  I agree.

18             THE COURT:  Okay.  You also, though, don't want

19     the Court to rely upon what we've been calling the dispute

20     summary sheets, right?

21             MR. DRAKE:  It's confusing.  That's correct.

22             THE COURT:  Okay.  But so what is it that you

23     think the Court can rely upon?

24             MR. DRAKE:  One we believe the Court can rely on

25     is -- well, it comes down to, I guess, plaintiffs' good

1    faith.

2           THE COURT:  Does exist a cancelled check?  A --

3    perhaps an invoice with a stamp on it that said "Paid"?  Is

4    that what I'm looking for?

5           MR. DRAKE:  I suggest to the Court the Court can

6    rely on what we have represented when there has been payment

7    made and they have no record, when we've gone back and

8    possibly found a copy of a check.  We've done everything we

9    can to show the Court the whole panoply of what we have in

10   our record, and I suggest to the Court the Court can rely on

11   that.  That's the best the Court has.  Plus, as I've said to

12   the Court before -- I am an officer of the Court -- that

13   I've made representations to the Court in good faith, and

14   that's the best we can do.

15          It's up to them to show that they've done it.

16   They haven't shown it, and, again, where they have failed to

17   show and yet we have found records to show that they have

18   paid it -- we didn't have to produce it; we did it in good

19   faith -- "By the way, they paid.  We found a check that they

20   didn't have."

21          If we were in bad faith, we'd say, "Oh, put that

22   aside."  No, we pulled it all out.  Everything.

23          And what we can't find -- we believe, for example,

24   in AC that there is no -- for example, they were supposed to

25   pay a certain amount of money which then would -- at the

1    time of the judgment, and then the judgment would go from

2    that point forward.  We haven't been able to find $6,000 or

3    $8,000, for example.  They haven't found any of the payment.

4    We said, "We found, I think, $123,000."

5            It doesn't matter the amount.  I'm simply saying

6    we found it.  They didn't.  We said that much has been paid,

7    but we can't find the record on the others.  So yes, I

8    suggest to the Court unless they can produce something else,

9    the inference goes against them.

10           It was their documents.  They knew in April of

11   2009 what they were doing; or if they didn't know, it was

12   reckless disregard.  They knew that they had a duty.  They

13   knew they had Abraham, Adams, all these others out here that

14   they had negotiated and consented to and then ran up to

15   Congress with, "Hey, by the way, put this in so that we can

16   eliminate the payment for Mr. Drake on this one and that one

17   that we negotiated."

18           THE COURT:  Mr. Drake, I've heard you.  I've heard

19   you.  But that's not what today's about.  It's not about

20   what happened in 2009 -- it's really not -- and what they

21   maybe did to try to deny you payment in this case.

22           What I'm trying to figure out is the numbers that

23   go into the mathematical calculation that I have to make.

24           MR. DRAKE:  I understand, Your Honor.

25           THE COURT:  The idea that -- I agree -- that

1    there's probably evidence that, had it been preserved,

2    certainly would have been better evidence of the payment

3    than what I've received so far here today from the District.

4    But that said, they have provided me with both these dispute

5    summary sheets and testimony, either live last time or

6    through the affidavits that have been submitted, as to how

7    those dispute summary sheets were created.  I mean, they did

8    try to set up a system to try and track these cases and

9    track the invoices that were coming in and the payments that

10   needed to be made.  That is some evidence.

11           I didn't say it necessarily carried the day, but I

12   think at the very least it's prima facie evidence of the

13   government's payment obligation in this case.

14           I mean, they do have some records, and they're

15   records that you yourself have relied upon; I mean, prior to

16   today and maybe the last hearing.  But there have been

17   previous submissions that you've made to the Court that, if

18   relied upon, these dispute summary sheets, there was a time

19   when that was your demand.  "Where are the dispute summary

20   sheets?  Because that's going to straighten this whole thing

21   out."

22           And then, we went and found two dispute summary

23   sheets and what we thought were dispute summary sheets in

24   the Clark case -- they're not quite dispute summary sheets,

25   but we found what it was that we thought you wanted, and now

1    we hear, "Oh, that's not good enough either."

2           So I think you've got an issue.  You've got a

3    problem.  I think the best way to deal with this is to go

4    through each of the specific entries.  And if you want to do

5    it through Mr. Murali, you can.  He can come to the podium.

6    We'll go through each one, and I'll hear you on the

7    individual issues that you have, and maybe it will become

8    clear.

9           But the idea that, you know, the Court is just

10   going to set to the side, to not consider, to give no weight

11   to these dispute summary sheets which you yourself in the

12   past have said you wanted, I don't think that's going to

13   happen.

14          Let's go ahead and go through each one of these

15   and see if we can make some ground with regard to the

16   specific objection that the plaintiffs have filed.

17          Let me ask you this:  You did a great job filing,

18   pulling together, what exactly it is that you're objecting

19   to.  If there is no objection, meaning if it wasn't included

20   in your last filing, can I assume from that that you agree

21   with the other numbers that the Court has come up with?

22          MR. DRAKE:  I believe that's where we are, and I'd

23   like to defer to Mr. Murali inasmuch as he has been involved

24   in this.

25          THE COURT:  Sure.  I'm going to be focusing on

1   those areas that you object.

2         MR. DRAKE:  I understand.

3         THE COURT:  To the extent you haven't objected, I

4   think we've got both parties -- the city's agreed to the

5   entirety of my prior charge, and the plaintiffs are agreeing

6   to all the numbers which were not the subject of the recent

7   objections.

8         MR. DRAKE:  I defer to Mr. Murali on that.  And if

9   I might state to the Court, I do appreciate the Court

10  allowing me a few minutes to kind of set context.  And it's

11  not just paper.  It's --

12        THE COURT:  I know.

13        MR. DRAKE:  It's blood and sweat that's been

14  sacrificed here.

15        THE COURT:  Understood.  Understood.

16        MR. DRAKE:  Thank you, Your Honor.

17        THE COURT:  Okay.  I think that's the best way to

18  proceed.  Let's just start running through the list because

19  each of these more general objections will come up in the

20  specific objections that the plaintiffs have made, and I

21  think it will be best to deal with them there.

22        So Mr. Murali, do you want to come forward,

23  please?

24        MR. MURALI:  Sure.  Thank you, Your Honor.

25        THE COURT:  Let me start by just asking you the

1    question I ended with with Mr. Drake.

2              MR. MURALI:  Okay.

3              THE COURT:  Again, if the plaintiff has not --

4    plaintiffs have not made a specific objection to an entry, a

5    number, in the Court's chart reflecting its preliminary

6    rulings in this case, does that mean that the plaintiffs

7    agree with that entry or number on the chart?

8              MR. MURALI:  Yes, Your Honor.

9              THE COURT:  Okay.  So then let's just focus, then,

10   on your objections.  There's a lot of them.  I'm not being

11   critical, but I think that's the best way to move through

12   this.

13             So I'm going to be going literally through in

14   numeric order the footnotes in my original chart.

15             MR. MURALI:  Okay.

16             THE COURT:  And we will take up each of the

17   objections, and I will hear you.  I think it will -- I hope

18   it will move more quickly after we get through the first few

19   because I think a number of them can sort of be grouped.

20             MR. MURALI:  Yes.  That's right.

21             THE COURT:  You're making the same argument with

22   each one depending upon how the Court comes down that's

23   going to resolve all of them.

24             MR. MURALI:  Your Honor, I believe there's a few

25   where the only thing that's really different are the

1    numbers.  But aside from that, the argument is the same.

2              THE COURT:  All right.  Let's go ahead and open

3    up, then, to the Abraham part of my chart.

4              I read Footnote 1.  I hear it.  It's of the same

5    tenor that Mr. Drake just expressed, sort of the context, so

6    I don't think I'm going to -- there's nothing for me to rule

7    on there.

8              MR. MURALI:  Right.

9              THE COURT:  With regard to Footnote 2, this is a

10   question that I have.  You have also submitted what you

11   called Attachment C to the joint report.

12             MR. MURALI:  Yes.

13             THE COURT:  The numbers add up differently.

14             MR. MURALI:  Yes.

15             THE COURT:  Now, maybe that just reflects -- I

16   assume it does reflect that all of the individual entries

17   that you objected to went your way.

18             MR. MURALI:  Right.

19             THE COURT:  And therefore the numbers come out

20   differently, perhaps more in your favor.

21             MR. MURALI:  Yes, Your Honor.  Attachment C would

22   be just, I guess, compiling all the information from the

23   footnotes into its own chart.  I know you said, you know,

24   you don't want a separate chart --

25             THE COURT:  Right.

1          MR. MURALI:  -- but this is just more for

2    convenience.

3          THE COURT:  Okay.  Understood.  I mean, the

4    numbers are -- the math is going to be what it's going to be

5    based on the Court's decisions.

6          MR. MURALI:  Right.

7          THE COURT:  Okay.  So let's just skip 2, and let's

8    talk about -- well, one thing that's not here but I want to

9    raise now is we have, in reviewing your material -- this is

10   not your objection, but I assume you might want to deal with

11   it.  We have located the first two HODs in the binder of

12   HODs, Plaintiffs' Exhibit 1.  The first two HODs are for --

13   how are we going to deal with this?  I can say -- I can say

14   the child's last name and first initial, correct?

15         MR. MURALI:  I think that would work, yes.

16         THE COURT:  All right.  So we've got Abraham D.  I

17   have two HODs which, as best we could figure out, are not --

18   were not in our chart or your chart anywhere.  I assume that

19   this is the lead plaintiff in the Abraham case.

20         MR. MURALI:  Yes, Abraham D. is the lead

21   plaintiff.

22         THE COURT:  But I don't have them anywhere.  I

23   don't have him or her in the chart so I assume it would be

24   plaintiffs' position that these two HODs you need to be

25   compensated for.

1            MR. MURALI:  Yes, that would be correct.  I

2      believe that may have been an oversight just because of the

3      case caption at the top and seeing that as a separate

4      plaintiff, Abraham, and not the case caption as it is.

5            THE COURT:  Oh, I see.  You just sort of -- you

6      think it is in there, but really it's not.

7            MR. MURALI:  Yes.  I think it was just an

8      oversight, but there should definitely be a plaintiff

9      Abraham in Abraham.

10            THE COURT:  Okay.

11            So let's talk about these two HODs.  What's your

12      basis for saying that these HODs are part of this case?

13            MR. MURALI:  The basis is that these two HODs have

14      been granted.  The case was filed under D. Abraham's name,

15      and these HODs predate the date of the Abraham judgment.

16            THE COURT:  Okay.  But you're representing to the

17      Court that the D. Abraham represented in these two HODs --

18      which are the first two HODs in Government's Exhibit or

19      Plaintiffs' Exhibit 1?

20            MR. MURALI:  That's right.

21            THE COURT:  -- that that is the same person who is

22      the lead plaintiff in the Abraham multiplaintiff case,

23      01-cv-27?

24            MR. MURALI:  Yes, that's correct.

25            THE COURT:  Okay.  And you believe that they both

1    reflect relief being granted to Mr. or Mrs. Abraham, the

2    child?

3              MR. MURALI:  Yes, if you look at the first HOD on

4    the second page, you can see that it was granted.  Same

5    thing with the second page of the second HOD.  "Hearing

6    officer upholds the agreements and orders the agreement of

7    the parties."  So...

8              THE COURT:  Okay.  And what do you think you have

9    to show to be a prevailing party?  I mean, you have to be a

10   prevailing party, right?

11             MR. MURALI:  That's correct.

12             THE COURT:  So that's just any relief?  Does it

13   have to be denial of FAPE?

14             MR. MURALI:  If you don't mind, may I consult with

15   Mr. Drake?

16             THE COURT:  Sure.

17             (Pause)

18             MR. MURALI:  Your Honor, the fact that we -- that

19   the plaintiff received a benefit from DCPS through the HOD

20   represents that the plaintiff was a prevailing party of

21   significant benefit.

22             THE COURT:  Okay.

23             All right.  Let me hear from Mr. Copeland on this

24   one.

25             MR. COPELAND:  Your Honor, we, too, recognize that

1    these two were not among those on the Court's chart, and

2    that the record in Abraham --

3            THE COURT:  I don't think they're on the dispute

4    summary sheets either.

5            MR. COPELAND:  Correct.

6            THE COURT:  That largely was the source of most of

7    the information in Abraham so I don't know why they weren't

8    included.

9            MR. COPELAND:  I think, consistent with what comes

10    later in the chart, there are cases where information was

11    not provided to us, and but -- the first thing I'll say is

12    that if they were not provided at the time, and it appears

13    that they were not because they're not on anybody's list and

14    they're not in the court record, then they've been

15    effectively waived.

16            THE COURT:  Why is that?

17            MR. COPELAND:  The consent judgment in Abraham

18    distinguishes all of the District's liabilities for all of

19    those claims, so it presumes that everything in it has been

20    resolved.

21            What we're talking about now is the change in law

22    since then where there's an enforcement action for the delta

23    of new money that could be awarded under the appropriations

24    cap, but it's not an opportunity for plaintiff to come back

25    and say, "I didn't submit enough" or "I left out these HODs

 1   or these invoices."  So I think that the Abraham consent

 2   judgment, which was introduced by both parties and requested

 3   by both parties --

 4            THE COURT:  Is that going to be your same argument

 5   when we encounter someone who actually is on the DSS -- I

 6   mean, on the dispute summary sheet list and Mr. Drake has

 7   identified one additional HOD?

 8            MR. COPELAND:  No.  It's going to be the

 9   argument when the Court's count and the record is that

10   there are zero.  There are zero, and Mr. Drake now can

11   produce -- produces one or more HODs that he contends should

12   have been --

13            THE COURT:  Okay.  Why?  Why?  I mean --

14            MR. COPELAND:  I have additional argument on this

15   as well as to why the Court should not count these.

16            THE COURT:  Uh-huh.

17            MR. COPELAND:  But --

18            THE COURT:  And I hear you on that, on the first

19   argument, but that would seem to me to suggest that there

20   should be no payment for any additional HODs.  All of that,

21   however, is based on your belief that your records were

22   accurate; that that -- I mean, why weren't they -- why

23   weren't these two on the DSS, on the dispute summary sheets?

24   Maybe it was your error.

25            MR. COPELAND:  Admittedly, we can't be sure.  But

1    the fact of the matter is that they're for every other kid

2    who is on the list.  In all of the cases there is a dispute

3    summary sheet reflecting that things were submitted, either

4    HODs or invoices.

5             THE COURT:  There were a few that were zeros.

6    There were.

7             MR. COPELAND:  There were a few that were zeros.

8             THE COURT:  There were a few that were zeroes.

9             MR. COPELAND:  And in those instances there was

10   evidence that we requested invoices on.  There's an

11   acknowledgement that there were possibilities and, for

12   whatever reason, invoices were not submitted for them, and

13   on those Mr. Drake elected to proceed forward with the

14   consent judgment without submitting the invoices.  So that's

15   going to be the argument for those.

16            But on this, for whatever reason -- and I can't

17   tell the Court the reason because I don't know it -- D.

18   Abraham was not part -- could have been, but was not part of

19   the Abraham case for whatever reason.

20            Additionally, neither of the -- at least the

21   first document explicitly is not an HOD.  It's an agreement.

22   It's a letter from Mr. Drake, and it's signed by someone,

23   Mr. Thomas Wright, who was -- worked in the general counsel

24   office of DCPS at the time.  It acknowledges that it's an

25   agreement that the -- the second page, the second bullet

1    point talks to withdrawing the pending hearing, and the

2    third actually mentions a conciliation agreement.

3            THE COURT:  Yes, but what's that last line?  It

4    says -- Paragraph 3 -- "The parties further agree that the

5    conciliation agreement shall apply to the settlement letter

6    for all purposes in the same manner as the settlement or

7    hearing officer's determination."

8            MR. COPELAND:  That's correct.  And we acknowledge

9    that at the time that's how these were treated, and the

10   District allowed a parent to recover fees, and often it

11   appears that they would ask the hearing officer to document

12   the agreement, to make it enforceable.  The background for

13   that is that *Buckhannon* had recently been decided, and there

14   was confusion as to the best way to handle this because it

15   changed the landscape somewhat with how these were handled.

16           It's certainly not the policy anymore, the way

17   things were handled, but at the time they would --

18           THE COURT:  How is it handled now?

19           MR. COPELAND:  A settlement agreement is not --

20   may not be part of a suit for fees.  Oftentimes.

21           THE COURT:  So but how do you make that?  How do

22   you make it -- how do you get the plaintiffs -- when the

23   city wants the plaintiff to be paid and you're entering the

24   settlement agreement, do you make it part of an HOD somehow?

25           MR. COPELAND:  No.  There's usually -- the HOD is

 1    the trigger for the entitlement to fees, and so it's either

 2    settled with the agency at the administrative level for the

 3    fees right then and there, and there's usually a release

 4    that's involved --

 5            THE COURT:  So there's no way to do it if prior to

 6    the hearing you want to settle the case and pay the

 7    plaintiff some fees?

 8            MR. COPELAND:  There is.  There's a release in

 9    those instances as well, but it's not converted in an HOD.

10    It's simply treated as a settlement agreement and processed

11    for payment accordingly.

12            THE COURT:  And you pay them fees?

13            MR. COPELAND:  Correct.

14            THE COURT:  So how is this different?

15            MR. COPELAND:  It isn't.  I am noting this for the

16    characterization of it as an HOD because I want to

17    distinguish from it.

18            Now, no doubtedly in the second of the Abraham

19    documents it would be an HOD.  But I think that the larger

20    issue is the one that I first spoke to, that the sort of

21    tray of fees that were submitted to the Court as part of the

22    consent judgment did not include Abraham for reasons that we

23    can't -- don't know.  I don't think anyone here knows.

24            And the effect of the consent judgment with

25    language proposed by both parties is that it cuts off

 1     entitlement to relief for -- on behalf of Mr. Abraham.

 2              THE COURT:  Right.  But the basis for that is the

 3     consent judgment itself.

 4              MR. COPELAND:  Correct.

 5              THE COURT:  Which talks about the overall numbers

 6     and the language that you're relying upon that essentially

 7     you're not going to get any more fees in the future.  You

 8     can't keep coming back to us and getting fees with the

 9     exception of unless the law changes.  That's the way I read

10     it.

11              MR. COPELAND:  Yes.

12              THE COURT:  And, though, the dispute summary

13     sheet --

14              MR. COPELAND:  Right.  I will take issue slightly

15     with the way the Court phrased it because it's not just the

16     fees.  It's in settlement of all of plaintiffs' claims.

17              THE COURT:  Right.  But what were the claims?

18              MR. COPELAND:  They were for attorneys' fees.

19              THE COURT:  Right.  But for which plaintiffs?

20              MR. COPELAND:  I think all but Mr. Abraham.

21              THE COURT:  Based on what?

22              MR. COPELAND:  His absence from the record in any

23     shape, form, or fashion other than his name at the top of

24     the caption.

25              THE COURT:  Okay.  But you're relying upon the

1     dispute summary sheet.

2             MR. COPELAND:  Correct.

3             THE COURT:  Okay.  All right.

4             So Mr. Drake, two arguments there.

5             Just first focusing on the nature of these

6     documents before we figure out why it was they weren't

7     included previously.  The government agrees that the second

8     one is an HOD, which would seem to be -- have provided some

9     relief.  The first document, however, they say is not an

10    HOD, was not made part of an HOD.  It seems to be just a

11    settlement, private settlement between the government and

12    yourself.  Why isn't that any payment precluded under

13    *Buckhannon*.

14            MR. COPELAND:  Your Honor, I just want to -- I

15    apologize if I created an erroneous impression.  The DCPS

16    treated these as -- that they made their fees available at

17    the time.  At the time DCPS would have treated this first

18    document as entitling Mr. Drake to an award of fees.

19            So I only -- I attempted to just draw a

20    distinction based on what the document was just for purposes

21    of description.  I don't challenge that it was actionable

22    for Mr. Drake to try and seek fees based upon it.

23            THE COURT:  So your argument is really the first

24    one.

25            MR. COPELAND:  It is.

1          THE COURT:  Okay.  Understood.

2          So you don't have to answer that question,

3     Mr. Drake.  We're going to be at this all day long.

4          MR. DRAKE:  I'm having trouble hearing.  If he

5     could speak just a little louder, I'd appreciate it.  I'm

6     hearing the Court okay.

7          THE COURT:  Here's the issue I want you to

8     address.  He's conceded that he's not -- the government is

9     not submitting, as a basis for arguing that the Court should

10    not award fees based on this first settlement letter, that

11    it would not have satisfied *Buckhannon*.  I think what he's

12    really saying is that the belief was back when this was

13    signed -- this is prior to *Buckhannon*, isn't it?

14          MR. DRAKE:  Yes, Your Honor.

15          THE COURT:  And that this would entitle you to

16    fees.

17          MR. DRAKE:  Yes.

18          THE COURT:  And then maybe the law changed

19    thereafter.

20          In any event, what I want you to just focus on is

21    this question of why wasn't -- why weren't these two HODs

22    included anywhere previously?

23          MR. DRAKE:  I can't answer that, Your Honor.  All

24    I can say is this:  When Judge Lamberth entered his order,

25    his order instructed at least that the defendant is to pay

1    on all HODs up to the $4,000.

2         The landscape changed at that time.  Up to that

3    time, we hadn't contemplated or anticipated how this would

4    be dealt with.  It would be -- in fact, it would amount

5    to -- the case became, for all practical purposes,

6    bifurcated.  Bifurcated above $4,000 and below $4,000.

7         So I can't give an explanation for why

8    specifically, if it's not in a particular -- all I can say

9    is that we submitted it to the best of our ability.  Once

10   the Court -- once Judge Lamberth entered his order, I went

11   back through all the records and pulled out all the HODs

12   believing I was complying with the Court's order.  Beyond

13   that -- that's the best that I can say.

14        THE COURT:  All right.  Well, Mr. Copeland's

15   argument is based on the consent judgment that was entered

16   in the Abraham case, the language of which, according to

17   Mr. Copeland, would seem to, he would argue, preclude the

18   government or the plaintiffs from later seeking additional

19   attorneys' fees beyond plaintiffs or HODs that had

20   previously been identified and invoiced for.  And there

21   doesn't seem to be any record that these two HODs were

22   included so why wouldn't that language from the consent

23   judgment bar relief now?

24        MR. DRAKE:  I don't know why --

25        THE COURT:  These are documents, according to

1    Mr. Copeland, that you should have discovered and invoiced

2    and made part of that consent judgment.

3         MR. DRAKE:  I don't know what he's talking about

4    or where he's finding in the document anything precluding

5    any subsequent recovery in terms of when the -- if there's a

6    change in the ability to pay.

7         This document was executed -- you see my

8    signature's on the document -- 16 years ago.  I can't

9    remember everything that happened on these hundreds of

10   documents 16 years ago.

11        The conciliation agreement was drafted by DCPS --

12   that's in Paragraph 3 -- to satisfy their need to allow

13   plaintiffs to settle these cases instead of waiting to go to

14   a hearing; so for all purposes this document is an HOD.  It

15   has the same status and dignity of anything that says "HOD"

16   at the top.  It's an HOD.  Their language.  Their language.

17        And so beyond that, in terms of count and all of

18   that, all I can say is that once the judge entered his

19   order, we went through -- we've been through the files.

20   I've been through the files many times trying to find every

21   HOD or settlement agreement that we could find, and I've

22   made mistakes, and I had to find -- I overlooked one or had

23   one that I believed that should be pulled, which I did.  I

24   pulled it when it appears that we did not prevail.

25        So we've been extremely careful, but it's been an

1    ongoing process, and I don't believe that there's any way --

2    any reasonable way to say that at this stage we're

3    surprised.  How can there be surprise when they signed it?

4    It's in their own records.

5           THE COURT:  Page 3 of the Abraham consent judgment

6    says -- this is the language that Mr. Copeland is relying

7    upon.  It says that "The judgment entered herein is in

8    settlement of all of plaintiffs' claims herein and will

9    extinguish all of defendant's liabilities for such claims,

10   including plaintiffs' requests for attorneys' fees for the

11   Court proceedings herein."

12          MR. DRAKE:  Where is the Court reading from,

13   please?

14          THE COURT:  Page 3 of the consent judgment in

15   Abraham.  I think Mr. Copeland has it.

16          MR. DRAKE:  I have it, yes.

17          That language is -- that language is limited by

18   what is said at the bottom of Page 2 and top of Page 3.

19   It's limited to what the defendant may lawfully pay at this

20   time under such applicable law.  That's the definition of

21   it.

22          They understood, when they drafted that language,

23   that there was hope and anticipation that the fee cap would

24   go away, and now to come along and to say something

25   different than that is just unconscionable.  It was never

1    intended.  And if you call the person who drafted this, put

2    him on the stand, they would have to -- if they told the

3    truth -- would have to admit that that's exactly right.

4            It was never intended that this would bar any

5    claim whatsoever for additional payment once the fee cap

6    went away.  The fee cap went away in 2009, except it didn't

7    go away for me.

8            THE COURT:  Oh, one more thing, Mr. Drake.  I do

9    want to hear you with regard to this first HOD.

10           MR. DRAKE:  Your Honor, you're still talking about

11   the Abraham HOD?

12           THE COURT:  Yes, Abraham, the first one.  Do you

13   believe -- if I believe that *Buckhannon* is applicable to

14   this agreement, do you believe that this agreement satisfies

15   *Buckhannon*?

16           MR. DRAKE:  *Buckhannon* does not apply, Your Honor.

17           THE COURT:  What's that?

18           MR. DRAKE:  *Buckhannon* doesn't apply.  This was

19   entered into a year before *Buckhannon*.  No one knew that

20   *Buck* -- how can it be retroactive?  When this settlement

21   agreement was entered into, there was no *Buckhannon* issue

22   around at all.

23           And in any event, Your Honor, in any event, it

24   says it is to be treated in all -- for all purposes as an

25   HOD.

1          Your Honor, this ought to be labeled HOD.

2     *Buckhannon* can't -- from that standpoint, without regard to

3     the fact that *Buckhannon*'s a year later, and then once

4     *Buckhannon* came down, the plaintiffs' bar immediately went

5     to work.  Well, the recollection is that there were -- no

6     settlement agreements were entered into until they would see

7     to it that they won a settlement agreement and they would

8     waive that prohibition and get a provision put in there.

9          Nothing like that here because we knew nothing

10    about *Buckhannon*.  *Buckhannon* didn't exist from any of our

11    standpoints, including the District's.  They have no right

12    whatsoever to assert *Buckhannon*.

13         THE COURT:  Okay.  Mr. Copeland, you don't -- do

14    you dispute that the individual who's in these first two

15    HODs is, in fact, the same student who is the lead plaintiff

16    in Abraham?

17         MR. COPELAND:  We do not dispute that.

18         THE COURT:  And there also appear to be HODs

19    related to Abraham in the Abraham case.

20         MR. COPELAND:  Yes, to the student.

21         THE COURT:  To the student.

22         MR. COPELAND:  Yes.

23         THE COURT:  Well, I mean, I understand that it

24    wasn't included anywhere, but are you arguing that these

25    HODs, had someone remembered to include them, could have

1    been included under the case?  I mean, are you saying that

2    they are part of the case or not?  I understand that you've

3    got this waiver argument.

4            MR. COPELAND:  I believe they are not part of the

5    case because they do not appear to have ever been introduced

6    into the case.  The -- I will concede that the time frame of

7    both the settlement agreement and the HOD are consistent

8    with the time that the Abraham suit was filed -- it was

9    filed in January 2001; these are 2000 matters -- and that

10   they could have been, it appears.  But I also can't say that

11   there were not other -- I'll just leave it there.

12           It appears that they could have been.  For

13   whatever reason, these two or perhaps others were intended

14   to be part of this suit, which is why the plaintiff was

15   listed.  His name starts with an AB.  Presumably that's why

16   he went into the caption, but at the same time they weren't

17   part of the case, and I think that the consent judgment

18   language does preclude the Court interest --

19           THE COURT:  But that's the basis for your

20   argument.

21           MR. COPELAND:  That's right.

22           THE COURT:  Is that you can't find HODs later that

23   were part of the case that you forgot to include prior to

24   the judgment.

25           MR. COPELAND:  Yes.

1          THE COURT:  Okay.

2          Let's move on, then, to Downing.

3          MR. MURALI:  That's Downing C., Your Honor?

4          THE COURT:  Yes.

5          MR. MURALI:  Yes, Your Honor.  Mr. Drake's records

6     reflect that only $8,300 were paid under Downing C., not the

7     $12,000 that the Court has indicated per the dispute summary

8     sheet.  As noted in the objection and in Ms. Harris-

9     Lindsey's testimony, the documents provided in Abraham were

10    not dispute summary sheets, therefore cannot be relied on as

11    such, and so that forms the basis for --

12         THE COURT:  I think they were dispute summary

13    sheets.  They are prepayment documents, that I understand.

14    But I think the testimony -- or am I wrong about that,

15    Mr. Copeland?  Are the documents underlying the Court's

16    chart in Abraham not dispute summary sheets?

17         MR. COPELAND:  That was the -- I believe that they

18    were.  I believe that they were.

19         THE COURT:  Right.

20         MR. COPELAND:  And certainly there has been a long

21    list that was part of the record that reflect amounts to be

22    paid, so we certainly can --

23         THE COURT:  It's the Clark case that has the

24    sheets that were created by the Office of Attorney General,

25    right?

```
 1                  MR. COPELAND:  Yes.

 2                  THE COURT:  Okay.  So when you say they're not

 3       dispute summary sheets, I think they are.  The weight I

 4       should give to them, because they are prepayment documents,

 5       is -- I understand that argument, that that's the argument

 6       you're making.

 7                  MR. MURALI:  Right.

 8                  THE COURT:  I don't understand when you say

 9       they're not dispute summary sheets.

10                  MR. MURALI:  In terms of -- this is my

11       recollection of the hearing as well, but Ms. Harris-Lindsey

12       clarified that a dispute summary sheet is something that's

13       prepared by attorneys for the purposes of litigation.  It's

14       effectively work product that provides an accounting.

15                  And the documents that were provided at the July

16       hearing were not of that nature.  They were prepared by I

17       believe some other office.  So they were, I believe by

18       definition, not dispute summary sheets.

19                  THE LAW CLERK:  So in Abraham we have --

20                  MR. MURALI:  Your Honor, if I may, I believe

21       Ms. Harris-Lindsey referred to the -- at least in the Adams

22       case, the document is a cover sheet, not a dispute summary

23       sheet.

24                  And in Abraham, Ms. Harris-Lindsey described it as

25       an inventory, not a dispute summary sheet, based on my notes
```

1     from the hearing.

2           THE COURT:  Okay.  Let's take a five-minute break.

3     I'm going to make a copy of these documents so we can have

4     them in front of us.

5           MR. MURALI:  Sure.  Thank you.

6           (Recess taken)

7           THE COURT:  Okay.  Come forward.  I'm just going

8     to hand down to you a document.  This is Document 16 in the

9     Adams case, a motion for payment of additional attorneys'

10    fees and costs filed by Mr. Drake, which attaches a chart

11    that Mr. Drake didn't create, the city did, but Mr. Drake

12    endorses in terms of the amounts that have been paid and

13    owed.

14          MR. MURALI:  Is it the chart that you're referring

15    to, Your Honor?

16          THE COURT:  Yes, the chart.  So I don't know if

17    that's a dispute summary sheet or not --

18          MR. MURALI:  Right.

19          THE COURT:  -- but it's a document that Mr. --

20    that the city created and Mr. Drake endorsed in the past.

21    He had a few corrections that he wanted to make to it.  He

22    indicates that in his motion.

23          MR. MURALI:  Yes, right.

24          THE COURT:  He wants a higher Laffey rate to be

25    paid.  He indicates that in his motion.  But he endorses

1    that document and the figures therein.  What is that?

2           MR. MURALI:  To a degree, Your Honor -- first of

3    all, I believe, in the motion, that Mr. Drake did not

4    entirely endorse it.  It was, in fact, explicitly stated

5    that plaintiffs could not vouch for the accuracy of any

6    information contained therein.  There was acknowledgement

7    that this was a document prepared by the District of

8    Columbia, and so --

9           THE COURT:  Where does it say that he doesn't

10   endorse that document?  Where does it say that?

11          MR. MURALI:  In the motion filed that started

12   these proceedings, these current post-judgment proceedings.

13          THE COURT:  I'm going back in time and finding the

14   documents on the docket.

15          MR. MURALI:  That's right.

16          THE COURT:  And you have one right in front of

17   you.

18          MR. MURALI:  Yes, Your Honor.

19          THE COURT:  So I don't think Mr. Drake's memory

20   has improved with time, nor yours, nor mine.

21          MR. MURALI:  Right.

22          THE COURT:  So I go back to the time frame that

23   all of this was happening.

24          MR. MURALI:  Yes, Your Honor.

25          THE COURT:  And there is a document filed in the

1    docket which attaches a chart from the city.  I don't know

2    what it is, what we're going to call it.

3                 MR. MURALI:  Right.

4                 THE COURT:  Maybe it's not a dispute summary

5    sheet.

6                 MR. MURALI:  Right.

7                 THE COURT:  But it appears to be a summary of

8    the amounts of money that are owed, that have been paid, and

9    Mr. Drake endorses it.  He makes a few corrections.  He says

10   there's a few errors in it.  He says I don't like the rate,

11   the Laffey rate, but pay me.

12                 MR. MURALI:  That's right.  So Your Honor can --

13                 THE COURT:  I guess my issue is that Mr. Drake

14   relied upon it, so that's why the Court is going to rely

15   upon it.

16                 MR. MURALI:  Okay.

17                 THE COURT:  The fact that many years later, ten

18   years later, he says he doesn't know if that's right, well,

19   he may not today, but he did back in 2004.

20                 MR. DRAKE:  May I take a look at it, Your Honor?

21                 MR. MURALI:  Your Honor, may I just have a minute?

22                 (Pause)

23                 MR. DRAKE:  Your Honor, I can't.  I have no

24   recollection of this document particularly, but whatever

25   I've submitted and represented to the Court to be what we

1    relied on, then we're bound by it.  I don't question that at

2    all.

3              But I have no recollection of the document at all.

4              THE COURT:  Okay.  Well, let me have it back up

5    here, please.

6              And just for the record, I'm looking at Document

7    No. 16 and its attachment, 16-1, in the Adams case, 03-cv-

8    2139, and it's that document which makes up -- made up a lot

9    of the data that was included in the Court's chart attached

10   to its preliminary ruling with regard to the Adams case.

11             MR. MURALI:  Yes, Your Honor.

12             THE COURT:  So then I have a precipe that was

13   filed by the city in the Abraham case.  And this is Document

14   73 in Case No. 01-cv-27.  I'll pass this down.

15             This is more along the lines of what I think

16   Mr. Copeland produced in the August time frame, but this was

17   on the docket of that case back in the time.  I don't see

18   any objection from Mr. Drake in the docket.  We're going to

19   look at it more closely to those figures the -- that informs

20   the information that's in the Court's chart and its

21   preliminary rulings with regard to the Abraham case.

22             MR. DRAKE:  Your Honor, with regard to that, in

23   Abraham, that particular document the Court's referring to,

24   the -- we had made clear during the proceeding before Judge

25   Lamberth that we did not vouch for the accuracy of this

1    document.  This is simply the best that we could place our

2    hands on at that time.

3              So separate and apart from the previous document

4    the Court handed to us, I have full recollection on this and

5    exactly how we -- and if I could inform the Court.

6              THE COURT:  Please.

7              MR. DRAKE:  When I went through that document many

8    years ago, I found that there were errors in it.  There were

9    children who had been left out.  But I don't want to bring

10   that particular issue -- I think that's for a different time

11   at this point.

12             But I will say that we cannot -- could not vouch

13   for its accuracy.  It was only the best that we could get

14   from the District at that time.

15             THE COURT:  Well, it might be that's where we end

16   up now.  It's the best that we have.

17             Okay.  So that's just overarching.  I think we

18   should -- I hear you when you say that these are not dispute

19   summary sheets.

20             MR. MURALI:  Yes, Your Honor.

21             THE COURT:  Do we have a dispute summary sheet in

22   this case, Mr. Copeland?  Is there any?

23             MR. COPELAND:  No.  No, not -- not the term of art

24   the DCPS uses for those documents.

25             THE COURT:  Okay.

1           MR. COPELAND:  We have similar things, similar

2   documents, but not the precise --

3           THE COURT:  All right.

4           So your point is well-taken.  Let's not -- let's

5   use proper terminology.  They're not dispute summary sheets.

6           MR. MURALI:  Yes, Your Honor.

7           THE COURT:  Okay.  So let's go back to where we

8   were at --

9           MR. MURALI:  Okay.

10          THE COURT:  -- which is dealing with -- what

11  number were we on?  Number three.

12          MR. MURALI:  I believe we were on 3, Downing C.

13          THE COURT:  Okay.  This is the one where you've

14  got a dispute over the actual number.

15          MR. MURALI:  The amount paid, yes.

16          THE COURT:  The amount paid.

17          MR. MURALI:  Yes.

18          THE COURT:  Okay.  You say that you've checked

19  your records, and you think you were paid less than what the

20  chart reflects, right?

21          MR. MURALI:  $8,300.

22          THE COURT:  Got it.  So what does that mean?  What

23  evidence do you have that you were paid less?  And I realize

24  this is the proving-the-negative part.  Hard.

25          But what evidence do you have of payment?  I

1    haven't seen that either, other than you telling me that

2    you've searched records, and this is what you've found.

3              MR. MURALI:  Yes, Your Honor.  This would be

4    Mr. Drake's internal accounting records, so to that

5    extent -- and for a lot of these cases, because the checks

6    were provided in large groups, it was sort of hard to parse

7    out for a large degree of plaintiffs with no accounting as

8    to which plaintiff was -- DCPS was paying for and how much

9    they were paying per plaintiff.  It was sort of hard to

10   parse it out by check.

11             But based on Mr. Drake's accountings, only $8,300

12   was paid, and as has been acknowledged, I would also like to

13   point out that any instance where Mr. Drake went back in and

14   found that DCPS actually paid more, the accounting was

15   corrected to reflect that, and the plaintiffs have requested

16   that the Court credit --

17             THE COURT:  No, I've seen that.  We're going to

18   come to some of those.  I'm just trying to weigh who has the

19   burden and the evidence before me.

20             MR. MURALI:  Right, Your Honor.

21             THE COURT:  I appreciate that you can't prove a

22   negative, but you've given me a general explanation of his

23   accounting records that someone looked and this is the only

24   check they could find that they received -- or checks,

25   maybe, in this case -- and there were not any more,

1    therefore you believe you weren't paid.

2              MR. MURALI:  That's right.

3              THE COURT:  I don't know enough.  I mean, are you

4    going to -- is that going to be the sum total of your

5    presentation with regard to every one of your objections

6    that's like this one?

7              MR. MURALI:  I mean -- sorry, Your Honor.  With

8    regards to Abraham, frankly D.C.'s evidence that they're

9    providing is also of a similar nature.  It's of an intent to

10   pay.  It's not of actual payment in any way.

11             There are no pay stubs, and Mr. Copeland has

12   indicated that all relevant records have been destroyed or

13   otherwise unavailable or difficult to attach to a plaintiff,

14   so in some ways we're sort of approaching the same problem.

15             THE COURT:  No.  I hear you.  But you could say

16   that they have presented records that show an intent to pay.

17             MR. MURALI:  That's correct.

18             THE COURT:  I can assume that they have paid;

19   that, you know, there's something there; that they have an

20   intent to pay you.

21             MR. MURALI:  Right.

22             THE COURT:  So then I turn to you and say, "Well,

23   that's what they have."

24             MR. MURALI:  Right.

25             THE COURT:  "What do you have?"  And you have that

1    you've looked through a database.

2              MR. MURALI:  Right.

3              THE COURT:  And I don't know of its reliability.

4              MR. MURALI:  Right.

5              THE COURT:  I don't know the kind of search that

6    you did, and I don't know what its output was.

7              MR. MURALI:  Your Honor, all I can say is that in

8    terms of the vast majority of the amounts in Abraham, they

9    comport with what defendant claims to have paid.  Our search

10   through the records revealed in this particular instance,

11   and I believe only a couple of others, that there was not

12   enough, and unfortunately I cannot provide you with a piece

13   of paper that says that -- you know, a cancelled check or

14   something to that extent that says that, you know, there's a

15   check from DCPS for $8,300 for Downing J., but the search of

16   the records reflects --

17             THE COURT:  Who did the search?

18             MR. MURALI:  Mr. Drake did.

19             THE COURT:  Well, maybe I need to hear from

20   Mr. Drake in terms of his accounting system.

21             MR. DRAKE:  Your Honor, again, in terms of

22   background, I'm a sole practitioner.  I went into this work

23   not through intent but through happenstance, representing,

24   as I told the Court, a little girl that became our

25   goddaughter.  And my practice grew not because I was looking

1    to develop a practice, but because women began coming to me,

2    "Mr. Drake, you had a lot of publicity about this child.

3    Can you save my child?"

4         I didn't set up a database.  I simply kept notes

5    as best I could.  But in terms of the payments, what I've

6    represented to the Court in terms of what payments we're

7    saying have been made, I went through either accounting

8    records or income records or where I had copies of checks,

9    but in many instances, when DCPS -- when D.C. would write a

10   check, it would not particularly indicate what child it

11   related to so I would have to ascribe it to whatever I could

12   best put together in terms of what was outstanding and

13   owing, and oftentimes it didn't -- the figures may not have

14   jibed.

15        So in terms of talking about any kind of modern

16   database, no, I didn't have that.  I just spent -- in fact,

17   I simply was noting what was owed and didn't submit bills

18   for a long time, I was so busy trying to simply represent

19   the children.  I was, but I came to have help.

20        That's the best that I can tell the Court.  I did

21   not have any modern type of accounting other than making

22   notes as we went through.

23        And all of this, as I say, came once Judge

24   Lamberth entered his order of what we had to do of going

25   back through those old records that had been purged in most

1    instances, except for HODs and settlement agreements and

2    retainer agreements.  That's where we are.  But we did --

3    that's where we've gotten the records.

4           THE COURT:  Okay.  So you don't have, like, an

5    electronic database that you can search?

6           MR. DRAKE:  No, Your Honor.  No.

7           THE COURT:  So when you say you searched

8    accounting records and you said copies of checks, what --

9    tell me what "accounting records" mean.  Is there, like, a

10   box?  Is it a filing cabinet?  You've got a file associated

11   with this case?  You've got a yellow file that says "Checks

12   paid"?

13          MR. DRAKE:  No.  What I have --

14          THE COURT:  What is it?

15          MR. DRAKE:  What I have are I have a jacket for

16   each child that I represented over the years for the last 20

17   years or more, and to the extent that I could ascribe a

18   check to that particular case, or it may have been five or

19   six cases, I would duplicate the copy of that check and put

20   it in each particular file.

21          In addition to that, from a --

22          THE COURT:  You would take a copy of the check

23   that was received, and you would put it in the file?

24          MR. DRAKE:  That's right, Your Honor.

25          THE COURT:  Okay.  But sometimes --

1          MR. DRAKE:  To the best I could.

2          THE COURT:  Because sometimes you'd just get a

3    check.  You don't know; it might be multiple cases.  It

4    doesn't indicate on the check what case the check is for, so

5    it could be confusing.

6          MR. DRAKE:  That's exactly right.  In addition,

7    the records I have very carefully kept from an income tax

8    standpoint was income noted from DCPS.  No notation in terms

9    of what child it related to.

10          THE COURT:  Sure.

11          MR. DRAKE:  But simply from DCPS X number of

12    documents.

13          THE COURT:  Got it.

14          MR. DRAKE:  Those were the records searched, and I

15    would represent to the Court those are the records.  That is

16    the record, and there's nothing else outstanding, and there

17    was nothing destroyed or -- discarded or destroyed once I

18    purged the files feeling that nothing -- we have judgments

19    now.  We have nothing further.

20          I carefully kept all HODs, so to that extent the

21    files are complete from the standpoint from where we stand

22    today.  But in terms of being able to prove a negative, we

23    can't do it.  We can't do it.

24          THE COURT:  Okay.  So it's possible, then, that

25    the deficiency that has been identified, it could be that,

1    well, that was in another check that you didn't know to put

2    into the file just because of the way the check was cut.

3              MR. DRAKE:  I would doubt that, Your Honor,

4    because I was very careful trying to keep the records

5    straight that the best -- I would not concede that at all,

6    Your Honor.  I went carefully through when I got a check.

7    Carefully through, okay, does it apply to this child, this

8    child, this child.

9              So no, I wouldn't concede that issue at all.  I

10   believe that the representation that we've made is the best

11   that could be made, and it would be far more accurate and

12   reliable than the District's nonexisting records.

13             THE COURT:  Well, I have records of an accounting

14   of what needs to be paid and in some of those records what

15   appears to be an intent to pay you.  I realize it's not a

16   record that says actually paid.

17             MR. DRAKE:  But in addition to that, Your Honor,

18   as I told the Court on the Abraham document, it would say

19   what's called a DSS, or whatever it might be ten or eleven

20   years ago, I went through the documents and found a number

21   of omissions of children who were a part of that action who

22   did not appear on that.  So it is not a reliable document.

23             It may be reliable in terms of, okay, we have most

24   of them listed, but they didn't have them all, and I found,

25   I think, instances where the figures were not correct.  So

1    it -- no, it's not a completely reliable document.

2         And as we so stated in the record in this case, in

3    this consolidated case, that we did not vouch for its

4    accuracy.  We simply stated, "This is the best we can find.

5    This is all we can find."

6         THE COURT:  Okay.  All right.  So let me just hear

7    from Mr. Copeland quickly on that.

8         So Mr. Copeland, it is your burden.  You do have

9    some prepayment records.  They have searched their records

10   system and have found, for example, with regard to C.

11   Downing that the records only reflect a payment of $8,300

12   according to the calculation with three HODs.  You owe them

13   twelve.  So there's a gap there.  What do I do with that?

14        MR. COPELAND:  I think you have to go with our

15   number, Your Honor.  That's the evidence in the record.

16   They're -- plaintiffs have not produced anything, not put

17   any documents into the record --

18        THE COURT:  Well, they don't have the burden.

19        MR. COPELAND:  Correct.  But there is also prima

20   facie evidence in the record.  If they want to dispute that,

21   then they have -- the burden can shift to them for them to

22   dispute the accuracy of it, and they haven't produced

23   anything.

24        Additionally, the Court just heard that with

25   Mr. Drake, although he attempted to do his best, there would

1    be long periods of time between when he would submit

2    invoices.

3              And if I might grab something.

4              THE COURT:  Yes.

5              MR. COPELAND:  This was going to come up in

6    Nesbit, but in the Adams case, there was a -- it's Document

7    No. 11 in Adams.  It was a submission to the Court.  It's

8    the submission I spoke of earlier, the declaration that was

9    submitted to explain why things were submitted late.  And in

10   it Ms. Pierson explains the invoices for multiple HODs, and

11   they would include as many -- seven HODs within a three-year

12   period on a single invoice.  You know, normally they

13   wouldn't accept this, but they were behind the ball.  They

14   had a court deadline, and they tried to process these things

15   as best they could.

16             They didn't ask Mr. Drake to resubmit anything, so

17   to the extent that he would get checks that were difficult

18   to separate out, that's because of how they were -- the

19   invoices were submitted to the District, who was then under

20   an obligation to pay.

21             There were -- I think this is reflected in what

22   Your Honor has already mentioned.  He would come back and

23   ask for additional money on an invoice that was either

24   processed or partially processed.

25             So any sort of -- additionally he'd explained that

1    he would have a case for a child.  He has a file for a

2    child.  Not by HOD or anything like that.  And so these

3    checks go in there.  If there's no indication as to which

4    HOD it applied to, then it's very hard, I would think, to

5    recreate and know with any certainty that if this child has

6    had ten, twelve HODs over his or her lifetime, and three or

7    four of them are relevant among the three cases here, and I

8    can allocate them -- I suspect I should allocate the money,

9    according to how he thinks, to come up to $8,300.

10          I don't -- that process to me is unlike what the

11   District's evidence comes from where it's submitted.

12   Invoices are submitted.  They're documented as part of a

13   payment process so it's prepayment evidence for purposes of

14   paying him.  It's not accumulated for any other purpose but

15   to enable the District to pay Mr. Drake the amount that he

16   has invoiced us subject to the appropriations cap.

17          And so I think, when you have to compare those two

18   systems for maintaining these records, one of them -- the

19   District's -- is, I think, more clearly reliable under these

20   facts, and that would be assuming that plaintiff had put his

21   own evidence, his own documents, ledger, whatever he

22   maintains for a child into the record to contradict what the

23   Court has before it.

24          THE COURT:  Okay.  It's 12:15.  So I do want to

25   break for lunch, and then unfortunately I've got a criminal

1    calendar this afternoon.  I've got two cases I've got to

2    call.  That would be at about 1:45, but I'd like to come

3    back and continue this because I can tell this is going to

4    take a long time.  So can we come back at 1:00?

5              MR. DRAKE:  Yes, Your Honor.

6              MR. COPELAND:  Yes, Your Honor.

7              THE COURT:  Okay.  I'll see everyone back at 1:00.

8              (Lunch recess taken)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                A F T E R N O O N   S E S S I O N

 2            THE COURTROOM DEPUTY:  Okay.  Recalling civil case

 3     Year 2000-591, Wanda Gertrude Allen, et al. vs. District of

 4     Columbia.  This is a continued evidentiary hearing.

 5            THE COURT:  Okay.  Counsel for plaintiffs, you can

 6     come forward again.

 7            MR. DRAKE:  Your Honor, are we back on the charts

 8     now?

 9            THE COURT:  We are.

10            MR. DRAKE:  And may I, before we start?  A

11     preliminary matter.  I omitted one thing I'd like to be sure

12     to get on the record that is from the Abraham judgment.  I

13     had failed to read the pertinent part.  I ask permission to

14     read that into the record, one paragraph.

15            THE COURT:  What is that?

16            MR. DRAKE:  Paragraph -- the second full paragraph

17     on Page 2 starting, "The parties have further agreed."

18            THE COURT:  Okay.

19            MR. DRAKE:  "The parties have further agreed that

20     the plaintiffs are not barred by this order from the pursuit

21     of future payment on the difference between the amount of

22     the award herein, $2,500,000, and the amount of DCPS's

23     payment, $497,922.75 as may then be permissible, and that

24     the defendant is not barred from asserting any available

25     defense concerning its legal authority to pay."
```

1              I just wanted to be sure that's in the record.

2              THE COURT:  Okay.

3              MR. DRAKE:  Thank you, Your Honor.

4              THE COURT:  So is the plaintiffs' argument going

5     to be the same with regard to every other objection it makes

6     that's like Mr. or C. Downing?

7              MR. MURALI:  Yes, Your Honor.  The objections are

8     going to be substantially the same.  The main -- I'm sorry,

9     the main reason being plaintiffs believe that defense would

10    not produce any kind of prepayment document that would

11    indicate an inability or a lack of intent to pay the full

12    amount as ordered by the Court, so hence plaintiff continues

13    to state that these documents are inherently unreliable.

14    Plaintiffs have provided their accountings in this chart and

15    in previous charts that --

16             THE COURT:  Okay.  No.  That's fine.

17             MR. MURALI:  But, yes.

18             THE COURT:  The objection is that Mr. Drake has

19    checked the records that he has.

20             MR. MURALI:  Yes.

21             THE COURT:  And he has for these cases where you

22    believe there is a discrepancy between the amount of the

23    money that was paid, as indicated in the Court's preliminary

24    chart.

25             MR. MURALI:  Right.

1          THE COURT:  And in Mr. Drake's records there is a

2     discrepancy, and so you have the same argument with regard

3     to each of those cases.

4          MR. MURALI:  Right.

5          THE COURT:  C. Downing just being an example.

6          MR. MURALI:  Right.

7          THE COURT:  That doesn't -- you can't -- we'll say

8     the city's records are insufficient.

9          MR. MURALI:  Right.

10          THE COURT:  They are prepayment records.  You've

11     checked your records.

12          MR. MURALI:  Right.

13          THE COURT:  And you've represented to the Court

14     that that -- what those records show are what's indicated in

15     your objection.

16          MR. MURALI:  That's correct.  I believe, if you

17     want the footnote numbers, it's 3, 5, 7, and 9.

18          THE COURT:  3, 5, 7, and 9.

19          MR. MURALI:  And I believe those are the footnotes

20     where we -- sorry, where the plaintiffs specifically have

21     objection with regards to the difference in number.

22     Footnote 4 is just concurring with the Court; Footnote 6 is,

23     again, concurring with the Court; and Footnote 8 is

24     concurring and acknowledging a typographical error.

25          THE COURT:  Understood.  And so we will correct

1    any errors that you've identified.

2              Okay.  So then that brings us to Footnote 10.

3              MR. MURALI:  Yes.

4              THE COURT:  Okay.  I've seen this footnote

5    multiple times in the past.

6              MR. MURALI:  Right.

7              THE COURT:  I mean, the basis for the Court's

8    preliminary ruling is as was indicated in the prior footnote

9    or in the footnote, and you seem to think that there is a

10   dispute here based on another review of records that has

11   been done; is that correct?

12             MR. MURALI:  I'm sorry, with regard to...?

13             THE COURT:  I'm in Footnote 10.  Footnote 10 is

14   the --

15             MR. MURALI:  Yes.

16             THE COURT:  A long footnote that talks about the

17   amount of money that was paid in the Clark case.  We believe

18   or the Court believes that you've conceded payment of

19   $127,000.

20             MR. MURALI:  That's correct.

21             THE COURT:  And you would agree with that, right?

22             MR. MURALI:  Yes.  Yes.

23             THE COURT:  Okay.  All right.  I think that

24   the difference here is another one of these where we just

25   have -- we've gone through, and we have dunked down further

 1    into it.

 2              MR. MURALI:  Right.

 3              THE COURT:  And we believe there is some evidence

 4    of additional payments beyond the $127,000.  But you would

 5    concede payment up to $127,257; is that right?

 6              MR. MURALI:  Sorry, let me just find it here.

 7    Yes, that's correct.

 8              THE COURT:  Because then you say "However, the

 9    most recent review of Plaintiffs pleading filed May 11,

10    2006, shows total prior payments by Defendant of $103,860,

11    not $127,257."

12              MR. MURALI:  Yes, Your Honor.

13              THE COURT:  "Accordingly," you said, "the possibly

14    correct remaining balance of the judgment" -- you've got the

15    figures there, $229,733, not $206,356 -- "calculations

16    herein are adjusted to reflect that possibly correct total

17    of $229,733 as shown here."

18              MR. MURALI:  Right.

19              THE COURT:  "However, Plaintiffs request Defendant

20    to search its records to determine if this is the correct

21    total figure and to confirm whether any other payments

22    remain beyond the $103,870 figure."

23              MR. MURALI:  That's right, Your Honor.

24              So I guess to summarize what this says, while the

25    recommended or the stated amounts of the payments in Judge

1    Kennedy's -- sorry, in Judge Kay's memorandum say it was

2    $127,257, a search of the record only reflects a payment of

3    $103,870.  So --

4            THE COURT:  Search of the record reflects

5    $103,860.

6            MR. MURALI:  870, Your Honor.  Oh, sorry, 860,

7    that's right.

8            THE COURT:  And that's the same search that you've

9    described previously where you've gone back through and

10   tried to piece this all back together again?

11           MR. MURALI:  I believe so.

12           THE COURT:  Maybe you can describe this.

13           MR. DRAKE:  May I explain that, Your Honor?

14           THE COURT:  Please.

15           MR. DRAKE:  The AC case judgment presented its own

16   impediments in that it was unclear whether Judge Kennedy

17   intended to -- exactly what he intended to do in regard to

18   Magistrate -- I think it's Magistrate Kay's recommendation,

19   and as we worked our way through this process, and as I went

20   back through the records again and into the records of

21   income, the best that I finally could come up with is

22   whatever we've shown here that I could not, in fact, come up

23   with a figure that is indicated in the judgment itself, and

24   that's why I was not representing to the Court that it

25   hadn't been paid.  I was simply saying can they show that

1    they paid it, and hoping that they can show it so it can go

2    away.

3            And if I could just make a collateral remark, Your

4    Honor.  I'm 78 years old.  I have nine-year-old daughters.

5    I'm concerned about people so it's urgent for me to have

6    this right at this point.  Thank you, Your Honor.

7            THE COURT:  Well, that's the whole point of this

8    exercise.

9            MR. DRAKE:  Thank you, Your Honor.

10           THE COURT:  And it's going to be -- it's going to

11   be part of the judgments in this case so you'll have it, the

12   calculation as of the date that Judge Lamberth wanted this

13   Court to provide it to him for.

14           So I want to just understand that this $103,860

15   figure, that is, again, you going and checking your records,

16   right?

17           MR. DRAKE:  That is correct, and I believe -- I

18   can't say for sure, but I believe that I accepted -- I

19   believe whatever the figure, $127,000, originally that we

20   had accepted.

21           THE COURT:  Accepted.

22           MR. DRAKE:  Accepted as a figure coming from them

23   until I then went back in the record and saw this is all I

24   can -- this is all that I can validate.  This is all that I

25   can find hoping I could find the rest of it.

1            I could not find it.  It appeared not to be there,

2     and I hope still that they can find a record to show that so

3     that we get this cleared away.

4            THE COURT:  Okay.  Mr. Copeland.

5            MR. COPELAND:  Judge Kay's more important

6     recommendation -- that's Document 32, on Page 3, Footnote

7     3 -- indicates that -- and this is the first sentence of the

8     footnote -- "Plaintiffs' documentation reflects a demand for

9     outstanding fees and costs in the amount $708,517 after

10    payment of $127,257 by defendant."

11           THE COURT:  So it's right there.  Judge Kay had

12    that finding, and ultimately the report was adopted by Judge

13    Kennedy.

14           MR. COPELAND:  Correct.  And it appears to have

15    been confirmed.

16           THE COURT:  All right.  I understand.  I at least

17    understand the parties' positions on that.

18           All right.  So then let's go, then, to the HODs.

19           MR. MURALI:  Okay.

20           THE COURT:  I have in my notes that there are four

21    HODs by an A. Clark again.

22           MR. MURALI:  That's right.

23           THE COURT:  I see A. Clark is listed.  I'm just

24    looking at the HODs that are in the stack of HODs,

25    Plaintiffs' Exhibit No. 1.  There are four in there for A.

1    Clark.

2            MR. MURALI:  That's right.

3            THE COURT:  Is that the same A. Clark as the A.

4    Clark in the Adams case at Note 38?

5            MR. MURALI:  At Note 38?  Yes, Your Honor.  That

6    would be the same A. Clark.

7            THE COURT:  Okay.  So you want four HODs in AC for

8    A. Clark.  You've produced four HODs.  I don't believe the

9    District contests that.

10            MR. MURALI:  Right.

11            THE COURT:  And then you want one HOD in the Adams

12    case; is that right?

13            MR. MURALI:  I'm sorry, let me --

14            THE COURT:  That's Note 38.

15            MR. MURALI:  Yes.  We've made a finding of four

16    HODs for A. Clark in Adams and in AC.

17            THE COURT:  Well, all I'm saying is -- I don't

18    know if we're in agreement or disagreement on this.  Right

19    now the chart reflects four --

20            MR. MURALI:  Yes.

21            THE COURT:  -- under AC and one under Adams.  I

22    don't think the city disputes that because that's what was

23    originally in my chart.

24            MR. MURALI:  Right.

25            THE COURT:  So I don't think you do either.

```
1                    MR. MURALI:  Let me defer to Mr. Drake, please.

2                    THE COURT:  Mr. Copeland; is that correct?

3                    MR. COPELAND:  It is correct, Your Honor.

4                    THE COURT:  Okay.  That's fine.  Thank you.

5                    All right.  One correction.  You actually gave us

6         five.

7                    MR. MURALI:  That's right, yes.

8                    THE COURT:  And we've been able to match them all

9         up.

10                   MR. MURALI:  Okay.

11                   THE COURT:  Meaning we've been able to match up

12        through dates.  And based on the records that we've received

13        from the city, which, again, every time, frankly, something

14        matches up, I think it adds some credence to those

15        documents.

16                   MR. MURALI:  Right.

17                   THE COURT:  But we were able to match up one of

18        those HODs as belonging in the Adams case and four in Clark.

19                   MR. MURALI:  That's right.

20                   THE COURT:  So I think we're okay on that.

21                   MR. MURALI:  Yes.  I think we're fine.  Yes.

22                   THE COURT:  Okay.  Footnotes 11 and 12, we're in

23        agreement.

24                   MR. MURALI:  That's right.

25                   THE COURT:  So now we're to Footnote 13.
```

1          MR. MURALI:  Yes, sorry, just to clarify.  In

2     Footnote 11 we're agreeing to the higher amount, $12,000.

3          THE COURT:  Yes, okay.  I appreciate that, that

4     that's something that you're doing.

5          Okay.  So let's go to 13.  It says you're willing

6     to accept the figure from your amended complaint, which is

7     $4,058 paid by defendant in total and $93 owed in costs.

8          MR. MURALI:  That's right.

9          THE COURT:  Okay.  So is there any disagreement on

10    this one?

11         MR. MURALI:  No, just for the record.

12         THE COURT:  You just apportion that differently;

13    is that correct?

14         MR. MURALI:  I believe so.  I think it's

15    apportioned based on what was in the amended complaint.

16         THE COURT:  Okay.  But you would agree he's owed

17    $151 in costs.  You want to say you've been paid $93.  So

18    that would increase somewhat the amount owed to you in

19    costs, right?

20         MR. MURALI:  Yes, Your Honor.

21         THE COURT:  Okay.  Mr. Copeland, do you -- what do

22    you say to that?  Do you care?

23         MR. COPELAND:  It looks like it's going to be

24    another $45.  It's certainly a negligible amount in the

25    grand scheme of things.  However, there's no -- plaintiffs

1    don't have any proof.  The evidence that the Court is

2    relying upon I think demonstrates the number that the $45

3    was paid.

4              THE COURT:  Okay.  So what's the basis for your

5    apportionment?  You say that's just what's in the amended

6    complaint?

7              MR. MURALI:  Yes.  That's how it was apportioned

8    in the amended complaint.

9              THE COURT:  In the amended complaint in the Clark

10   case?

11             MR. MURALI:  In the Clark case.  The same one that

12   the Court has been referencing in AC.

13             THE COURT:  Okay.

14             MR. MURALI:  Where it says AC at 5 for the

15   reference there.  That would be the same document.

16             THE COURT:  So you think that's just a typo on our

17   behalf, on the Court's.

18             MR. MURALI:  It's possible, Your Honor.  I just

19   pulled the figure from the amended complaint so...

20             THE COURT:  Okay.  So if you're looking at the

21   amended complaint -- I have it in front of me.  Do you have

22   it there?

23             MR. MURALI:  I do not have a copy in front of me,

24   Your Honor.

25             No, Your Honor, I don't have a copy.

1          THE COURT:  Well, I can hand this down, but it

2     does seem to say that there's a partial payment of $4,058.

3          MR. MURALI:  Your Honor, if the issue is just with

4     regards to the apportionment with costs, plaintiffs are

5     willing to waive it, waive their objection.

6          THE COURT:  Okay.  So we'll say No. -- there's a

7     few more like that, and just -- it's not hardly worth

8     arguing about.

9          MR. MURALI:  Right.

10         THE COURT:  But that's No. 13.  Let's say

11    plaintiffs will waive that.

12         Okay.  We're now on to 15.

13         MR. MURALI:  That's right.  And if Your Honor will

14    recall, Ms. Harris-Lindsey did testify that she had no

15    recollection of that document or what it was.

16         THE COURT:  Okay.  But this is just another one

17    where there's a dispute between the documents that have been

18    submitted by the city and what?  You've checked your records

19    and --

20         MR. MURALI:  That's right.

21         THE COURT:  That there's zero?

22         MR. MURALI:  That's right, Your Honor.

23         THE COURT:  Okay.  So this is not unlike some of

24    the ones that we did at the beginning.

25         MR. MURALI:  Yes, Your Honor.

1          THE COURT:  Okay.  And I think between

2     Ms. Lindsey's testimony and the affidavit she submitted,

3     there's evidence in the record as to what those sheets are.

4     They're not dispute summary sheets.  They were not created

5     by anyone in her office.  They were created by the attorneys

6     in the Office of Attorney General.

7          MR. MURALI:  Your Honor, to that extent,

8     plaintiffs would also like to object to Ms. Harris-Lindsey's

9     characterization as it was speculation.  She does not -- in

10    the affidavit she states that she does not actually know

11    where the documents came from.  It's just her best belief.

12         THE COURT:  Uh-huh.

13         MR. MURALI:  So her guess is speculation so I'm

14    not sure the degree to which the Court can rely on that.

15         THE COURT:  Okay.  But you're submitting that you

16    have searched your records or Mr. Drake has searched his

17    records, and he believes they've received zero payments.

18         MR. MURALI:  That's correct, Your Honor.  And this

19    goes back to can't prove if it was never paid at all.

20         THE COURT:  Okay.  I understand.

21         MR. MURALI:  There's nothing.

22         THE COURT:  Mr. Copeland, so similar sorts of

23    arguments, but now we're in the Clark case, different kind

24    of documents.

25         MR. COPELAND:  Correct.  That is not what

1   Ms. Harris-Lindsey's declaration says.  It says, "I have

2   come to learn the dispute summary sheets included in the

3   record in Clark were prepared by lawyers in the District's

4   Office of the Attorney General."  That's what the documents

5   are.  There's no dispute about them.

6           The weight the Court affords them is up to the

7   Court.  Certainly we believe that they are reliable and

8   accurate for purposes of establishing prima facie evidence

9   that payment was made.  They're prepayment --

10          THE COURT:  But unlike the other cases where I

11  have documents, which, as you said earlier, are documents

12  created during the course of the payment process, so, you

13  know, the process was moving forward and the Court should be

14  able to -- can fairly rely upon them as evidence of actual

15  payment occurring.  That's not what these documents were.

16  Or were they?  Can you make the same characterization with

17  regard to the documents in Clark?

18          MR. COPELAND:  I think you can, Your Honor.  I'm

19  going to grab them.  I have them right here.

20          THE COURT:  (To the gallery) If anyone's here

21  for -- please just come forward.  I'm going to be doing this

22  right up to the time of the detention hearing, so whatever

23  you need to do just come forward and go back.

24          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

25          MR. COPELAND:  These are the processing of

1    invoices.

2            THE COURT:  The documents in Clark.

3            MR. COPELAND:  Yes.

4            THE COURT:  Okay.

5            MR. COPELAND:  They're reviews of the plaintiffs'

6    invoices that were submitted.  They form the basis of the

7    Court's conclusions as to Judge Kay's recommendation and

8    Judge Kennedy's conclusion of the amount that should be

9    paid, and I don't -- and the fact of the matter is is that

10   plaintiffs don't dispute by and large that almost everything

11   consistent with this was, in fact, paid, so there's every

12   indication I believe that the Court can credit this as

13   evidence as it came with the documents in Adams and Abraham.

14           THE COURT:  Okay.  But these documents were

15   created for purposes of trying to figure out -- I mean, for

16   purposes of the review that Judge Kay was doing.

17           MR. COPELAND:  Correct.

18           THE COURT:  Okay.  They're not the internal

19   documents within -- you know, created by Ms. Harris-Lindsey

20   or someone in her division that was getting these various

21   debts paid.

22           MR. COPELAND:  No.  It was a different process in

23   Clark certainly than the others.  There's no consent

24   judgment.

25           THE COURT:  Right.

1          MR. COPELAND:  So there was no agreement by the

2     parties.

3          THE COURT:  Right.  Okay.

4          For K. Jenkins.

5          MR. MURALI:  Yes.

6          THE COURT:  Footnote 16.

7          MR. MURALI:  Yes, Your Honor.

8          Again, Mr. Drake's search of the records reflects

9     only $3,898 paid so there's an additional $102 that is

10    unaccounted for.

11         THE COURT:  Well, my chart acknowledges that

12    there's at least $100 owed so here we're arguing about it

13    appears to be $20.

14         MR. MURALI:  That's right.

15         THE COURT:  Okay.  Is Mr. Drake going to waive

16    that?

17         MR. MURALI:  Yes, we're willing to waive that.

18         THE COURT:  Okay.

19         Footnote 17, again, with respect to M. Jenkins,

20    the chart reflects one HOD.  You submitted three HODs.

21         MR. MURALI:  That's correct.  And, Your Honor, if

22    I may, I'll defer to Mr. Drake on the *Buckhannon* issue.

23         THE COURT:  Okay.  Here's the issue that I really

24    want to -- my issue is that we dug down in.  We looked at

25    the HODs.  The three HODs you submit match up with the three

1    HODs for M. Jenkins in the Adams case.  Look at Footnote 58.

2                MR. DRAKE:  I think the footnotes are Mr. Murali.

3                THE COURT:  I know.  This is me with both of you.

4            So Footnote 58, the three HODs that are at issue

5    for M. Jenkins, same child, right, Mr. Drake?  This is the

6    same child.  There's only one M. Jenkins, right?

7                MR. DRAKE:  M. Jenkins?

8                THE COURT:  Yes.

9                MR. DRAKE:  Yes, Your Honor.

10               THE COURT:  Okay.  So we've got the same child in

11   two cases.

12               MR. MURALI:  That's right.

13               THE COURT:  Three HODs for M. Jenkins on the

14   Court's chart originally in the Adams case.  That's at

15   Footnote 58.  They all match up, the ones that you

16   submitted.

17               MR. MURALI:  That's right.  Yes, three --

18               THE COURT:  So we're not going to double-count

19   these HODs.

20               MR. MURALI:  No.

21           Okay.  I see the issue.

22               THE COURT:  Okay.  That's what I thought.

23   So there's one, which DCPS doesn't contest the one for

24   M. Jenkins --

25               MR. MURALI:  That's right.

```
1              THE COURT:  -- in Clark.

2              MR. MURALI:  That's right.

3              THE COURT:  The three you've identified are the

4     ones in Adams that we're going to come to soon.

5              MR. MURALI:  That's right, Your Honor.

6              THE COURT:  Which I don't think they dispute

7     either.  So I think --

8              MR. MURALI:  There was an error on our part.

9              THE COURT:  So I think No. 17 is resolved.

10             MR. MURALI:  Except with regards to the Buckhannon

11    issue to the degree --

12             THE COURT:  Well, I think the Buckhannon issue

13    comes up with regard -- I don't know if there is one.

14    There's not for the one HOD because I don't even have the

15    HOD for M. Jenkins in Clark, so there's no Buckhannon issue

16    there, okay?

17             MR. MURALI:  Okay.

18             THE COURT:  So I think 17 is resolved.

19             MR. MURALI:  Okay.

20             THE COURT:  We'll come to it again when we get to

21    58.

22             MR. MURALI:  Okay.

23             THE COURT:  Footnote 19, we agree.  20, we agree.

24    21, we agree.  22.

25             MR. MURALI:  Yes, Your Honor.  That's with regards
```

```
1    to plaintiff M. Robinson.

2              THE COURT:  I think -- don't we agree on that as

3    well?

4              MR. MURALI:  Yes.  It would be whatever figure we

5    posted in our sur-reply, which I think is the same, so I

6    think it's just an acknowledgement that we agree.

7              THE COURT:  We agree.

8              MR. MURALI:  Yes.

9              THE COURT:  Okay.  So now we're on to 23.

10             Let me just pause for a second.

11             Madam Clerk, what do we -- I don't want to hold up

12   the criminal calendar.

13             THE COURTROOM DEPUTY:  We're fine.

14             (Discussion off the record)

15             THE COURT:  All right.  So then back to Footnote

16   23.

17             MR. MURALI:  That's right.

18             THE COURT:  This is another no payment case.

19             MR. MURALI:  That's right.

20             THE COURT:  Just like Footnote 24, another no

21   payment case.

22             MR. MURALI:  Yes.

23             THE COURT:  So in a sense, 23, 24, and 15 --

24             MR. MURALI:  15.

25             THE COURT:  -- are all the same.
```

```
1                  MR. MURALI:  That's right.

2                  THE COURT:  Okay.  Well, I don't need to hear any

3         more argument on those.  I just have to make my decision.

4                  MR. MURALI:  All right.

5                  MR. COPELAND:  Your Honor, may I add something on

6         these?

7                  THE COURT:  Sure.

8                  MR. COPELAND:  If the plaintiff was going to

9         contend that proof wasn't made, they could submit proof that

10        the invoice was at least submitted to us.

11                 THE COURT:  Say it again.

12                 MR. COPELAND:  They could present proof to the

13        Court that the invoice was submitted, and they haven't been

14        able to do that, so in a case where they contend --

15                 THE COURT:  Where there's zero.

16                 MR. COPELAND:  Correct.  Correct.

17                 THE COURT:  Okay.

18                 MR. COPELAND:  For purposes of moving through, I

19        would just like to say it so we don't have to --

20                 THE COURT:  All right.  But that is a new point.

21                 MR. COPELAND:  Yes.

22                 THE COURT:  So you could submit an invoice -- I

23        mean, these are just in the cases where literally it's zero.

24                 MR. MURALI:  Just one second, Your Honor.

25                 THE COURT:  Okay.
```

1          MR. DRAKE:  Your Honor, I don't have the time

2    sheets in that regard.  Which particular case are we on?

3    Which child?

4          THE COURT:  We're on Clark, and there are three

5    different children in Clark that are at issue on this point.

6          MR. DRAKE:  Well, in regard to that, if there were

7    an HOD, if there is an HOD, there would have been an invoice

8    submitted.  I have not -- I haven't -- in many of the cases

9    haven't retained the time sheets that were submitted, and

10   that's the best I can say in that regard.  If they're saying

11   there was an invoice submitted, that's on them.  We -- well,

12   that's all I can say.  If we had an invoice -- if we had an

13   HOD, we submitted the invoice.  But in terms of purging the

14   files, I would not have kept -- many times I would not have

15   kept the time sheets once the judgment was entered.

16         THE COURT:  I don't know what a time sheet is.

17   We're talking about an invoice for payment.

18         So Mr. Copeland has made -- just in the cases

19   where literally there's this dispute between the city

20   believes they've paid the full amount, you believe they've

21   paid zero, he says, "Well, where's your invoice?  Did you

22   submit an invoice for payment in this case?"

23         MR. DRAKE:  And I represent to the Court that if

24   we -- if we have -- if we're showing an HOD, there was an

25   invoice submitted, and it's up to them to show that they

1    made a payment.

2           There's nothing more I can say.  I can go back and

3    look through the file one more time.  There are some

4    instances --

5           THE COURT:  We're not doing anything more after

6    today.

7           MR. DRAKE:  I appreciate that.

8           THE COURT:  You do not have any invoices here

9    today?

10          MR. DRAKE:  As far as I'm concerned -- I don't

11   have anything here with me today.

12          THE COURT:  Understood.  This is fine.  This just

13   goes to those cases where they appear maybe they were left

14   out, forgotten, overlooked.

15          Though you don't have, in the Clark case,

16   Mr. Copeland, the argument like you have in Adams and in

17   Abraham based on the consent judgment.

18          MR. COPELAND:  Correct.  Correct.  I mean, we do

19   have -- I would say that the difference, though, is that in

20   terms of the -- if there was an error, if there was an

21   oversight, to that extent, I mean, we're now a decade past

22   when the judgment was entered, and I apologize for not

23   knowing the specific legal doctrine that applies, but it

24   seems to be that he slept a bit on his rights to contest

25   that there was an error.  Whether that's under Rule 60 or

1    something, he should have moved and presumably he should

2    have shown some sort of excusable neglect or something like

3    that to qualify for that kind of relief, and I don't think

4    that kind of demonstration has been made.

5                    THE COURT:  Okay.  I understand.

6                    MR. DRAKE:  Your Honor --

7                    THE COURT:  Yes.

8                    MR. DRAKE:  -- in that regard, Judge Lamberth's

9    order was that for each child that there was an HOD they

10   were to pay up to the $4,000.  That's the law of the case.

11                   THE COURT:  Uh-huh.

12                   MR. DRAKE:  For them to go back now to say, "Well,

13   we didn't get an invoice" -- the judge said HOD, you pay the

14   bill.  Case closed, it appears to me.

15                   THE COURT:  I hear you.  I hear you.  I think it

16   still comes back to the documents.  I'm not really moved --

17   I hear Mr. Copeland as well.  This whole case has been about

18   you trying to get payment for each of these children up to

19   the cap.

20                   MR. DRAKE:  That's right.  We're trying to get

21   paid for the whole amount for years.

22                   THE COURT:  I know.  So in the sense -- I don't

23   know if you've been sleeping on your rights.  I hear you.

24                   MR. DRAKE:  Thank you, Your Honor.

25                   THE COURT:  Okay.

1          Okay.  So now we're to Footnote 25?

2          MR. MURALI:  Yes.

3          Yes, Your Honor.  Some of the objections under

4    Adams simply deal with apportionment between fees and costs.

5    To that regard, this was, as I was preparing the sheets,

6    what seemed like the logical apportionment based on costs,

7    but if the Court wants to apportion them differently,

8    plaintiffs have no objection to that.

9          THE COURT:  Okay.  For these small dollar

10   figures --

11         MR. MURALI:  Right, yes.

12         THE COURT:  -- how are we going to apportion it?

13   You're going to waive those objections?

14         MR. MURALI:  Right.

15         THE COURT:  But that's just the general objection

16   that you're making there.  I'll get that on the record for

17   each of the specific ones as we go through because I

18   certainly want to have you make the decision on what's small

19   and what's not small.

20         MR. MURALI:  Right.

21         THE COURT:  So I'm going to move beyond 25 and go

22   to 26.  This is, again, the general objection about the

23   total amount owed.

24         MR. MURALI:  That's right.

25         THE COURT:  And the numbers are -- the math is

1    what it is based on the decisions that I make.

2                MR. MURALI:  Right, exactly.

3                THE COURT:  Okay.  So then let's go to 27.  In

4    this case I preliminarily found four HODs.  You provided --

5                MR. MURALI:  So there would be four plus one, Your

6    Honor.

7                THE COURT:  Four plus one.

8                MR. MURALI:  Yes.  Because there was a subsequent

9    Adams judgment.  Plaintiffs have been labeling it Adams

10   Supplemental or Adams 2 so there would be the four HODs that

11   are in the file plus the one judgment, the one additional

12   judgment.

13               THE COURT:  What is the supplemental Adams?

14               MR. MURALI:  It was a subsequent judgment in Adams

15   that -- there were two Adams judgments.  One was dated May

16   25, 2005, and there was a second one that was dated August

17   30, 2005.

18               THE COURT:  I don't know anything about them.

19   There's no individual Adams case.

20               MR. MURALI:  Your Honor, it is also listed in

21   Attachment C, and in all plaintiffs' filings there have been

22   two separate Adams submissions.  Within all plaintiffs'

23   charts, there's been a reference to an Adams 2 so...

24               THE COURT:  Well, I mean, I don't -- okay.  In any

25   event, I only have four HODs that are provided.

1          MR. MURALI:  That's right.  But there was also an

2     additional judgment in Adams 2, August 30, 2005.

3          THE COURT:  Okay.  And where is that?  Is that in

4     the --

5          MR. MURALI:  That would be in the record, Your

6     Honor.  Your Honor, I have Adams 1 and 2 here.

7          THE COURT:  Yes.  Okay.  So you're counting this

8     as the fifth HOD, this August 30, 2005, consent judgment?

9          MR. MURALI:  That's right, Your Honor.

10         THE COURT:  Okay.  Why is this an HOD?

11         MR. DRAKE:  I'm sorry, Your Honor, I didn't hear

12    the Court, what the Court's asked.

13         THE COURT:  We're talking now about Adams,

14    Supplemental Adams, Adams 2, which this is the first I've

15    heard of it.  I know it's been around, but it's the first

16    I've focused on it.

17         MR. DRAKE:  In Adams there were two judgments.

18    One was the initial judgment for -- I don't have it in front

19    of me now, but the multiplaintiffs that were there.  The

20    second was the -- a subsequent order entered for a -- I

21    believe it would have been a subsequent HOD.  The HODs I

22    have for -- I have for Thomas Adams one, two, three.

23         THE COURT:  Four.

24         MR. DRAKE:  Well, I have three right here, but

25    that's what I have at the moment.

1          In any event, I will assure the Court that the

2    second to supplemental was, in fact, for Adams separate

3    from -- separate from -- if my recollection is correct,

4    separate from the multipart was a -- the best I can say, the

5    supplemental is the best I can say after the fact of

6    entering the first judgment, the first order, rather.

7          Same case, second order.

8          THE COURT:  I see that.  I don't know if there's a

9    new HOD.

10          I'll pass it -- I mean, I -- these are documents

11    you gave to me.  I'll pass it down to you.  I don't see it.

12          I have four HODs that you've submitted.  You're

13    trying to say there's a fifth, and I think it's based on

14    that document, but I don't see it there.

15          (To the Courtroom Deputy) Are we ready?

16          THE COURTROOM DEPUTY:  Yes.

17          THE COURT:  Okay.  So when we come back,

18    Mr. Copeland, I want to hear you on that issue, and I

19    certainly want to hear you, Mr. Drake, when you look at it

20    now and think about what that document means, that second

21    consent judgment.

22          I don't see anything in there about an HOD.  We'll

23    start with that when we get back.

24          This will take a little bit.  Feel free to remain

25    in the courtroom, but you'll need to pull your things

1    together because I have to have new counsel come forward.

2           (Recess taken)

3           THE COURTROOM DEPUTY:  Recalling civil case Year

4    2000-591, *Wanda Gertrude Allen, et al. vs. District of*

5    *Columbia*.  This is a continued evidentiary hearing.

6           THE COURT:  Okay.  When we left off, we were

7    dealing with Footnote 27.  I'll start first with the

8    plaintiffs.  I'd asked that you look at that second consent

9    judgment, which you referred to as the Supplemental Adams

10   case.  I still don't understand how that is an HOD worthy of

11   a $4,000 payment.

12          MR. DRAKE:  Your Honor, on the Adams Supplemental

13   or Adams 2, that's an error on our part.  That's not an HOD.

14   That's for supplemental attorneys' fees or attorneys' fees.

15          THE COURT:  That's what I thought.

16          MR. DRAKE:  And for whatever reason, we had what

17   I thought was a failure of communication between me and

18   Mr. Murali in that regard.  So we certainly withdraw that --

19   any claim for an HOD there.

20          THE COURT:  Okay.

21          MR. DRAKE:  That's our error.  My error.

22          THE COURT:  That's fine.  So that case has four

23   HODs, and we're all in agreement as to the four HODs.  So

24   now I'll consider that resolved.

25          We'll go to 28.  28 is K. Allen, and we're in the

 1   Adams case now.  K. Allen.

 2          MR. MURALI:  Yes, Your Honor.

 3          THE COURT:  For this one, my chart said one HOD,

 4   and it appears that you want to say that there are more than

 5   one HOD.

 6          MR. MURALI:  Yes, that's correct.  Plaintiffs have

 7   provided three HODs for plaintiff K. Allen.

 8          THE COURT:  Okay.  Well, this is the first --

 9   there's a few cases that fall into this category.

10          MR. MURALI:  Right.

11          THE COURT:  This is an individual child who has

12   both an individual case and also is a plaintiff in one of

13   the multiplaintiff cases.  I am confused by the language of

14   your objection or clarification to your objection in

15   Footnote 28.  I just don't know what you want me to do.

16   Just tell me what you want me to do.

17          MR. MURALI:  Understood, Your Honor.  I believe

18   the confusion stems from our -- the plaintiffs' initial

19   submission where all the Allen HODs were lumped together

20   under the -- as a single minor plaintiff, and it's possible

21   here that when preparing these footnotes, we may have

22   double-counted Allen.  But with regards to this plaintiff,

23   there -- over the course of this entire set of plaintiffs

24   from all these proceedings, there would be only three HODs

25   total.

1          THE COURT:  You think there's three total.

2          MR. MURALI:  Yes, and they provide them in the

3     packet, Your Honor.

4          THE COURT:  Okay.  But where would you put them?

5     Do you want me to -- where do you want me to put them?

6          MR. MURALI:  Ideally, it would be under Allen as

7     an individual plaintiff separated out from these cases, so

8     separated out from Adams because Allen was filed as its own

9     case.

10          THE COURT:  So K. Allen as a plaintiff in the

11     multiplaintiff Adams case, you would want that to be

12     essentially zero HODs.

13          MR. MURALI:  Zero here, but under Allen as a

14     separate case.

15          THE COURT:  Okay.  But all the payments that are

16     made reflected on my chart for K. Allen under the Adams

17     case, I mean, you would want me to transfer those over to

18     the --

19          MR. MURALI:  Yes, Your Honor.

20          THE COURT:  -- individual Allen case, right?

21          MR. MURALI:  Yes, Your Honor.

22          THE COURT:  So the government's going to get --

23     the District's going to get credit for the payments that we

24     all acknowledged that they made.  We might have a dispute

25     about the amount, but I'm just transferring all the HODs,

1   but not the evidence of payment --

2           MR. MURALI:  Right.

3           THE COURT:  -- over to that individual Allen case.

4           MR. MURALI:  Right.

5           THE COURT:  Is that right?

6           MR. MURALI:  Yes.  I believe that's correct, if

7   I'm understanding you correctly.

8           THE COURT:  Okay.  Well, we've got to be real

9   clear.

10          MR. MURALI:  Yes.

11          THE COURT:  Mr. Copeland.

12          MR. COPELAND:  It doesn't matter to us which case

13  they're assigned to.  I'll say that up front.

14          And among the materials that the -- the HODs that

15  were supplied to us, there are four of them.  Two of them

16  are duplicates.

17          THE COURT:  One of them's a duplicate, so that

18  leaves three.  That leaves three.

19          MR. COPELAND:  Right.  The first one -- I think

20  the second and the third one are included in the Court's

21  calculations already.  The one that is dated 1997, I do not

22  believe should -- is the only thing that might be new, and I

23  don't think it should be included.  It's dated '97.  There's

24  a three-year statute of limitations on attorneys' fees

25  applications from an HOD that would not have been timely to

1    have been included in any of the lawsuits here.  Moreover,

2    in 1997, I don't believe there was a fee cap so it wouldn't

3    really be actionable under the peculiarities of this case.

4            THE COURT:  What's the Adams date for the

5    complaint?

6            MR. COPELAND:  It's January 2001.  Oh, Adams,

7    excuse me, it's not.

8            Adams is --

9            THE LAW CLERK:  Adams is October 2003, I think.

10           MR. COPELAND:  2003.

11           The earliest multiparty case was Abraham, and it

12   was filed in January 2001 so the statute of limitations

13   would run regardless of which multiparty case it was thrown

14   into.

15           THE COURT:  So there are three HODs.  You agree --

16   you think there should be two, not three.

17           MR. COPELAND:  Correct.

18           THE COURT:  The one that you dispute is November

19   1997.

20           MR. COPELAND:  Correct.

21           THE COURT:  And you think that's just too old.

22           MR. COPELAND:  Yes.

23           THE COURT:  Because by the filing of this

24   complaint, October of 2003, that HOD is already six years

25   old?

1          MR. COPELAND:  Correct.  And I don't think --

2     there is not a fee cap in 1997 so it shouldn't -- it

3     wouldn't fall within the kind of the issue presented.

4          THE COURT:  Okay.  Mr. Drake, can you speak to the

5     November 17, 1997, K. Allen HOD.

6          MR. DRAKE:  Yes, Your Honor, and without regard to

7     addressing anything as to statute of limitations, this date,

8     1997, it is my -- certainly my recollection, my belief, and

9     I thought that we had dealt with this in a way that

10    everything back at that time had been paid for so to the

11    extent that we made an error and included it, I would

12    withdraw that HOD as a claim.  It would not be, in my

13    view -- would have -- should have been paid prior to the --

14    prior to the fee cap going into effect for what amounts to

15    really the cut-off time.  So that would be another error on

16    our part.

17         THE COURT:  No, that's what this is about.  That's

18    fine.

19         MR. DRAKE:  Okay.  We withdraw that, Your Honor.

20         THE COURT:  Okay.  So then we're going to have

21    two HODs.  I'm going to put both HODs in the K. Allen

22    individual case, and I will as well transfer to the

23    individual case all -- you know, all -- my determination

24    with regard to fees paid to date.

25         MR. MURALI:  Thank you, Your Honor.

1            THE COURT:  So let me just double-check one thing

2      first.  So are we good with that one?  We only had two.

3      There's going to be two, and they're both -- two HODs, and

4      both HODs will be in the Allen individual case as well as

5      all evidence of payment.

6            Okay.  So let's go to No. 29.

7            MR. MURALI:  Okay.

8            THE COURT:  Footnote 29 is a dispute with regard

9      to the fees paid to date.  We said $5,927 and change is

10     paid --

11           MR. MURALI:  Right.

12           THE COURT:  -- in to K. Allen -- regardless of

13     which case was paid for K. Allen HOD.  You object to that,

14     but I don't know if there is a big objection or not.

15           MR. MURALI:  So, Your Honor, I believe the

16     overarching objection with regard to that would be with

17     regards to crediting the defendant.  Plaintiffs are

18     maintaining an objection in all cases where the defendant

19     allegedly overpaid.  This should not count against any other

20     totals or the entire amount due.  As for whatever reason

21     DCPS had at the time when they paid beyond $4,000, they did

22     so in order to satisfy the outstanding judgments, which are

23     still clearly at issue in this case.

24           This would also go back to plaintiffs' position

25     that in this current proceeding and these proceedings as a

1  result of Judge Lamberth's order, these don't touch the

2  entire outstanding amounts that are still due to Mr. Drake

3  and the plaintiffs.  These are -- effectively what's

4  happening is we're discussing the amount paid in the interim

5  based off of calculations that were not contemplated at the

6  time that these judgments came down.  Because at the time

7  these judgments came down, nobody was apportioning them by

8  HODs or by plaintiffs.  It was just a lump-sum figure.

9       THE COURT:  Okay.  Well, I don't know what you

10  want me to do with that.

11       MR. MURALI:  Effectively plaintiffs, in all

12  instances where the Court has indicated a negative in the

13  amount due, we'd ask that the Court treat that as a zero as

14  in the --

15       THE COURT:  You don't want me to credit it towards

16  any amount owed by the District for payments under the

17  $4,000 cap.

18       MR. MURALI:  That's correct.  Just treat it as

19  zero.

20       THE COURT:  Right.  But you would agree that it

21  needs to go towards a deduction from the overarching

22  judgment.

23       MR. MURALI:  Absolutely.  Absolutely, Your Honor.

24       THE COURT:  Okay.  That's the first time this has

25  come up.  I know we touched on this last time.

1           Mr. Copeland, that's not the way I did it.  I did

2    it in a way I think was probably more beneficial to the

3    District, but I've got to tell you, it's not clear to me,

4    other than I made that decision in the past, at least

5    preliminarily, why that makes sense and is fair.

6           MR. COPELAND:  We like the way you did it.

7           THE COURT:  I know you do.  I know you do.

8           MR. COPELAND:  I think it is actually appropriate

9    for the way you did it.  If you look back to the joint

10   submission that was submitted in August, Mr. Drake talks

11   about that checks were issued for multiple plaintiffs,

12   multiple HODs.  They were sort of lumped together, and as

13   I explained earlier, Ms. Pierson's declaration, that's how

14   the invoices came in, too.  So to the extent that there is

15   this -- that invoices would come in reflecting sort of

16   blocks of children and plaintiffs, that they would be paid

17   that way, I believe it's not equitable to --

18           THE COURT:  I don't know that that's happening

19   here though.  I mean, first -- Nesbit, that seems to be,

20   like, the big outlier.

21           MR. COPELAND:  Uh-huh.

22           THE COURT:  But as far as I know, those are all

23   checks paid in the Nesbit case.

24           MR. COPELAND:  No.  It was paid in the Adams case.

25           THE COURT:  Okay.

1      MR. COPELAND:  It was paid in the Adams case, and

2   so all -- and, again, Adams has a large number of individual

3   children.  I think the record establishes that the invoices

4   would come in for multiple HODs, multiple children.

5      There was a time crunch in Adams based upon the

6   Court's order that these things be paid by a certain date.

7   DCPS did not adhere to its sort of usual protocols in order

8   to get these checks out to Mr. Drake as it was supposed to.

9   It still didn't meet its deadline to do so from the Court.

10  And I think if you look into the record in Adams, and

11  specifically Ms. Pierson's declaration, it establishes that

12  fact, and that's --

13      THE COURT:  Where is this Pierson declaration?

14      MR. COPELAND:  Sure.  It's Document No. 11.

15      THE COURT:  Document No. 11?

16      MR. COPELAND:  Yes.

17      Document No. 11 is a submission to the Court.  I

18  guess it's 11-1 in Adams.  And, again, they had not met

19  their deadline to make timely submissions on the fee

20  invoices, and so her declaration was included to explain why

21  they had not met their deadline.

22      But in it it talks about the difficulty they had

23  in processing these because the usual process, as

24  articulated here, is you would submit one invoice per HOD,

25  and it would be evaluated and documented that way.  And here

1   they would have multiples, and rather than send them back to

2   Mr. Drake to be redone, we had to meet our deadline -- we

3   had to try to meet our deadline, and so they would simply

4   work with what they had to issue the checks up to $4,000 on

5   each of the HODs -- not up to $4,000.  It was to whatever

6   the cap was.

7             I think I lost you.

8             THE COURT:  But I just don't understand.  But what

9   would they then do?  They would issue a check?

10            MR. COPELAND:  There were 60 invoices submitted.

11            THE COURT:  How did they become associated with

12  Mr. Nesbit and him alone?

13            MR. COPELAND:  That I don't know.  He had a lot of

14  HODs, if my memory serves me.  I don't have the chart in

15  front of me.

16            Actually, I do.  He had a lot, and so if they all

17  came in -- if those were among those grouped, if there were

18  more than him on the invoice that included all of those, it

19  would make sense to me that when that check was cut that's

20  how it would -- it would have been issued.

21            I can't confirm to the Court that that's how it

22  did it, but I think that makes the most sense as opposed to

23  tieing it to some individual case that's not even part of

24  anything here, which is what I think Mr. Drake asserts

25  happened.

1          THE COURT:  Okay.  Mr. Drake.

2          MR. COPELAND:  If I can just clarify one thing,

3     Your Honor, just to sort of wrap it up.  That's the --

4     because all of these came in with multiple cases, these

5     invoices came in referencing multiple cases, we don't

6     believe that it's equitable to only credit against a single

7     plaintiff in this process because that's not how the

8     invoices were submitted to us.  They were submitted to us

9     from multiple HODs, multiple children, and in that way it

10    would be equitable to credit -- to spread the credit across

11    all of the totals.

12          MR. DRAKE:  Your Honor, again, I couldn't hear

13    Mr. Copeland very well, but what I'm understanding he's

14    saying is that we haven't -- that if they made what might be

15    considered an overpayment over the fee cap, that they now

16    deserve credit against other cases where they hadn't paid

17    over the fee cap.  If we're talking about -- if we want to

18    go to Nesbit.

19          THE COURT:  Yes.

20          MR. DRAKE:  We'll go to Nesbit, first of all.

21          Nesbit is an individual independent case that's

22    not a part of this -- is not a part of this consolidated

23    case at all.

24          THE COURT:  Well, it's listed.  I mean, I don't

25    know why you say it's not part of it.  It's always been

1    listed on all the lists that have been submitted to me under

2    Adams.

3                   MR. DRAKE:  Well, there's an error.

4                   THE COURT:  I don't know about that.

5                   MR. DRAKE:  Nesbit shows up under Adams, if that's

6    where it is --

7                   THE COURT:  It does.

8                   MR. DRAKE:  -- as individual cases, but, Your

9    Honor --

10                  THE COURT:  It's not an individual case.

11                  MR. DRAKE:  Well, if I may -- if I may state to

12   the Court, it is.  It's *Nesbit vs. D.C.*, Civil Action

13   01-2429.  That's one HOD.

14                  There are other HODs subsequent and separate from

15   this case, of course, that show up, then, under the

16   multiplaintiff cases.  It has nothing to do whatsoever --

17   this one particular case where they paid $59,000 is not a

18   part of the consolidated case.

19                  There are three other HODs that are a part of

20   that, and those were paid totaling, I think, approximately

21   $72,000.  But I urge the Court not to in any way consider

22   the independent case which never even showed up until -- was

23   not even an issue until we got involved here in trying to

24   parse just where we were in terms of HODs.  It's not a part

25   of the consolidated case.  The one HOD which shows up -- in

1    which they paid it.  Why they paid the amount they did, I

2    have no idea.

3            THE COURT:  Why would they do that?  Why would

4    they pay far in excess of what they're required to do?

5            MR. DRAKE:  I told the Court some time ago that

6    there was a period of time in which the -- it was construed

7    by DCPS that the cap did not apply in terms of reaching into

8    other years' budgets and paying.  What they did, I don't

9    know, but that's not my responsibility, to explain why they

10   did it.  They did it.

11           And now to charge this -- after all, it's not as

12   though they gave me free money.  It was owed.  There wasn't

13   any question about that the money was owed, and so why they

14   did that, I'm suggesting to the Court they had a duty, and

15   they were on notice from way back months ago here that I was

16   claiming that there was a period of time when they paid

17   without regard to the fee cap because of the budget issues

18   on Capitol Hill.  They were reaching back into -- and I gave

19   them the names and asked to contact those people, and Erika

20   Pierson and Jim Baxley could have answered the question for

21   them.

22           But if they hadn't found them, that's on them.  It

23   shouldn't be charged against me.  After all, we're just

24   talking about a small percentage of the bills and the money

25   that was owed over the nearly 15 to 20 years.

1          And so it isn't as though there's any advantage.

2     It's just that there was a period of time when they paid

3     what they should have paid all the way through if they

4     hadn't -- and I'll use the word -- slipped in and got the

5     fee cap that they got in 2009.

6          So it's unfair.  It is unfair on their part to

7     make that claim.

8          We're saying that one HOD -- and I can sort it out

9     here in a moment.  I had it sorted out earlier.  There's one

10    HOD for the *Nesbit v. D.C.* independent case, unrelated, not

11    a part of the consolidation.

12         There are three other HODs in which they've paid

13    up the fee cap or slightly over.  I don't know what.  They

14    might have been within a few hundred dollars of the $4,000

15    fee cap.  We're not claiming they owe any more on that.

16    When you add them up together about what the Court

17    indicated, it looked like they had paid on Nesbit for three

18    or four HODs.  That's our position, and it's firmly our

19    position.

20         It's unfair what they're attempting to do.  It's

21    unfair.

22         THE COURT:  Well, in part it's because that's the

23    way I did it, and so they're wanting me to stick to the way

24    I originally did it.

25         MR. DRAKE:  Well, they haven't rejected what the

1   Court has said.

2   THE COURT:  Okay.

3   MR. DRAKE:  Thank you, Your Honor.

4   THE COURT:  Understood.

5   MR. COPELAND:  Your Honor, just to follow up, if

6   you look at Attachment B of the submission on -- it's the

7   revised Attachment B.  It was filed earlier this week by

8   plaintiffs.  It references that the payments were made as

9   a part of nine other cases, and I think that is evidence

10  of the fact that payments were issued in accordance with

11  how Ms. Pierson reflects that they received invoices from

12  Mr. Drake grouped together, not separated, not by individual

13  HODs.  And so if the payment in turn reflected a lump sum

14  from multiple cases --

15  THE COURT:  Where do you see multiple cases?  I'm

16  looking at a revised fee.

17  MR. COPELAND:  Sure.  If you go to administrative,

18  Check No. 5722071, and in parentheses it says it's part of a

19  check total dated -- I don't know, there's four numbers

20  there.  It included nine other cases.  So if there is a --

21  if there are some checks that involve multiple cases, that's

22  a result of how the invoices were submitted.  And if the

23  invoices were submitted with multiple cases and paid with

24  multiple cases, it seems most equitable to apply the credit

25  across the multiple cases.

1              THE COURT:  Okay.  Mr. --

2              MR. DRAKE:  Your Honor, if I may?

3              THE COURT:  Do you see that?  Yes, please, you

4       may.

5              MR. DRAKE:  The check --

6              THE COURT:  Yes.

7              MR. DRAKE:  -- that they said --

8              THE COURT:  Yes.

9              MR. DRAKE:  -- in *Nesbit vs. D.C.*, independent

10      case, references that specific file number for *Nesbit vs.*

11      *D.C.*

12             THE COURT:  I don't know what you're talking

13      about.  What file number?

14             MR. DRAKE:  Civil Action 01-2429.  Judge Kessler's

15      order of November 4, 2003, orders them to make payment, and

16      attached to that order in my file -- I can't say what's in

17      the Court's file, but attached to that is a breakout of

18      exactly what the amount is administrative, $25,686.25.

19      That's in my -- that's our Exhibit B --

20             THE COURT:  I see it.

21             MR. DRAKE:  -- which I had submitted a revision on

22      or about August the 30th in which we show the exact breakout

23      of what the fees, costs, and partial payments are, and then

24      the judicial proceedings in that case, which comes out to be

25      an exact amount of $59,367.75, exactly the amount of the

1    check that they paid.

2            So it isn't even a question to talk about any kind

3    of multiple plaintiffs.

4            THE COURT:  Well, it comes from your own document

5    so I want you to turn to your revised Exhibit B.

6            MR. DRAKE:  Yes.

7            THE COURT:  And you talk about partial payment

8    of $9,920.  This is a hard document to read and understand,

9    Mr. Drake.

10           MR. DRAKE:  Yes.

11           THE COURT:  But then there are four parentheticals

12   after that.  The one that Mr. Copeland focuses on is the one

13   that begins as a part of a total check dated -- and there's

14   an odd date there; I don't know what date that is --

15   including nine other cases for a total amount of $48,975.

16   So Mr. Copeland says this is some evidence of about how

17   these cases were both invoiced and paid; that essentially

18   this is a payment, if I'm understanding him correctly, for

19   what's due in multiple cases because that's how you invoiced

20   it.

21           So his point is, if true, then why shouldn't any

22   credit also relieve the city of its obligation for anything

23   it hasn't paid under the fee cap in multiple cases?

24           MR. DRAKE:  Because, Your Honor, he's in error.

25   As I told the Court how they paid -- we credited -- I

1    credited the District with the payment of $9,920 against

2    what they owed on this one particular case, and the fact

3    that it came out of a check for eight or nine or whatever

4    cases it may be, it is inconceivable to suggest that there's

5    no way to know what other cases -- at this point what other

6    case may have been involved.  But it certainly wasn't a part

7    of any multiple -- it's just they combined the check.

8              A number of invoices have been submitted on a

9    number of children.  They combined them into a particular

10   check for this amount of money, $48,975.  Nine other cases

11   that are to be HODs or other children, they combined it, and

12   I simply gave them credit for what of that part they had

13   paid, and then submitted a balance.

14             The subtotal, then, that was owed at that point

15   for the administrative case in that one HOD was $25,686.

16   And then to struggle through it here when we had to come

17   over here to court, they added another -- I didn't do it;

18   they did it -- $33,681.50 to handle this one HOD to get for

19   the child that the hearing officer ordered.

20             I didn't do it.  They did it.  And so, Your Honor,

21   please, don't be misled by the fact that I made an honest

22   disclosure that the one check, the $9,920, was combined with

23   nine other cases.  No relationship whatsoever.

24             THE COURT:  So you backed that $9,920 out of the

25   check for $48,975.  You found the amount of that check,

1   which was a partial payment to Nesbit.

2          MR. DRAKE:  In that instance.  Obviously I found,

3   by looking -- it's obvious that they -- on that particular

4   check that they paid -- and the check I'm talking about -- I

5   don't have the check here, but that particular check in

6   which we're saying there were nine others in there, yes, I

7   backed it out.  It was obvious that they had to identify

8   Nesbit on that check, X number of dollars.

9          THE COURT:  Got it.

10          MR. DRAKE:  The X number is right here.

11          THE COURT:  Understood.  I think I understand you

12   now.

13          But do you have something else there?  Do you have

14   something there that you were saying that demonstrates that

15   these payments were payments made pursuant to Judge

16   Kessler's order in the Nesbit case?  Do you have --

17          MR. DRAKE:  What I have, Judge -- her order was a

18   bit oblique.  It simply said pay, and the -- I'm looking for

19   the order.

20          THE COURT:  Well, I need the order.

21          MR. DRAKE:  I think I've submitted the order which

22   she entered on November 4, 2003, and she said plaintiffs'

23   motion is granted, and defendant is to pay plaintiffs no

24   later than December 15, 2003.

25          As I said, I found in my file, then attached to

1    it, time sheets for Pierre Devon Nesbit, April 25, 2003,

2    Page 18, which would have been from the submittal to Judge

3    Kessler at that time.

4            I recognize she didn't specify the amount, but I'm

5    saying that the indicia is that when I found it in my files,

6    after 15 years later looking through it, there was the

7    attachment which I had made to justify, so I understood what

8    had been done, and I had -- I'd written on the check, the

9    copy of the check itself, "Paid in full, $59,367."

10           And I'm certainly willing to hand that up to the

11   Court, if you'd like.

12           THE COURT:  Please, yes.  I mean, if you have

13   something, let me see it.

14           MR. DRAKE:  I'm sorry?

15           THE COURT:  Let me see it.

16           Why wouldn't you submit that?

17           (Pause)

18           THE COURT:  Okay.  Have you shown this to

19   Mr. Copeland?

20           MR. DRAKE:  I don't know whether we did or not.  I

21   don't remember.

22           MR. COPELAND:  No, I have not seen this, Your

23   Honor.  Mr. Drake has not produced anything in the form of

24   checks or invoices or ledgers or anything since I've been on

25   the case.

1           But, again, this does not break anything out.  I

2     thought he indicated that there was an indication as to how

3     he arrived at his figure, and that's not reflected here in

4     this document.

5           I'll also note in his submission, Revised

6     Submission B --

7           THE COURT:  He's got a time sheet there just for

8     Mr. Nesbit, and it adds up to $59,000.  He's got it attached

9     to the order from Judge Kessler saying "Pay up, government,"

10    from Mr. Nesbit.  And then the check that you produced is

11    the same amount of money as his time sheet in the Nesbit

12    case.

13          MR. COPELAND:  I see that, Your Honor.  This is

14    the first time that I have seen this.

15          THE COURT:  Yes, I know.  Well, me, too.

16          MR. COPELAND:  I don't know how to respond

17    honestly to it here.

18          THE COURT:  Well, it's tough to respond to.

19          MR. COPELAND:  Right.

20          THE COURT:  Okay.  Mr. Drake, are you going to

21    offer that as an exhibit?  It's a lot of money.

22          MR. DRAKE:  I'm sorry?

23          THE COURT:  Are you going to offer that as an

24    exhibit?

25          MR. DRAKE:  I'm pleased to offer it.  Everything's

1    on the table in that regard.

2             THE COURT:  Yes.  That's a lot of money.

3             MR. DRAKE:  I don't have an extra copy.  If

4    someone can make a copy of it, that would be fine.  I'm

5    prepared to offer it as an exhibit, as Plaintiffs' Exhibit

6    2, I suppose.

7             THE COURT:  Okay.  At the end, let's get a copy of

8    it, and that will be Plaintiffs' Exhibit 2.  I'll admit

9    that.

10            MR. COPELAND:  Your Honor, I would be remiss if I

11   didn't at least note an objection to the fact that this is

12   something that obviously would have been helpful to us to

13   know in advance and to be able to investigate, and we didn't

14   have that opportunity.

15            THE COURT:  Okay.  Understood.  It will be

16   admitted.

17            All right.  So that's Footnote 29.  Footnote 29 is

18   the similar sort of objection, correct, that you were -- any

19   case involving a credit, you want the credit to be towards

20   the judgment, not towards any underpayment that the city has

21   made with regard to other plaintiffs underneath the $4,000

22   cap?

23            MR. MURALI:  Yes, Your Honor.

24            THE COURT:  Okay.

25            MR. MURALI:  So the payment wouldn't be

1    apportioned amongst --

2              THE COURT:  Yes.  We don't need to argue that any

3    further.  I do believe I'm going to go the other way on

4    that.

5              Okay.  Let's go forward to Page 30 -- I mean,

6    Footnote 30.

7              MR. MURALI:  Okay.

8              THE COURT:  This is another case involving we said

9    four HODs; you've provided five.

10             MR. MURALI:  That's right, Your Honor.

11             THE COURT:  So let me hear from Mr. Copeland.

12   This is J. Barnes.

13             MR. COPELAND:  There are five, Your Honor.  There

14   are four in this case and one back on Page 7 of this

15   Attachment D, so that's the five total that are included.

16             THE COURT:  So that's for Barnes?  Four here

17   and --

18             MR. COPELAND:  One in the Clark case.

19             THE COURT:  Is that correct?  Is J. Barnes the

20   same J. Barnes in the Clark case?

21             MR. COPELAND:  It is, Your Honor.

22             THE COURT:  Mr. Drake?

23             MR. DRAKE:  We're looking.  We're looking, Your

24   Honor.

25             MR. MURALI:  Yes, Your Honor.  We're double-

1    checking, but we believe there's only one J. Barnes.

2              THE COURT:  Okay.  So that's the five.  So

3    essentially we're in agreement as well on that, right?  The

4    city and we've come up with five HODs.

5              MR. MURALI:  Yes, Your Honor.  We're not trying to

6    double-count anything.

7              THE COURT:  Okay.  So we'll put four here and then

8    the one in the Clark case.  Four in Adams, and one in Clark.

9    Yes?

10             MR. MURALI:  Yes, Your Honor.

11             THE COURT:  Okay.  We're to Bates C., Footnote 31.

12   I originally identified three HODs.  You've provided four.

13             MR. MURALI:  Yes, Your Honor.

14             THE COURT:  Mr. Copeland?

15             MR. COPELAND:  It's the same situation, Your

16   Honor.  There's three in this case, and there's one in the

17   Clark case.

18             THE COURT:  I don't know if you could make this

19   more confusing if you tried.

20             MR. MURALI:  Apologies, Your Honor.  I think there

21   was some confusion with the spreadsheet as well so --

22             THE COURT:  Okay.  Do you agree with that as well?

23   C. Bates, three here, and one for C. Bates in Clark?

24             MR. MURALI:  Yes, Your Honor.  That is -- yes,

25   that's correct.  So that's the five.

1          THE COURT:  Okay.  Now, we go to J. Bates,

2    Footnote 32.

3          MR. MURALI:  Yes, Your Honor.  There we're

4    conceding that the amount was -- or we're saying that the

5    amount is $16,000.

6          THE COURT:  Okay.  And in here you're claiming

7    that the omission that you previously made was in error; is

8    that right?

9          MR. MURALI:  Yes, Your Honor.  The initial figure

10   was an error, so we're agreeing with the figure that was

11   provided in defense documents.

12         THE COURT:  Okay.  Does the District disagree with

13   that?  I mean, essentially they made a mistake, but they're

14   now agreeing with the documents that you produced.

15         MR. COPELAND:  That's correct.  No problem.

16         THE COURT:  Okay.  Number 33.  That's an

17   agreement.

18         MR. MURALI:  Yes, Your Honor.

19         THE COURT:  Don't need to spend time on that.

20         No. 34, J. Bennett.  This appears to be another

21   apportionment issue.

22         MR. MURALI:  Yes, Your Honor.

23         THE COURT:  Do you waive on that?

24         MR. MURALI:  Yes.  With regards to apportionment,

25   but not with regards to the issue regarding Butler R.

1     contained in that footnote.

2               THE COURT:  With regard to...?

3               MR. MURALI:  The supposed overpayment in Butler

4     R., the next plaintiff.  There was no footnote in Butler R.

5     for me to write an objection.

6               THE COURT:  Okay.  Let's just focus on J. Bennett.

7               MR. MURALI:  Okay.

8               THE COURT:  J. Bennett you waive.

9               MR. MURALI:  Yes, Your Honor.  With regards to

10    apportionment, yes.

11              THE COURT:  Now we're on to Butler R.  We said in

12    the original chart $12,976 was the amount of the payment.

13    You say your records are only $8,000, a payment of $8,000.

14    Correct?

15              MR. MURALI:  Yes, Your Honor.

16              THE COURT:  Okay.  Well, I think we've dealt with

17    this issue previously.

18              MR. MURALI:  Yes, Your Honor.

19              THE COURT:  So the Court will just have to make a

20    decision with these as a group.

21              Let's move on to No. 36, A. Boney.

22              MR. MURALI:  Yes, Your Honor.  Here plaintiffs,

23    again, have no record of payment so it would be a similar

24    issue to Butler R.

25              THE COURT:  Well, it's a little bit different.

1          MR. MURALI:  Sorry, Your Honor.  The AC

2     plaintiffs.

3          THE COURT:  Right.

4          Mr. Copeland, do you want to make any different

5     argument in this case now that we are in Adams?

6          MR. COPELAND:  Well, Your Honor, in Adams there's

7     a consent judgment as well that contains the same language,

8     and moreover I think the same issue is that this was an

9     oversight, and the time to amend -- attempt to correct an

10     error maybe under Rule 60B seems the most likely place to do

11     it as long as it's passed, and there hasn't been a showing

12     of any justifiable reason under Rule 60B.

13          And if I could say one more thing, and I just want

14     to stress that because it's a different -- it's not the

15     difference between a previous cap and the new cap, as Judge

16     Lamberth has concluded it.  It's an additional -- it's sort

17     of the entire amount purportedly that wasn't paid.

18          Contemporaneous records reflect that we didn't

19     have it.  We asked for them.  We didn't get them.  We paid

20     what we got, and there was no effort in the intervening

21     years to provide that information, and we just think it's

22     too late at this point.

23          THE COURT:  Okay.  Let's go to D. Carswell, 37.

24          MR. MURALI:  Yes, Your Honor.  We have counted two

25     HODs for D. Carswell that are provided in the packet.

1          THE COURT:  Mr. Copeland?

2          MR. MURALI:  And there are -- I don't believe they

3     are in any other multiple-plaintiff case.

4          MR. COPELAND:  Well, these HODs were discovered

5     recently.  I think this is really an issue of at the time --

6     at the time that all of this was being done in the Adams

7     case, the invoices were requested, they were not provided,

8     and so it's the same argument that I think we've made on the

9     other cases.

10         THE COURT:  Right.  Well, but it's -- yes, is it

11    were they not provided, is the question?

12         MR. COPELAND:  And our position is there's no

13    evidence -- there's evidence in the record that we -- that

14    they were not provided.  There's nothing contrary from

15    plaintiffs in this case that they were provided.

16         MR. MURALI:  Your Honor, Mr. Drake has maintained

17    that in every instance of an HOD -- of a successful HOD, he

18    has filed an invoice.  The same would have been true for

19    Carswell D.

20         And the fact is the District had access to these

21    HODs just as the plaintiffs did.  These documents were not,

22    you know, exclusive to us.  These are public -- or private

23    sealed records.

24         THE COURT:  So the fact that they weren't included

25    on the sheets that we've relied upon was just an error.

1      MR. MURALI:  I'm not sure because they weren't

2  prepared by plaintiffs, Your Honor.  So it might have been

3  defendant's error, but certainly, based on Mr. Drake's

4  attestations, he would have provided an invoice.

5      THE COURT:  But he doesn't have an invoice here

6  today.

7      MR. MURALI:  There's no invoice here today, Your

8  Honor.  However, we do have the actual HODs, which I think

9  speak for themselves.

10      THE COURT:  Okay.  A. Clark.

11      MR. MURALI:  With regard to A. Clark, it appears

12  to be yet another issue with the same plaintiff being

13  counted twice so I think there's -- A. Clark appears in AC

14  as well.

15      THE COURT:  So yes.  I have -- we've been able --

16  among the five HODs that were submitted, four were in AC,

17  and one was in Adams.

18      MR. MURALI:  Right.  That is correct.

19      THE COURT:  So I think we're all in agreement on

20  that.

21      MR. MURALI:  Yes.

22      THE COURT:  Okay.  No. 39, A. Clark with regard to

23  the payment $12,208.  You add costs.

24      MR. MURALI:  Yes.  Again, Your Honor, that goes

25  back to the apportionment issue.  Plaintiffs are willing to

1    waive any apportionments.

2             THE COURT:  Okay.  All right.

3             We're to Curtis-Walker R., No. 40.  In agreement?

4             MR. MURALI:  Yes, Your Honor.

5             THE COURT:  41.  This is another no payment case.

6             MR. MURALI:  Yes, Your Honor.

7             THE COURT:  All right.  I'll just have to deal

8    with those as a group.

9             MR. MURALI:  Yes, and I believe you asked for

10   clarification with regards to the objection in the last

11   hearing, so just for the record, there was -- there's an

12   issue of neither the amount owed or costs were paid so it

13   would have been $4,000 owed on the HOD plus $60 in costs

14   that are owed for a total of $4,060.

15            THE COURT:  Which one are you on?

16            MR. MURALI:  Sorry, Your Honor, Curtis-Walker R.

17            THE COURT:  Okay.  No. 41.

18            MR. MURALI:  Yes.

19            THE COURT:  I didn't know that.  Is that something

20   I brought up at the last --

21            MR. MURALI:  Yes, Your Honor.  You requested

22   clarification.

23            THE COURT:  Okay.  So say it again.

24            MR. MURALI:  With regard to Curtis-Walker, because

25   there's one HOD at issue, and plaintiffs are claiming no

1    payment, there is also no payment of costs in that case, so

2    it would be a total of $4,060 that is owed.

3              THE COURT:  Okay.  Curtis-Walker S., 42.  We're in

4    agreement.

5              MR. MURALI:  Yes, Your Honor.

6              THE COURT:  No. 45?

7              MR. MURALI:  It's again the apportionment issue,

8    Your Honor, and plaintiffs will waive.

9              THE COURT:  Well, on that one you actually admit

10   that they did pay $103, right?

11             MR. MURALI:  I'm sorry?

12             THE COURT:  On No. 45.

13             MR. MURALI:  I'm sorry, I think I'm looking at the

14   wrong one.

15             THE COURT:  No. 45.  Essentially you admit to $103

16   in costs were paid.

17             MR. MURALI:  Yes, Your Honor.  Yes.  With regard

18   to that plaintiff, I think we found payment of the $103.

19             THE COURT:  All right.  So I'll amend the chart.

20             MR. MURALI:  Okay.

21             THE COURT:  D. Drew.  Same issue.  You found $92

22   in costs were paid.

23             MR. MURALI:  Yes, Your Honor.

24             THE COURT:  All right.  So I'll amend the chart.

25             MR. MURALI:  $92.95 in costs.

1          THE COURT:  That's right.

2          No. 48, D. Elliott.  I had found eight HODs.  You

3     found seven and agree to use the lower number; is that

4     right?

5          MR. MURALI:  Yes, Your Honor.  We searched the

6     record and only found seven HODs.

7          THE COURT:  Okay.  So I'll amend the chart to

8     include seven instead of eight.

9          MR. MURALI:  Yes, Your Honor, absent showing of an

10    additional HOD.

11         THE COURT:  Right.  As far as I know, that's where

12    we are at.

13         M. Faulkner, No. 50.

14         MR. MURALI:  Yes, Your Honor.

15         THE COURT:  We're in agreement.

16         MR. MURALI:  Yes, Your Honor.

17         THE COURT:  No. 51, S. Grimes.  I said one HOD.

18         MR. MURALI:  Yes, Your Honor.

19         THE COURT:  You provided two.  One under an

20    adopted name, and one under a birth name.

21         MR. MURALI:  Yes, Your Honor.  The Plaintiff

22    Grimes was originally J. Johnson, and the first HOD was

23    under birth names.  Then Plaintiff Grimes was eventually

24    adopted by a Ms. Grimes and had the adopted name of Grimes.

25    So there are two HODs with regard to this plaintiff.

```
 1                    THE COURT:  Okay.  I only have -- so do I have the

 2      S. Johnson HOD?

 3                    MR. MURALI:  Yes, Your Honor.  I believe Johnson

 4      is in the packet.

 5                    THE COURT:  Okay.  Let's try to find it.  It's not

 6      in my packet.

 7                    MR. MURALI:  One moment, Your Honor.

 8                    (Pause)

 9                    MR. DRAKE:  Your Honor, if I may, I can't find --

10      I don't find a Johnson in our stack, but Shantell Johnson

11      and Shantell Grimes are one and the same person.  She was

12      adopted.

13                    THE COURT:  I don't doubt it.  I just need the

14      HOD.

15                    MR. DRAKE:  We have two HODs.  I don't know why we

16      don't have it here.  I can't find it at the moment, but I

17      represent to the Court there are two HODs there, but I'll

18      continue to look through my files.

19                    THE COURT:  All right.  Mr. Copeland, you don't

20      have this HOD?

21                    MR. COPELAND:  No.

22                    THE COURT:  All right.  Well, right now that's one

23      HOD because I have not seen another one.

24                    S. Grimes, Footnote 52.

25                    MR. MURALI:  Yes, Your Honor.
```

1          THE COURT:  This is just the other issue.  There

2     was payment made under one of the plaintiffs' two surnames;

3     is that right?

4          MR. MURALI:  That's correct, Your Honor.

5          THE COURT:  But you admit that the payment was

6     made.

7          MR. MURALI:  Sorry, Your Honor.

8          Yes, Your Honor.  It's just a clarification of --

9          THE COURT:  Okay.  So that's just a clarification.

10         MR. MURALI:  But plaintiffs are maintaining their

11    claim for two HODs.

12         THE COURT:  Understood.  Understood.  We don't

13    have it right now.  Maybe you will find it.

14         MR. MURALI:  Yes, Your Honor.

15         THE COURT:  Hopkins A., No. 53.

16         MR. MURALI:  Yes, Your Honor.  Plaintiffs' record

17    reflects no payment, and so plaintiffs are claiming that

18    $12,000 is owed up to the fee cap plus $105 in costs.

19         THE COURT:  Okay.  Well, where does -- I

20    understand the whole no record of payment.

21         MR. MURALI:  Yes, Your Honor.

22         THE COURT:  What evidence do you have with regard

23    to $105 of costs rather than $69 of costs?  I mean, where

24    does that come from?

25         MR. MURALI:  Your Honor, we're willing to waive

1    the $69.

2            THE COURT:  Okay.  So this is just the issue of no

3    payment versus --

4            MR. MURALI:  That's right, Your Honor.

5            THE COURT:  -- the District's record of payment.

6    Got it.

7            Isaac E.

8            MR. MURALI:  Yes, Your Honor.

9            THE COURT:  54.

10           MR. MURALI:  Yes, Your Honor.  So here --

11           THE COURT:  I said three HODs, but this is another

12   one of those where you've got E. Isaac in the multiple-

13   plaintiff case and also the individual, his -- his or her

14   own individual case.

15           MR. MURALI:  Yes, Your Honor.  And so like Allen,

16   plaintiffs would request that everything be moved to the

17   individual case in terms of accounting.

18           THE COURT:  Okay.  And also in terms of payment as

19   well, right?

20           MR. MURALI:  Yes, Your Honor.

21           THE COURT:  And there's a total of how many HODs

22   then?  I mean, we have four.  We said four on our chart.  If

23   you add up his individual case and this case, we have three

24   here and one elsewhere.

25           MR. MURALI:  Yes, Your Honor.

1          THE COURT:  So you're going to want four.

2          MR. MURALI:  Let me confirm that.

3          THE COURT:  That's based, again, on the city's

4     charts.

5          MR. MURALI:  Yes, Your Honor.  But if we have a

6     physical count that is less than that, we --

7          THE COURT:  Well, it's up to you.

8          MR. MURALI:  Let me consult with Mr. Drake.

9          (Pause)

10         MR. MURALI:  Your Honor, if we can only find

11    three, we can only find three so...

12         THE COURT:  Well, you only provided two.

13         MR. MURALI:  Let me see.

14         Your Honor, we can only find two as well, and

15    we're unsure where the third one came from, but it's in Your

16    Honor's record from you as well.

17         THE COURT:  Well, let me hear from you on that.  I

18    mean, your document, if I were to say it's -- I have said

19    it's prima facie evidence of payment.  What do I do with the

20    fact that you also have got some information in there with

21    regard to HODs?  It's your burden, but why can't that

22    document --

23         MR. COPELAND:  It is, Your Honor.

24         THE COURT:  -- be used --

25         MR. COPELAND:  It can be.

1        THE COURT:  -- to demonstrate the HODs?

2        MR. COPELAND:  It can.  If plaintiffs choose not

3   to, that's their choice, but our position is that we would

4   rely upon the documents that we put into the record, or our

5   documents that were put into the record by Mr. Drake will

6   stand by themselves.

7        THE COURT:  All right.  Your position is you just

8   want two?

9        It's not a trap.  I don't mean to...

10        All right.  Ultimately, if I decide that I'm going

11   to rely upon the documents submitted by the District, I'm

12   going to give you the full amount of the HODs that are in

13   there.

14        MR. DRAKE:  I'd be very happy about that.

15        THE COURT:  I know you're not asking for it.

16        MR. DRAKE:  I can only tell the Court what I

17   found.

18        MR. MURALI:  Thank you, Your Honor.

19        THE COURT:  No. 55.

20        MR. MURALI:  Yes, Your Honor.  I believe this is a

21   continuation of the objection in 54.  It's listed at Note

22   93, and that is with regard to the amount paid.

23        Plaintiffs have acknowledged in their original

24   objection that the defendant had paid $13,596.50 for Isaac

25   E., and as such, defendant would owe nothing further at this

1    time.

2              THE COURT:  Okay.

3              MR. DRAKE:  And I would once again go back to the

4    issue of not -- plaintiffs requesting the Court not credit

5    overpayment.

6              THE COURT:  Understood.  That's a different issue

7    though.

8              MR. DRAKE:  Yes, sir.

9              THE COURT:  But you are conceding that there's a

10   $2,000 payment.

11             Okay.  K. Jenkins.  We're in agreement on that.

12             MR. MURALI:  Yes, Your Honor.

13             THE COURT:  Second K. Jenkins at No. 57, I think

14   I'm going to acknowledge the error.  I think there was an

15   error there on my part; so we'll put our charts together,

16   and we'll correct that.

17             MR. MURALI:  Understood.  Thank you, Your Honor.

18             THE COURT:  No. 58 for M. Jenkins.  I think we're

19   in agreement at this point.

20             MR. MURALI:  Yes.  Yes, Your Honor.  Yes.  Again,

21   the plaintiffs don't want to double-count anything so...

22             THE COURT:  Okay.  M. Jenkins, No. 59, I think

23   that's our error so we're going to correct that.

24             MR. MURALI:  Okay.  Thank you, Your Honor.

25             THE COURT:  No. 60, Footnote 60, we're in

1    agreement.

2           MR. MURALI:  Yes, Your Honor.

3           THE COURT:  So now we're to Footnote 61, D. Jones.

4           MR. MURALI:  Yes.

5           THE COURT:  I said one HOD.  You've provided four.

6           MR. MURALI:  Yes, Your Honor, and there's also a

7    Jones W. and a Jones C. in Abraham and AC respectively.

8           But with regards to Jones D., there are four

9    physical HODs that have been provided to the Court and to

10   the defendant at the last hearing.

11          THE COURT:  But this is the same Jones D. who is

12   an individual case, right?

13          MR. MURALI:  Yes, Your Honor, so let me double-

14   check that.

15          (Pause)

16          MR. MURALI:  Yes, Your Honor.  It's the same

17   plaintiff as the individual.

18          THE COURT:  So we've got one here and one in the

19   individual case.

20          MR. MURALI:  Yes, Your Honor.

21          Yes, Your Honor.

22          THE COURT:  Yes, there's two.

23          MR. MURALI:  Right.

24          THE COURT:  But now you've got four.

25          MR. MURALI:  Yes, Your Honor.

```
 1              THE COURT:  So what would you want me to do with

 2      these four?

 3              MR. MURALI:  Plaintiffs would request that they

 4      all go to the Jones individual case --

 5              THE COURT:  Okay.

 6              MR. MURALI:  -- and add the two HODs from the

 7      packet that plaintiffs have provided.

 8              THE COURT:  Mr. Copeland?

 9              MR. COPELAND:  There's only two, Your Honor.  The

10      one that's listed fourth in the packet is a repeat of the

11      first one.  It's a duplicate.  And the second one listed is

12      again from May of 1997, which is outside of the time where

13      there was a fee cap in place.

14              THE COURT:  Okay.  Mr. Drake or...

15              MR. MURALI:  Your Honor, plaintiffs concede both

16      those points.  The one was Ninety --

17              THE COURT:  Of the four, one was a duplicate, and

18      one was back in '97.

19              MR. MURALI:  Yes, Your Honor.

20              THE COURT:  So we'll drop those two, and we'll

21      have two.

22              MR. MURALI:  Yes, Your Honor.

23              THE COURT:  Do you want me to keep it the same, or

24      both in the D. Jones?

25              MR. MURALI:  Both in D. Jones.
```

```
 1                    THE COURT:  Okay.

 2                    MR. MURALI:  Thank you.

 3                    THE COURT:  Okay.  Then we're to No. 62, which

 4     deals with -- I think we're just going to amend the chart

 5     with the admission regarding payment.  There's a slight

 6     difference --

 7                    MR. MURALI:  Yes, Your Honor.

 8                    THE COURT:  -- but we'll make that.

 9                    63.  We agree with regard to the HODs.

10                    64.  One HOD.  This is in D. Logan.  You've

11     provided two.

12                    MR. MURALI:  Yes, Your Honor.

13                    THE COURT:  Okay.  Mr. Copeland?

14                    MR. COPELAND:  I'm sorry, what --

15                    THE COURT:  I'm on D. Logan, Footnote 64.  They

16     did provide two HODs.  They're different dates.

17                    MR. COPELAND:  Because one of them is in 2004, the

18     first one listed at the time where the fee cap was already

19     $4,000.

20                    THE COURT:  I'm sorry?  You lost me.  What?

21                    MR. COPELAND:  Sure.  There are two HODs included.

22                    THE COURT:  One's November 28th of 2003.  The

23     other one is April 12th of 2004.

24                    MR. COPELAND:  In 2004, the fee cap had been

25     raised to $4,000.
```

1          THE COURT:  I don't know what that means.  So?

2          MR. COPELAND:  We're talking about amounts that

3     are -- additional amounts that are due because of the

4     retroactive raising of the fee cap from a lower amount.  In

5     2004 the fee cap was already at -- excuse me, was already at

6     $4,000 so there's no delta of additional money that should

7     be owed on this HOD.

8          THE COURT:  If you paid it.

9          MR. COPELAND:  Yes.

10          THE COURT:  It's not on your dispute summary

11     sheet.  Why do I -- why do I accept that you paid anything?

12     Why isn't that zero?  What evidence do you have that you

13     paid it?

14          MR. COPELAND:  Well, also this is in Adams.  One

15     second, let me...

16          Because Adams was -- excuse me, Adams was filed in

17     2003, so this would not have been part of the Adams case

18     because it's an HOD from 2004.

19          THE COURT:  So it post-dates.

20          MR. COPELAND:  Correct.

21          THE COURT:  Okay.  I guess that's the way I think

22     about it.

23          But I think that there are others that are also

24     post-dated.  I mean, there are HODs in Adams's case that are

25     on the dispute summary sheet that post-date the complaint.

1    There are a lot of them, I'm told.  It doesn't seem to

2    matter.

3            I mean, I know you weren't around.

4            MR. COPELAND:  Right, but I would say that,

5    coupled with the fact that this was issued at a time where

6    there was -- Mr. Drake would have received $4,000 for this

7    HOD, he could have invoiced it separately in a separate

8    case.  Maybe there was no need.  The parties were able to

9    settle it without need of filing suit.  I don't know.  I

10   think the burden is on him to establish that fact.

11           The Court has one HOD that we concede from a time

12   when the fee cap was less than $4,000, so additional money

13   would be owed on it.

14           THE COURT:  The burden is on you to establish

15   payment.  The burden is on Mr. Drake to establish HODs.

16           MR. COPELAND:  Correct.

17           THE COURT:  He's come forward with another HOD

18   that's in the time frame and involves a student that he

19   tells me is part of this case, and there's no easy way to --

20   I mean, you've done quite well so far to distinguish it.

21   And the mere fact that it post-dates, it didn't seem to --

22   my understanding is there are other HODs in this case which

23   post-date the filing of the complaint that nevertheless the

24   city paid.

25           I hear you.  Well, there might be some explanation

1    for it, but if I accept your dispute summary sheets, or

2    whatever we want to call them, and give them some weight,

3    then why would I not accept an HOD which on its face would

4    seem to be like the others but was somehow missed.

5              MR. COPELAND:  Because, number one, it's

6    plaintiffs' burden to establish that the HOD is tied to this

7    case.  There's nothing in it on its face.  It establishes it

8    as an HOD that post-dates the filing of the lawsuit, but

9    there is nothing to it that connects it to this case.  On

10   its -- there's nothing on the face of this HOD.

11             THE COURT:  I don't know what that would be.

12   There's nothing to any of the HODs that you said were okay

13   that connects it to this case other than the fact that it's

14   on your dispute summary sheet.  I don't know what's going to

15   be on the face of these because the HOD is not going to say,

16   you know, "And here's the federal court case that this is

17   related to."  I mean, that's an issue without -- for this

18   whole case since one of the things that causes confusion is

19   that it's organized in your mind and your mind and in the

20   hearing officer's mind as, you know, these are HODs.

21   They're not organized by federal case number, and yet that's

22   what my job is to do.  So it makes it confusing.

23             MR. COPELAND:  I understand Your Honor's concern,

24   but I do think -- I would fall back that they're -- that the

25   proof need not be the HOD itself.  If Mr. Drake had a

1    record, a litigation something, a litigation file

2    explaining, you know, that it was part of this case and that

3    this HOD was part of this case, any kind of proof, anything,

4    that could connect because we have no way to disprove that.

5            THE COURT:  You sound like Mr. Drake.

6            Okay.  Let me hear Mr. Drake for a moment.  He has

7    no way to disprove your payments either.

8            MR. DRAKE:  Well, again, I'm having trouble

9    hearing Mr. Copeland.

10           THE COURT:  The issue here, Mr. Drake, is on the

11   second D. Logan HOD -- you submitted one.  You've produced

12   two.  The second one, however, is dated April 12th of 2004,

13   which post-dates the complaint in the Adams case.

14           MR. DRAKE:  Yes.

15           THE COURT:  So the argument is, well, that can't

16   possibly be part of the district court case if it came

17   however later it was.

18           THE LAW CLERK:  It's one week later than the --

19           THE COURT:  It's some significant time after the

20   complaint was filed and one week later than any other HOD in

21   the DSS.

22           That said, the concept -- what I thought was a

23   clear line weeks ago -- that any HOD that comes after the

24   filing of the federal complaint can't be part of the federal

25   case, that doesn't seem to be correct because the city's own

1     documents show that they were paying for HODs in Adams that

2     occurred after the filing of the federal suit in Adams.

3             MR. DRAKE:  I couldn't have said it better myself,

4     Your Honor.

5             In addition to that, when I've -- when complaints

6     were filed in federal court, HODs weren't listed.  The

7     plaintiffs were listed, but HODs weren't listed, and so in

8     that regard -- well, I'll really say no more.  I'll simply

9     say that's how it was filed.  The HODs weren't there, and

10    I'll simply accept the Court's statement in that regard.

11            THE COURT:  You said the second HOD was, in fact,

12    part of this case.

13            MR. DRAKE:  I would consider it to be part of the

14    case because when we finally -- when we finally settled in

15    Adams, and I believe Adams was a consent judgment as well,

16    that -- and I don't have -- I do have that.

17            The whole idea was at that time that we had --

18    that we were resolving everything with regard to, I

19    believe -- let me be sure what I'm saying.

20            I believe that we were settling everything with

21    regard to each particular child.  I'm not sure on that.  I

22    can't say for sure, but that would be my recollection.

23            THE COURT:  Was the consent judgment in Adams

24    after April 12th of 2004?

25            THE LAW CLERK:  They were both in 2005.

1      THE COURT:  So -- okay.  So this fell in that gap

2   between the filing of the complaint and the consent

3   judgment.

4      MR. DRAKE:  Adams, I have -- it was entered May

5   25, 2005.  That's the consent judgment for the

6   multiplaintiffs' case, so that would post-date -- I don't

7   have.  I don't have the HOD.  The HOD was prior to that; is

8   that correct?  The HOD's date.

9      THE COURT:  Uh-huh.

10      MR. DRAKE:  My view would be that the HODs that

11   should be included there -- and, again, I go back to the

12   order from the judge.  The judge said, "Pay" -- "Wherever

13   you didn't pay $4,000, pay it," and so I don't see how there

14   could be any realistic question about that.  Otherwise we're

15   left with an HOD that would be an orphan.

16      THE COURT:  Yes, okay.  Understood.  All right.

17      Let's go to J. Lyons.  No. 65.  My chart said five

18   HODs.  You've indicated you've provided six.

19      MR. MURALI:  Yes, Your Honor.

20      THE COURT:  I only count four.

21      MR. MURALI:  Just one moment, Your Honor.

22      (Pause)

23      MR. MURALI:  Your Honor, on recount we only found

24   four as well so I think we'll go with four.

25      THE COURT:  Well, I know you're going to go for

1    four, but if I accept the use of the city's documents, I'm

2    going to give you five.

3              MR. MURALI:  Understood.

4              THE COURT:  Okay.  Mr. Marbury or M. Marbury, No.

5    66.  Zero HODs.  You've provided four.

6              MR. MURALI:  Yes, Your Honor.

7              THE COURT:  But this person is also plaintiff in

8    the Abraham case.

9              MR. MURALI:  I believe that's correct.

10             THE COURT:  And all four of the HODs provided are

11   covered in the Abraham dates; that is, the dates of service

12   listed on them --

13             MR. MURALI:  Yes, Your Honor.

14             THE COURT:  -- are the same as the dates of

15   service listed in the -- you know, in the government's

16   documents.

17             MR. MURALI:  Yes, Your Honor, and to that extent

18   we would say that, to avoid double-counting, all the Marbury

19   HODs would go to Abraham.

20             THE COURT:  Essentially with regard to 66 here,

21   that's been resolved.

22             MR. MURALI:  Yes, Your Honor.  We'll go with what

23   the Court has indicated.

24             THE COURT:  Right.  C. McDowell, Footnote 67,

25   three HODs.

1            MR. MURALI:  Yes, Your Honor.

2            THE COURT:  It appears here -- this is like one of

3      the other prior cases.  You want to move these three HODs

4      out of this case --

5            MR. MURALI:  Yes, Your Honor.

6            THE COURT:  -- and put them in the individual

7      case.

8            MR. MURALI:  That's right.

9            THE COURT:  But between these two cases we have

10     four HODs, according to the government's documents, but

11     you've only provided us with three.

12           MR. MURALI:  Yes, Your Honor.

13           THE COURT:  So I think similarly, if I accept the

14     government's paperwork, then I'm going to have to give you

15     credit for the four.

16           MR. MURALI:  Yes, Your Honor.

17           THE COURT:  But you would want me to move all of

18     them into C. McDowell individual case.

19           MR. MURALI:  That's correct, Your Honor.

20           THE COURT:  Is C. McDowell the same as D.

21     McDowell?

22           MR. MURALI:  I'm not certain.

23           THE COURT:  It appears to be the child's first and

24     middle name.

25           MR. MURALI:  Your Honor, there should be only one

1    McDowell.

2              THE COURT:  Yes.  I think the initials refer to a

3    first and a middle name.

4              MR. MURALI:  Okay.

5              THE COURT:  Okay.  We're going to go to 68.

6              MR. MURALI:  Yes, Your Honor, A. Moore.

7              THE COURT:  We're in agreement on the three HODs.

8              MR. MURALI:  Yes, Your Honor.

9              THE COURT:  I think this is an issue over

10   apportionment as between fees and costs, right?

11             MR. MURALI:  Yes, Your Honor.

12             THE COURT:  You're going to waive on that.

13             MR. MURALI:  Yes, Your Honor.

14             THE COURT:  Okay.  Nesbit P.  It's with regard to

15   the number of HODs.  I said seven.  You admit to seven.

16             MR. MURALI:  Yes, Your Honor.

17             THE COURT:  You only provided four.

18             MR. MURALI:  Your Honor, we were relying on the

19   number in the dispute summary sheet --

20             THE COURT:  Okay.

21             MR. MURALI:  -- as noted in the objection.

22             THE COURT:  Okay.  Then as for the number, I think

23   I've heard everybody on that.

24             MR. MURALI:  Yes, Your Honor.

25             THE COURT:  So I'm not going to go back through

1    that.

2              Let's go to L. Perkins, No. 71.  Similar to P.

3    Nesbit.

4              MR. MURALI:  Yes, Your Honor.

5              THE COURT:  Three HODs.  You admit to three HODs.

6    You only provided two in the packet.

7              MR. MURALI:  Yes, Your Honor.  Again, plaintiffs

8    are accepting the FAPE from the dispute summary sheet.

9              Let me consult with Mr. Drake briefly.

10             (Pause)

11             THE COURT:  I mean, I do wonder if anyone's done

12   the calculation.

13             (Pause)

14             MR. MURALI:  Your Honor, with regards to L.

15   Perkins, we would maintain only two HODs.

16             THE COURT:  Okay.

17             I do wonder, you know, given that you have

18   fewer physical HODs you can find at this point in time than

19   is reflected in many of these -- for many of these

20   plaintiffs --

21             MR. MURALI:  Your Honor, I believe that was an

22   issue with -- when we were counting the HODs, we had two

23   separate stacks, and something --

24             THE COURT:  I'm just wondering if you

25   ultimately -- if it's sort of a wash.

1          MR. MURALI:  I'm not so --

2          THE COURT:  For every dispute you have over the

3    amount of payment that has been made, all of which are a few

4    thousand dollars apiece, every time the city acknowledges an

5    HOD that you can no longer prove, that that's worth four

6    grand.

7          MR. MURALI:  Yes, Your Honor.

8          THE COURT:  I do wonder if -- how it works out if

9    I -- we just go with the documents that the city has

10   provided.  I mean, I think you make out okay.  It's all a

11   wash.

12         This is just me speaking out loud.

13         MR. MURALI:  Understand.

14         THE COURT:  Okay.  No. 72.

15         MR. MURALI:  Plaintiffs would like to have as

16   accurate an accounting as possible.

17         THE COURT:  Well, so do I.  I agree with that.

18         All right.  No. 72.  This is another no payment

19   case.

20         MR. MURALI:  Yes, Your Honor.

21         THE COURT:  So we'll skip that.  I've heard you on

22   that.

23         MR. MURALI:  Okay.

24         THE COURT:  73, two HODs in the chart.  You

25   provided three.

```
 1              MR. MURALI:  Yes, Your Honor.

 2              THE COURT:  I'll hear Mr. Copeland on this one.

 3              Mr. Copeland, your dispute summary sheet, or what

 4     I've been calling a dispute summary sheet, the document that

 5     I've been relying upon, says that the November 21, 2001, HOD

 6     was unsuccessful, but the HOD itself does indicate that some

 7     relief, though not all, was awarded, which I would think

 8     would be sufficient for a prevailing party status, but I'll

 9     hear from you.

10              MR. COPELAND:  We would contend that they were not

11     a prevailing party.  There was incidental relief, procedural

12     relief.  It does not change the legal relationship between

13     the parties and that they didn't --

14              THE COURT:  Well, let's just look at this then.

15              MR. COPELAND:  Sure.

16              THE COURT:  Shaw S.  It's the November 21.

17              MR. COPELAND:  Yes.  And I have it, Your Honor.

18              THE COURT:  Okay.  I'm looking at it now.

19              MR. COPELAND:  This is not a -- what is -- the

20     hearing officer orders the parties to have a meeting to get

21     the process started, and the only relief, substantive

22     relief, is the request for an alternative special education

23     placement and tutorial services, and they were both denied.

24              MR. MURALI:  I'm sorry, Mr. Copeland.  Can you

25     clarify which page?
```

1            THE COURT:  We're looking at the November 21,

2       2001 --

3            MR. MURALI:  Thank you, Your Honor.

4            THE COURT:  -- HOD for S. Shaw.

5            MR. COPELAND:  And that's buttressed by the fact

6       that the final conclusion of law, just above the decision

7       portion, establishes the DCPS was providing the student with

8       a FAPE.

9            THE COURT:  Is it the city's position that there

10      has to be a denial of FAPE for you to be a prevailing party?

11           MR. COPELAND:  Not necessarily.

12           THE COURT:  Okay.  Well, what is your position

13      then?

14           MR. COPELAND:  With this, yes.  In this case there

15      is.

16           It's -- I can't come up with an example on the

17      spot, Your Honor.  I think it's conceivable that there could

18      be a sufficient -- that there could be an issue that could

19      entitle someone to be a prevailing party; for example,

20      something like a preliminary injunction, which is not a

21      final.

22           Like an interim award can change the legal

23      relationship between the parties sufficient to make that

24      person a prevailing party for that portion of the case, but,

25      again, if -- the due process complaint here failed to

1     establish that the school was not providing her with a FAPE,

2     and in that way I don't think she was a prevailing party,

3     and she wouldn't be entitled to fees.

4          THE COURT:  Okay.  Well, the Court or the hearing

5     officer orders an IEP meeting, wants to have the student

6     attend, some other individual -- don't know who that is --

7     attend, and shall administer the Vineland -- I don't know

8     what that is -- to the student and the classroom teacher

9     prior to the placement meeting, the IEP meeting, so

10    essentially they're ordering an IEP meeting.

11         Okay.  Mr. Drake, Mr. Copeland says that's not a

12    prevailing party.

13         MR. DRAKE:  Well, I appreciate that.

14         THE COURT:  There's no denial of FAPE.  All they

15    did was order up an IEP meeting and a Vineland, whatever

16    that is.

17         MR. DRAKE:  But if one could put themselves back

18    in this timeframe, it was nearly impossible to get DCPS to

19    do anything that we wanted them to do.  The accomplishment

20    of getting an IEP placement meeting was all important.

21         THE COURT:  Doesn't that happen every year anyway?

22         MR. DRAKE:  No, Your Honor.  Back then you got it

23    when they decided you can have it, no matter what the law

24    said.  The hearing officer said you shall do it.  But beyond

25    that, in case -- I'm sure -- Mr. Copeland obviously was not

1    there at that time, but if he were to speak to some of the

2    people with DCPS, the Vineland was critically important,

3    critically important, to determine the intellectual level of

4    the child.  Just to accomplish getting that evaluation was

5    critical.

6           Absolutely we prevailed in there.  There's just no

7    way.  We got substantial benefit.  Without this HOD this

8    child was at risk of going down the path that so many others

9    went.  Because we got this HOD, we had an opportunity for

10   intervention.

11          The parent prevailed.  No question about it.  And

12   to say that they shouldn't pay for this is, again, I'll use

13   the word unconscionable.

14          THE COURT:  Okay.  For this one I'm going to ask

15   you to submit the full HOD --

16          MR. DRAKE:  Okay.

17          THE COURT:  -- because we have a dispute over

18   whether you're prevailing.  And I'll have the same request

19   for any -- I think this is the first one that we've had

20   where there's a real dispute about whether or not you're a

21   prevailing party, but for any future ones I'm going to make

22   the same request so I can review the entire decision before

23   I make my decision about whether or not you were prevailing.

24          Okay.  That takes us through -- what number were

25   we on?  That was 73.

1           We're out of time.  It's 5:00.  We have to close

2      down so we need to pick another date because we're not done.

3      We've got another 25 or so more of these to go through, and

4      we have to do that at another session.

5           So I want to pick a date.  I want it to be a quick

6      date because I need to get this done.  I want to get this

7      done by the end of this month, my opinion finished by the

8      end of this month, so I want to bring us right back together

9      as soon as we can come back in.

10          What's everyone's availability next week?

11          Madam Clerk, what do I have?  Tuesday morning?  Is

12     that open?

13          THE COURTROOM DEPUTY:  Yes.

14          MR. DRAKE:  Your Honor, I'm scheduled back in

15     Indiana for Monday.  I'm scheduled back here for Friday.

16     Could the Court possibly do this on Thursday, next Thursday?

17          THE COURT:  What's next Thursday?

18          THE COURTROOM DEPUTY:  Next Thursday the 8th, you

19     have a mediation starting at 10:00 in the morning.

20          MR. COPELAND:  I'm regrettably not available

21     Thursday afternoon.

22          THE COURT:  Let's try another date.

23          THE COURTROOM DEPUTY:  Tuesday the 13th, the

24     morning is free.  It's free Thursday morning -- I'm sorry,

25     Tuesday morning, and on the 15th you're free in the morning.

```
1            MR. DRAKE:  What about next week?  Is there
2     anything available next week?
3            THE COURT:  Well, I really want to do it next
4     week.  What about next Wednesday?
5            THE COURTROOM DEPUTY:  Next Wednesday, let me look
6     at -- oh, Judge Robinson is covering you.  She's covering --
7     are you going to be here?  Because Judge Robinson is
8     covering the criminal calendar.
9            THE COURT:  I have nothing scheduled that day.  So
10    I've got all day Wednesday?
11           THE COURTROOM DEPUTY:  Yes, it looks like it.
12           THE COURT:  Okay.
13           THE COURTROOM DEPUTY:  Because your criminal
14    calendar has gone to Judge Robinson.
15           MR. DRAKE:  That would be great, Your Honor.  I
16    can come back -- transfer back Tuesday and be available
17    Wednesday, yes, Your Honor.
18           THE COURT:  Okay.  So let's say Wednesday.
19           Are you available, Mr. Copeland?
20           MR. COPELAND:  I am.  May we please do it -- it
21    can be late morning, but in the morning, please?
22           THE COURT:  Okay.  Let's say Wednesday at 10:00.
23           MR. COPELAND:  Does that work for you?
24           MR. DRAKE:  10:00?
25           MR. COPELAND:  10:00.
```

1          MR. DRAKE:  That's fine, Your Honor.

2          THE COURT:  And we're going to start on No. 75.

3          Okay.  Wednesday at 10:00.  We'll continue until

4     then.  Thank you, Counsel.  Everyone's excused.

5          MR. DRAKE:  Thank you, Your Honor.

6               (Whereupon the hearing was

7                adjourned at 5:02 p.m.)

8

9          **CERTIFICATE OF OFFICIAL COURT REPORTER**

10

11          I, LISA A. MOREIRA, RDR, CRR, do hereby

12     certify that the above and foregoing constitutes a true and

13     accurate transcript of my stenographic notes and is a full,

14     true and complete transcript of the proceedings to the best

15     of my ability.

16     Dated this 7th day of July, 2017.

17

18                              /s/Lisa A. Moreira, RDR, CRR
                                Official Court Reporter
19                              United States Courthouse
                                Room 6718
20                              333 Constitution Avenue, NW
                                Washington, DC 20001
21

22

23

24

25